1                  industry in manufacturing flocked fabric?

2    A.    Heat setting has been around -- in flock, I became

3          aware of it in the '80's.  Late-'80's is when we

4          started to do it.

5    Q.    Okay.  I just want to get a better idea of the

6          process itself.

7    A.    Uh-huh.

8    Q.    Normally, you have the flocked fabric that comes

9          out with fibres that are in a flattened state and

10         then it's put into the heat setting process where

11         they're raised; is that correct?

12   A.    No.  No.  You have to heat set while the fibres are

13         in an erect state on the line.  If it's already

14         flattened, you're going to heat set it flat.

15   Q.    Okay.  Where on that line that we talked about

16         earlier is the heat setting station?

17   A.    Now it's right at the exit of the oven.  It was not

18         in 1981.  We didn't have a separate heat setting

19         station.  Back in 1988, we started heat setting

20         with the main oven on the final pass, high elevated

21         temperatures in excess of 400 degrees.

22   Q.    So inside the oven, you actually were heat setting

23         in 1988?

24   A.    Yes.

25   Q.    And when did that process change where you actually

1       added a heat set at the exit of the oven?

2    A.    I believe that's -- it would be early '90's.

3    Q.    Can you give me a year?

4    A.    Exactly, no.

5    Q.    Are there records that would show when the heat

6          setting element was added into the line?

7    A.    I would venture to say we should be able to find

8          exactly when that piece of equipment was purchased,

9          yes, but I don't have it to memory.

10   Q.    Would they be up in the Canadian outfit?

11   A.    Or here, one of the two.

12   Q.    When did you begin to -- strike that.

13         Does Microfibre thermal brush its flocked

14         fabric?

15   A.    When you say "Microfibres," you're talking which

16         plant?

17   Q.    I'm talking anywhere in the company.

18   A.    Yes, they do.

19   Q.    Where do they perform thermal brushing?

20   A.    They perform thermal brushing in Winston-Salem.

21         They perform thermal brushing in Jasper, Georgia;

22         Kingston, Ontario; Laarne, Belgium.

23   Q.    Is there any time where you would manufacture a

24         flocked fabric without thermal brushing?

25   A.    Oh, yes.

54

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

INTERMARK FABRIC CORPORATION  :
      Plaintiff  :
        :
      v.  :  C.A. No. 302 CV 1267 AVC
        :
MICROFIBRES, INC.  :
      Defendant  :

## AFFIDAVIT OF WILLIAM F. LAIRD

I, WILLIAM F. LAIRD, under oath and upon personal knowledge do depose and state as follows:

1.     I am the Corporate Director of Engineering for Microfibres, Inc. I have worked for Microfibres for over 25 years at its Canadian manufacturing facility, Hartford Fibres Ltd.

2.     The purpose of this affidavit is to explain the development of Microfibres' heat setting process, which it uses in connection with the manufacture of some of its flocked fabric. I was responsible for improving Microfibres' heat setting process during the early 1990s and for purchasing the equipment associated with those improvements.

3.     Heat setting is a well-known practice in the textile industry generally and in the flocked fabric industry specifically. It has been practiced by textile manufacturers for decades.

4.     Heat setting of flocked fabric is a relatively simple process. The flocked fabric consists of small nylon fibers adhered to a substrate with an adhesive. To heat set

the fabric the manufacturer must apply heat to the nylon fibers for a period of time. Generally, the nylon is heated to around 420 degrees Fahrenheit.

5.      The application of heat to the nylon fibers causes a change in the molecular structure so that the nylon develops a "memory". The nylon "memorizes" its position at the time of the heat setting. For example, if the fibers are erect during heat setting, the nylon fibers will return to that erect position after further processing such as transfer printing if the subsequent heat is less than the temperature at which the nylon was heat set.

6.      Microfibres has performed heat setting on some of its flocked fabric products since 1988.

7.      When Microfibres began heat setting its flocked fabric, it used the gas oven that was part of its flock coating line. Microfibres would increase the temperature in the last portion of the gas oven to achieve the desired heat set.

8.      There were several manufacturing disadvantages associated with using the gas oven. The temperature of the oven could not be finely controlled. It was slow to heat up and slow to cool down. The oven heat was uneven. As the fabric traveled through the oven, the fabric would turn yellowish at elevated temperatures. Other portions of the fabric, particularly the edges, would not get hot enough and would not properly heat set. As a result, the edges of the fabric would get crushed during transfer printing and would not return to an erect position. The resulting heat set flocked fabric was inferior and had to be discarded, which cost Microfibres money.

9.     To address the heat setting problems, in the Fall of 1991, Microfibres purchased some electric infrared heaters manufactured by Glenro, Inc., a company that built and sold heaters and ovens for industrial use, including heat setting flocked fabric. Microfibres bought the Glenro heaters through Winkfield Engineering, who installed them. (A copy of Glenro's proposal, which includes a quote, product specifications, and some promotional literature, is attached as Exhibit 1.) Microfibres installed the heaters at the end of one of the gas ovens in its Canadian facility during the Fall or early Winter of 1991.

10.    When Microfibres' purchased and installed the Glenro heaters, they were commercially available. Glenro was a company well known in the textile industry at that time and Glenro actively marketed its heaters to flocked fabric manufacturers.

11.    When the '021 Patent application was filed, a number of Microfibres' competitors knew about electric infrared heaters manufactured by Glenro and used them to heat set their flocked fabric. For instance, I believe Spectro Coating purchased and installed a Glenro electric infrared oven before Microfibres purchased one. Spectro used the oven to heat set its flocked fabric, just like Microfibres. In addition, I believe Intermark tested a Glenro electric infrared heater before Microfibres.

12.    Similar heaters were available from other manufacturers, including Casso-Solar Corporation, and were used by flocked fabric manufacturers. For example, I have read the deposition testimony of Luther Boyd Madren, an employee of Culp, Inc., one of Microfibres' competitors. Mr. Madren testified that in 1990 Culp purchased electric

infrared heaters manufactured by Casso-Solar and used the heaters to heat set its fabric. That use predates Microfibres' purchase and installation of the Glenro heaters. (A copy of Mr. Madren's deposition testimony is attached as Exhibit 2.)

13.    Microfibres purchased the Glenro electric infrared heaters because they offered some production advantages for heat setting flocked fabric over Microfibres' gas oven. The temperature could be finely adjusted and the oven was responsive to temperature adjustments. It heated up quickly and cooled down quickly. In addition, unlike the gas oven, the Glenro oven allowed the user to heat different portions of the fabric at different temperatures. Glenro referred to this as "zones". By adjusting the zones, Microfibres could heat the edges, which tended to cool faster, and eliminate some of the uneven heat setting. Also, the Glenro oven did not yellow the nylon fibers like the gas did at elevated temperatures.

14.    Although the Glenro oven offered some production advantages for heat setting flocked fabric over the gas oven, it did not consistently produce a better heat set fabric and still produced waste fabric because of uneven heat setting.

15.    The Glenro heaters Microfibres purchased employed a central optical infrared temperature sensor (also commercially available and supplied by Glenro) that automatically adjusted the temperature of the heaters according to the temperature at the center of the fabric. Because the center of the fabric often became hotter than the edges of the fabric, the Glenro heaters Microfibres purchased around September 1991 did not fully resolve the problem of uneven heat setting.

16.    In February, 1992, to address this problem, Microfibres purchased, at my suggestion, two additional available infrared sensors and thermometers from Glenro. Microfibres purchased the sensors and thermometers through Winkfield Engineering. (The invoice for the purchase of the sensors and thermometers is attaches as <u>Exhibit 3</u>.) We installed them on the outside edges of the Glenro heaters in April 1992 after purchasing some additional electrical cables.  (The invoice for the purchase of the cables is attached as <u>Exhibit 4</u>.)

17.    The additional heat sensors monitored the temperature of the fabric at the edge to ensure a uniform heat set.  Employees manually adjusted the temperature at the edge zones according to the information provided by the additional sensors.  We referred to this as "side-center-side" control.

18.    The side sensors, like the Glenro heaters, were commercially available. Glenro's promotional material, in fact, touted that its ovens could provide separate temperature control at the edges. (Exh. 1).

19.    We experimented with the Glenro heaters for the next several years in an effort to avoid the problem of uneven heat setting.  In 1993, after the application for the '021 Patent was filed, at my suggestion, we removed the manual temperature controls for the side zones and replaced them with automatic controls.  (A copy of the invoice for the automatic controls is attached as <u>Exhibit 5</u>.)  The new controls adjusted the temperature at the edge of the fabric automatically and therefore more quickly than the manual controls.  We experimented with settings for the automatic side controls until

we achieved a process that ensured more even heat setting and reduced our seconds waste.

20.     Beginning in January 1994, James McCulloch and I discussed the possibility of patenting the automatic side-center-side heat setting process I had developed in 1993. I do not believe the fully automatic side controls were known in the industry at that time, nor were the temperature settings we used for those side controls. Accordingly, Jim McCulloch wrote to me on February 15, 1994 and suggested that our heat setting process was sufficiently superior and unique as to be patentable. (A copy of Jim's memorandum to me dated February 15, 1994 is attached as Exhibit 6.) I responded and suggested that the heaters were known and the process was not worth patenting because of the difficulties associated with enforcing such a patent. (A copy of my undated memorandum to Jim McCulloch is attached as Exhibit 7.) We ultimately decided not to pursue a patent application and instead maintained the automatic control process as a trade secret.

21.     The use of a Glenro electric infrared heater to heat set flocked fabric was known to those skilled in the art of manufacturing flocked fabric as of July 31, 1992. The Glenro heaters Microfibres used at that time (or ones like it from companies such as Casso-Solar) were commercially available, were marketed to flocked fabric manufacturers, and were used by Microfibres' competitors for heat setting flocked fabric at the time the '021 application was filed.

22.     The additional sensors we added to the Glenro heaters were also commercially available and marketed by Glenro for use in textile applications as of July 31, 1992 for controlling temperature zones.

23.     The automatic controls we added to the Glenro oven in 1993 were also commercially available.

24.     The invention claimed by the '021 Patent is a transfer printed flocked fabric with a textile substrate and dark pigmented adhesive. The invention produced a deeper and darker colored crock-fast, transfer printed flocked fabric. The '021 Patent does not claim a particular method of heat setting flocked fabric, nor does it require that the fabric used be heat set.

25.     The Glenro electric infrared oven did not affect the quality of the invention claimed by the '021 Patent. The oven did not produce a deeper or darker colored, crock-fast, transfer printed flocked fabric. Rather, the oven, which was also being used by our competitors, produced a number of production efficiencies for manufacturing heat set flocked fabric. The electric infrared oven was faster, cheaper, smaller, and produced less waste than Microfibres achieved with its gas oven because the fabric did not get too hot and yellow, nor too cool and improperly heat set.

26.     The additional sensors we purchased in February 1992 and installed in April 1992 did not affect the quality of the invention claimed by the '021 Patent. These sensors, which were also commercially available, did not produce a deeper or darker colored, crock-fast, transfer printed flocked fabric. Rather, the sensors helped achieve

production efficiencies in the manufacture of heat set flocked fabric. It allowed Microfibres to control the temperatures along the edges of the fabric and thereby eliminate some of the uneven heat setting Microfibres experienced with the Glenro heaters alone.

27.    The automatic controls that Microfibres purchased in 1993 were installed after the application for the '021 Patent was filed. They did not affect the quality of the invention claimed by the '021 Patent either. They produced operational efficiencies in the manufacture of heat set flocked fabric by decreasing uneven heat setting.

28.    Intermark has suggested that the heat setting trials Microfibres performed in April and December of 1992 were performed on the Glenro heat setting equipment I purchased in 1991 and 1992. This is speculation on Intermark's part. At that time Microfibres was continuing to experiment with its heat setting equipment and Microfibres did not exclusively use the Glenro equipment, as Intermark claims. We continued to perform some heat setting with the gas ovens. At this point it is not possible to determine how the heat setting was performed for the April and December 1992 trials.

Signed under the pains and penalties of perjury this _31_ day of July, 2003:

William F. Laird

#55839

1    BY MR. O'BRIEN:
2       Q.  If you could turn to Exhibit No. 31.
3    Under paragraph one, again, you talk about sending
4    examples of Barrington Charcoal and Arlo Sky to
5    Hemendra Shah at Spectro Coating.  Do you see that?
6       A.  Yes.
7       Q.  Would the Barringer Charcoal have been
8    heat set?
9       A.  It was on the 1.5 Cadillac, yes, I think
10   it would have been heat set.
11      Q.  So this sample that you sent to Hemendra
12   Shah on December 6, 1991, the Barringer Charcoal
13   was a heat set flocked fabric with a dark black
14   pigmented adhesive?
15      A.  Yes.
16      Q.  Can you describe for me what heat setting
17   is?
18      A.  It's an exposure of the nylon fiber to
19   heat to almost to the melting point where the fiber
20   would stand direct and if mashed down, it would
21   recover or partially recover back to the upright
22   stance.
23      Q.  Are these samples that we looked at,
24   specifically 35, 36 and 37, are those products heat
25   set?

81

1    A.  They are most likely.  I don't know, but
2    they are marked 1.5 Cadillac.  At that time if it
3    was heat set he done it at Spectro Coating.
4       Q.  Can you explain to me in -- strike that.
5          At some point in time did Culp begin to
6    heat set flocked fabric?
7       A.  We had the capability of doing it in
8    early '90, I think it was.
9          MR. O'BRIEN:  Let me show you a document
10   dated April 4, 1989.
11      (Exhibit No. 44 marked for identification.)
12      BY MR. O'BRIEN:
13      Q.  Can you identify that document?
14      A.  It's a quotation from Casso-Solar to Earl
15   Dunn describing a proposed infrared heating system
16   with infrared quartz heaters.
17      Q.  And the quotation is attached, is that
18   what the documentation is attached to the letter?
19      A.  It looks like a description of the unit.
20   Terms and conditions -- term of purchase -- I don't
21   see a price on it.
22      Q.  So this then is a quote in 1989 for a
23   heat setting piece of machinery?
24         MR. GRIMM:  Objection to the form.
25         THE WITNESS:  It's more of a proposal.

82

1    That's what he wants to install.
2       BY MR. O'BRIEN:
3       Q.  What type of unit is he proposing that he
4    install in Exhibit No. 44?
5       A.  It's an infrared type heater element used
6    to heat set the flocked fabric with.
7       Q.  What's the particular manufacturer,
8    Casso-Solar?
9       A.  Yes, sir.
10         MR. O'BRIEN:  If I could show you another
11   document dated March 9, 1990.
12      (Exhibit No. 45 marked for identification.)
13      BY MR. O'BRIEN:
14      Q.  Can you identify that document?
15      A.  It's a letter dated March 9, 1990 to Earl
16   Dunn.  There is a reference to quotation number
17   7592/90.  It says Mr. Dunn, enclosed is our latest
18   quotation for an infrared heat setting unit.
19         This particular design is identical to
20   the Casso-Solar unit that is in place at your
21   plant.  Please note that the price is less for a
22   second unit because of no engineering charge.
23   Please feel free to call if you have any questions.
24   It's signed by John Dodd, regional sales manager.
25      Q.  What's the Casso-Solar unit that is in

83

1    place at your plant referred to?
2       A.  It was an infrared heat setting unit.
3       Q.  So before March of 1990, Culp had
4    purchased a heat setting unit?
5       A.  Yes, sir.
6       Q.  So in 1990 -- strike that.
7          Was Culp in 1990 heat setting flocked
8    fabric?
9       A.  Yes, I'm sure we were.
10      Q.  Is there a particular manner that Culp
11   heat set its flocked fabric in 1991?
12      A.  There is a couple of ways to do it, but
13   the preferred way for us was to try to heat set it
14   prior to heat transfer printing, and that was the
15   purpose of the infrared heat setting unit was to
16   run it in front of the infrared prior to it going
17   to the transfer calender.
18      Q.  Can you explain that to me, the
19   chronological order of the flock going through the
20   transfer printer and how it eventually gets to the
21   heat --
22      A.  We received the flocked fabric from the
23   supplier, in this case Spectro Coating, take a
24   greige unprepared fabric, flock fabric, and run it
25   into a holding tray or scray we call them.

84

21 (Pages 81 to 84)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

INTERMARK FABRIC CORPORATION      :
       Plaintiff                :
                                      :

           v.                        :       C.A. No. 302 CV 1267 AVC
                                        :

MICROFIBRES, INC.                     :
       Defendant             :

## AFFIDAVIT OF JAMES R. McCULLOCH

I, James R. McCulloch, under oath and upon personal knowledge do depose and state as follows:

1.     I am the President of Microfibres, Inc. I have worked for Microfibres for over 20 years.

2.     The purpose of this affidavit is to explain the improvements in transfer printed flocked fabric achieved with the invention claimed by the '021 Patent. I will also briefly describe the heat setting process developed by Microfibres' employee William Laird in the 1990s and describe the benefits that process achieved. In so doing I intend to correct Intermark's mischaracterization of my April 17, 2003 deposition testimony concerning the relationship between the invention claimed by the '021 Patent and Microfibres' heat setting process.

3.     First I want to explain my invention, which Intermark mischaracterizes. The invention I conceived and claimed in the '021 Patent is a transfer printed flocked fabric made with a textile substrate and dark pigmented adhesive. The primary novelty

in this invention is the combination of dark pigmented adhesive and transfer printing, which no one had previously thought to do. The invention was an improvement over the prior art because it allowed the production of a deep and dark colored, crock-fast, transfer printed flocked fabric. Prior to my invention no one had been able to achieve deep and dark colors that were crock fast on transfer printed flocked fabric. Before my invention the dye-stuffs rubbed off easily from transfer printed flocked fabric, which is known as crocking. Also, no one had successfully achieved deep color penetration with transfer printing without simultaneously crushing the fibers. My invention permitted the use of less dye and less pressure while still achieving a deep color. It is a commercially successful product.

4.      The '021 Patent does not claim any particular method of heat setting flocked fabric. It does not claim flocked fabric.

5.      The '021 Patent does not exclude others from heat setting flocked fabric. Others, including Intermark, are free to heat set their non-infringing flocked fabric in any manner they choose.

6.      The '021 Patent also does not require that heat setting be performed to practice my invention. You could alternatively thermal brush the fabric as the '021 Patent states. You could also leave the fabric unprocessed. That choice is up to the manufacturer depending on the fabric look that is desired. Certain segments of Microfibres' market prefer to receive the product claimed by the '021 Patent without heat setting.

7.     I was not actively involved in developing the improvements William Laird made to Microfibres' heat setting process. However, I did discuss William Laird's work with him at that time and reviewed some samples of heat set flocked fabric he manufactured. Since my April 17, 2003 deposition and in response to Intermark's request for documents relating to Microfibres' heat setting process, I have discussed our heat setting process further with William Laird and have reviewed documents that relate to the development of that process.

8.     At the time I filed the application for the '021 Patent I understood that William Laird had purchased some commercially available electric infrared heaters to heat set some of our flocked fabric as a potential substitute for the gas oven in our flock coating machine. I also understood that he had purchased some commercially available infrared sensors and thermometers that he attached to the edges of the infrared heaters. The heaters, sensors, and thermometers were known in the industry for heat setting flocked fabric and were purchased from a company called Glenro, Inc.

9.     When I filed the '021 Patent application I understood that Microfibres' gas oven did not heat set flocked fabric as evenly as Microfibres desired and created other production inefficiencies. The gas ovens had to be run slower by 10 yards a minute if we used them for heat setting. In addition, at elevated temperatures the gas oven sometimes turned flocked fabric yellowish. I understood that Bill Laird purchased the Glenro equipment in an attempt to eliminate these problems and inefficiencies from our heat set flocked fabric production line.

3

10.    The Glenro electric infrared heaters did not affect the quality of the invention claimed by the '021 Patent. The heaters did not produce a deeper or darker colored, crock-fast, transfer printed flocked fabric with dark adhesive. Rather, the heaters, which were also being used by our competitors, produced a number of production efficiencies for manufacturing heat set flocked fabric. Significantly, the electric infrared heaters were faster and increased Microfibres' production capabilities. Our customer demands at that time necessitated faster production. In addition, the Glenro equipment was small, reduced energy consumption by the gas oven, and produced less waste because the fabric did not get too hot and yellow, nor too cool and unevenly heat set. The Glenro equipment also reduced oven fires and promoted safety.

11.    Similarly, the additional sensors and thermometers we purchased in February 1992 and installed in April 1992 did not affect the quality of the invention claimed by the '021 Patent. This equipment, which also was commercially available, did not produce a deeper or darker colored, crock-fast, transfer printed flocked fabric. Instead, like the heaters, the sensors and thermometers helped achieve production efficiencies for the manufacture of heat set flocked fabric. They allowed Microfibres to monitor and manually control the temperatures applied to the edges of the fabric and thereby eliminate some of the uneven heat setting Microfibres experienced with the Glenro heaters alone.

12.    The automatic controls that Microfibres purchased in 1993 were installed after the application for the '021 Patent was filed.

4

13. When I filed the application for the '021 Patent on July 31, 1992 I did not consider the equipment purchased by William Laird to be a better method of practicing the claimed invention: transfer printed flocked fabric made with a textile substrate and dark pigmented adhesive. The commercially available equipment was simply superior at heat setting flocked fabric than the gas oven.

14. When I filed the application for the '021 Patent, I did not consider the new equipment William Laird had purchased to be unique or a secret since the equipment was commercially available.

15. When William Laird added the automatic controls in 1993 and developed various temperature parameters through experimentation, however, I did think the process was unique and thought the heat set flocked fabric it produced was better than Microfibres' prior heat set flocked fabric. I considered patenting the automatic control process in 1994 and discussed that possibility with William Laird. We decided not to patent the process for a number of reasons, including the fact that the equipment was commercially available and the fact that process patents can be difficult to enforce. We instead treated the equipment modifications and temperature parameters developed in 1993-1994 a trade secret.

16. I have reviewed Intermark's motion for summary judgment and supporting memorandum. It mischaracterizes my deposition testimony in this litigation and suggests inferences that are factually incorrect.

17.    I did not testify on page 103 that in order to achieve the deep and dark colors under my invention Microfibres developed a special heat setting process. Rather, I incorrectly testified that the heat setting process William Laird developed for Microfibres preceded my invention. It did not. William Laird began developing a heat setting process with the Glenro equipment after I conceived the invention in 1991. The heat setting process did not achieve deep and dark colors.

18.    I did not testify at page 104 that the heat setting process William Laird developed was the best way of carrying out the invention claimed by the '021 Patent. Intermark mischaracterizes my testimony. I testified that I thought the new heat setting process was the best way of heat setting flocked fabric.

19.    I did not testify on page 108 of my deposition or mean to suggest that the heat setting process developed by William Laird improved the quality of the invention claimed by the '021 Patent. Rather, I testified and meant to say that the heat setting process in place on July 31, 1992 improved several production efficiencies such as speed and a more uniform heat set.

20.    I testified that the heat setting process developed by William Laird produced several production efficiencies. However, those production efficiencies did not relate to the quality of the invention claimed by the '021 Patent but rather to the production of heat set flocked fabric.

21.    I testified that Microfibres considered the heat setting process developed by Bill Laird to be a trade secret. However, we only considered it a trade secret in 1993-1994, after the automatic controls were added and temperature parameters defined.

22.    Intermark also wrongly infers from the fact that because Microfibres was performing heat setting trials and testing in April and December 1992 that the tests only involved the heat setting equipment purchased by William Laird. That is false. Microfibres continued to use and run heat setting trials on the gas oven at that time.

23.    I honestly disclosed the best way of practicing the invention claimed by the '021 Patent to the Patent Office. Microfibres' use of Glenro heaters and sensors did not improve the invention claimed by the '021 Patent. I did not consider these equipment changes relevant to the '021 Patent or the application I filed on July 31, 1992 and do not consider it relevant now. My invention does not claim a particular method of heat setting. Moreover, the Glenro equipment was commercially available, known in the industry, and achieved only production efficiencies for the production of heat set flocked fabric like cost savings, speed, and safety.

Signed under the pains and penalties of perjury this __7__ day of August, 2003.

James R. McCulloch

#558473

7

Ronald S. Perry, Ph.D.                   CONFIDENTIAL                   September 29, 2003
                                          Bloomfield, CT

127

1    reference whatsoever in any of those depositions to

2    infrared?

3         A.    I thought there were some references to

4    infrared.

5         Q.    Was heat setting through infrared equipment

6    known in the industry?

7         A.    Yes.

8         Q.    Was it known in the industry prior to July

9    31 of 1992?

10        A.    Yes.

11        Q.    Was heat setting -- was infrared heat

12   setting with temperature controls known in the

13   industry prior to July 31 of 1992?

14        A.    Yes.

15        Q.    Was the -- are you familiar with the Glenro

16   infrared heat setting equipment?

17        A.    Only from the deposition of Dr. Brookstein.

18   I may have used it at one time.  I just can't recall.

19        Q.    Was the Glenro infrared heat setting

20   equipment available to the industry on or before July

21   31, 1992?

22        A.    Yes.

Ronald S. Perry, Ph.D.                CONFIDENTIAL                September 29, 2003
                                       Bloomfield, CT

128

1        Q.    Was the Glenro heat setting equipment with

2   temperature controls available to the industry on or

3   before July 31 of 1992?

4        A.    Yes.

5        Q.    Are you aware that Intermark itself had

6   examined such heat setting equipment?

7        A.    No.

8        Q.    Are you aware that Culp had examined such

9   heat setting equipment?

10       A.    No.

11       Q.    Would you agree, sir, that as of July 31,

12  1992 the use of infrared heat setting equipment with

13  temperature controls was not a trade secret?

14             MR. O'BRIEN:  Before I want to make

15  sure we understand what's being asked here.  Do you

16  mean the standard infrared heaters that included

17  temperature controls?

18             MR. GRIMM:  This is improper conduct.

19  Don't instruct your witness through a question to me.

20             MR. O'BRIEN:  I'm not instructing him

21  at all.

22             MR. GRIMM:  If he doesn't understand my

Ronald S. Perry, Ph.D.                 CONFIDENTIAL                 September 29, 2003
                                       Bloomfield, CT

129

1    question he can say so and I'll try and rephrase it.

2                    MR. O'BRIEN:  It's a very misleading

3    question.

4                    MR. GRIMM:  It is not.  Could you read

5    my question back, please.

6                    (Reporter read back as requested.)

7                    MR. O'BRIEN:  I'm going to object to

8    the form of the question.  The form of the question is

9    vague and ambiguous and misleading.

10                    THE WITNESS:  Did you say after 1992 or

11    before?

12                    MR. GRIMM:  Would you read my question

13    back for him, please.

14                    (Reporter read back as requested.)

15                    THE WITNESS:  Yes, I would agree.

16                    MR. O'BRIEN:  Same objection.

17        Q.    (By Mr. Grimm)  Did you review the

18    affidavits of Mr. McCulloch and Mr. Laird which were

19    submitted in opposition to Intermark's motion for

20    summary judgment related to best mode?

21        A.    No, I don't believe I read those.

22        Q.    If you didn't read them, sir, could you

Ronald S. Perry, Ph.D.         CONFIDENTIAL          September 29, 2003
                               Bloomfield, CT

137

1        Q.    Do you know the details of that?

2        A.    No.  It's a trade secret.

3        Q.    Did some controls on the infrared heat

4    setting equipment publicly available in 1992 offer

5    side center side temperature control?

6        A.    I assume so.

7        Q.    Would one skilled in the art of heat setting

8    know that they would be better off with controlling

9    temperatures on the side center control?

10                    MR. O'BRIEN:  Objection to form.

11                    THE WITNESS:  If one skilled in the

12   art, would they know?

13       Q.    (By Mr. Grimm)  Let me rephrase it.

14       A.    Yes.

15       Q.    In July of -- as of July 31, 1992 would one

16   skilled in the art of heat setting know that it would

17   be advantageous to control the temperature side center

18   side?

19       A.    Of course.

20       Q.    And would a person familiar with heat

21   setting in that July 31, 1992 time frame also know

22   that there was infrared heat setting equipment

```
 1                    taken.)

 2       Q.    Let me rephrase my question.  In order to

 3             achieve the deep dark contrasts with your

 4             invention, you also developed a heat setting

 5             process; is that correct?  I'm not asking you

 6             to describe it.  I'm asking if you also

 7             developed a heat setting process.

 8       A.    It's not deep dark contrast.  It's deep

 9             colors.

10       Q.    In order to achieve these deep colors, you

11             developed a heat setting process?

12       A.    Yes, that was part of the work that preceded

13             the invention, yes.

14       Q.    And that process involved certain pressures

15             and treatment of the heat setting, correct?

16             I'm not asking for specifics of what they

17             are, but it involved certain parameters with

18             the heat setting machine?

19       A.    Yes, different types of equipment, yes.

20       Q.    And different treatments?

21       A.    Well, there are normally different ways to

22             heat set fabrics, yes.

23       Q.    But you developed a special way to heat set

24             the fabric, correct?

25       A.    An improved way, yes.
```

103

1    Q.    And you considered that improved way to be a

2          trade secret, correct?

3    A.    Yes.

4    Q.    And that was done in roughly -- it was done

5          before 1992 or -- Strike that.  It was before

6          you filed your patent application?

7    A.    Yes.

8    Q.    I'd like to go  -- and it would be accurate

9          to state you don't disclose that trade secret

10         in your patent application, correct?

11   A.    No.  It was also not limited to the patent as

12         well, the specific way we did it.  It could

13         be done in a variety of ways.

14   Q.    But the best way was this way that you don't

15         want to disclose because it's a trade secret?

16   A.    We thought the best way was, yes, it was

17         certainly a major improvement of over how we

18         had done it in the past.

19   Q.    And do you continue to do it with respect to

20         this trade secret manner, this proprietary

21         manner?

22   A.    Yes, with modifications.  We've made numerous

23         modifications to the equipment.

24   Q.    And this proprietary method of doing it was

25         the way Mr. Laird did it roughly sometime in

104

1        the samples that Mr. Laird made?

2    A.    Well, it was a safety improvement, so it

3          minimized the risk of fires in ovens.  That

4          was a major plus.  It was more cost effective

5          to do it, and for transfer printing, transfer

6          printing traditionally was cost -- it was a

7          lower priced product and that was very

8          important.  So it was a more cost effective

9          way.  It used less energy, and it had better

10         control -- it didn't yellow the fabric as

11         much.

12   Q.    Why didn't it yellow the fabric as much?

13   A.    I think the dwell time, the temperature that

14         the nylon was subjected to was shorter.

15   Q.    So with the new improved equipment you were

16         able to create a flocked fabric for transfer

17         printing with a shorter dwell time?

18   A.    It allowed us to run higher line speeds,

19         product speeds.

20   Q.    And it prevented discoloration of the fabric,

21         correct?

22   A.    It reduced it or minimized it.

23   Q.    So it improved the quality of the product,

24         correct?

25   A.    I would say maybe yes, but the main, you know

108