UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

INTERMARK FABRIC CORPORATION :
:
v. : Case Number: 3:02 CV 1267 (AVC)
:
MICROFIBRES, INC. :

# MICROFIBRES, INC.'S MEMORANDUM OF LAW
# IN SUPPORT OF MOTION FOR PREJUDGMENT ATTACHMENT
# AND DISCLOSURE OF ASSETS

MICROFIBRES, INC.
By its Attorneys,

Brent R. Canning, Esq. (CT 23991)
William R. Grimm, Esq.
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (Fax)

RESIDENT COUNSEL:
Jeffrey W. Kennedy, Esq. (CT 16419)
Milano & Wanat
471 East Main Street
Branford, Connecticut 06405
203.315.7000 (TEL)
203.315.7007 (FAX)

**ORAL ARGUMENT
REQUESTED**

I.  **INTRODUCTION**

In this case Microfibres has sued Intermark for patent infringement. Intermark closed for business this month and in its most recent filing with the Court it stated that it is liquidating assets and "winding-up" its business. If these activities are permitted to continue Intermark will almost certainly be unable to satisfy the judgment that is likely to enter in favor of Microfibres.

For these reasons Microfibres hereby moves for an attachment pursuant to Fed. R. Civ. Pro. 64 and Conn. Gen. Stat. § 52-278d against all available assets, including real estate, bank accounts, and accounts receivable. It also moves, pursuant to Conn. Gen. Stat. § 52-278n, for an order directing Intermark to disclose property in which it has an interest. The attachment should be set at $2 million, which is well below what Microfibres will obtain at trial.

The burden for obtaining an attachment is not stringent. Microfibres only needs to show probable cause to sustain its claim. Here, there is little doubt that Microfibres will prevail because Intermark has effectively admitted infringing Microfibres' '021 Patent. Intermark's Vice-President, Wayne Turcotte, testified at his deposition that Intermark has directly infringed Microfibres' patent and that it induces its customers to infringe by supplying them with instructions and specially adapted fabric components. Intermark also infringes the patent by assembling most of the components of the patented product in the United States and selling them overseas to its German affiliate for the final component.

II.   **FACTS**

Microfibres is the assignee of United States Patent No. 5,981,021 (the "'021 Patent"), which was issued on November 9, 1999 to James McCulloch, the inventor and president of Microfibres. The '021 Patent describes an invention that was a simple but significant step forward in creating richly and deeply colored flocked fabrics that have a soft feel -- something that the industry previously had been unable to achieve. (A copy of the '021 Patent is attached as <u>Exhibit A</u>).

As the background section of the '021 Patent explains, flocked fabric is manufactured by adhering tiny nylon or polyester fibers (called flock) to a textile backing (called a substrate). One of the conventional methods of dyeing flocked fabric is to transfer print it -- a process in which paper that has been covered in dyestuffs is pressed into contact with flocked fabric. The pressure and heat from the printing process force the dye off the paper and into the flock fibers, coloring them.

Before McCulloch's invention, manufacturers were unable to transfer print on flocked fabric and create deeply and richly colored flocked fabric with a soft feel. To get deep color penetration the transfer printing process was performed at high pressure with a substantial amount of dye. Unfortunately, the intense pressure flattened and melted the flock fibers and created a flat, papery fabric that was unacceptable for most upholstery applications. Moreover, the excess dyestuffs used during the printing would rub off in a process known as "crocking."

When manufacturers tried to reduce the amount of pressure and dyestuffs (to prevent flattening and crocking), the color would not penetrate the flock deeply. The

3

lower portion of the flock fibers would remain un-dyed and the textile substrate would show through the flock -- a problem called "grin-through."

James McCulloch solved these problems. Company records show that by March 21, 1991 McCulloch conceived the idea of combining (a) transfer printing, and (b) flocked fabric in which the flock fibers were adhered to the textile substrate with dark-pigmented glue. Although transfer printing and pigmented adhesives were both known in the flocked fabric industry in March 1991, no one had previously thought to combine them.

The results were remarkable. The dark-pigmented glue colored the textile substrate and the bottom portion of the flock fibers; eliminating grin-through. Because there was no grin-through, the amount of dyestuffs and pressure could be reduced and the flock did not melt or flatten. McCulloch's invention achieved a deeply and richly colored flocked fabric that had a nice soft feel without any crocking or grin-through.

In 2002 Microfibres caught Intermark and its German affiliate, Spandauer Velours, infringing the '021 Patent. Microfibres directed Intermark to stop and Intermark filed this lawsuit, claiming that it did not infringe and that the '021 Patent was invalid. Microfibres filed a counterclaim based upon Intermark's infringement of the '021 Patent.

On September 27, 2005 Intermark filed a Memorandum of Law in which it stated "Intermark is in the process of winding-up its business based on several factors, including declining market conditions." (See *Memorandum of Law in Support of Plaintiff Intermark Fabric Corporation's Opposition to Microfibres, Inc.'s Motion for Reconsideration* at 4, attached as Exhibit B.).

4

**III.   ARGUMENT**

    **A.   An Attachment Should Issue For $2 Million Because There is Probable Cause To Believe Microfibres Will Obtain a Judgment In a Greater Amount.**

Under Connecticut law an attachment should issue when a claimant demonstrates "probable cause" that a judgment will enter at trial that is equal to or greater than the amount of the attachment sought. See Walpole Woodworkers, Inc. v. Atlas Fencing, Inc., 218 F. Supp.2d 247 (D. Conn. 2002).

"Probable cause" is a lesser burden than "preponderance of the evidence." Id. at 249. It is "a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." Id. It is a flexible, common-sense standard and does not demand that the belief be correct or that it is more likely true than false. See New England Land Co. Ltd. v. DeMarkey, 569 A.2d 1098 (Conn. 1990) ("The plaintiff does not need to establish that he will prevail, only that there is probable cause to sustain the validity of the claim."); Orsini v. Tarro, 834 A.2d 776 (Conn. App. 2003).

In Walpole the plaintiff sued a competitor for copyright and trademark infringement. It moved for a prejudgment attachment and disclosure of the defendant's assets pursuant to Connecticut's prejudgment attachment statute. See id. The Court agreed that the seller met the required showing of probable cause and issued an attachment. It also awarded the seller's request for discovery of the defendant's assets.

Here, there is ample evidence of probable cause to "sustain the validity of the claim" that Intermark is liable for directly infringing Microfibres' '021 Patent and for inducing infringement and that the judgment will exceed $2 million.

### 1. Intermark Is Liable for Direct Infringement.

A defendant is liable for direct infringement if it makes, uses, or offers to sell a patented invention in the United States. See 35 U.S.C. § 271(a).[1] At Intermark's 30(b)(6) deposition, Wayne Turcotte, the company's Executive Vice President, admitted that Intermark has manufactured a flocked fabric that includes all of the elements claimed in the '021 Patent -- a flocked fabric that is made with a textile substrate, dark pigmented adhesive, and that is transfer printed:

> Q. What is Exhibit 4?
> A. It's a flocked fabric with a black adhesive on a poly cotton substrate that's been embossed and then transfer printed.
> Q. When you say "embossed," do you mean air embossed?
> A. Yes.
> Q. Did Intermark perform all the operations necessary to create Exhibit 4?
> A. Yes.
> Q. *So Intermark took a textile substrate, applied black adhesive, coated flock to create a flocked fabric, correct?*
> A. Yes.
> Q. It air texturized the fabric, correct?
> A. Yes.
> Q. The purpose of which was to create a pattern?
> A. Yes.
> Q. *And then Intermark transfer printed on that fabric, correct?*
> A. Yes.
> . . . .
> Q. So is it fair to say that at the time Intermark created the flocked fabric which is Exhibit 4, it was on notice of the existence of Microfibres' 021 patent?
> A. Yes.
> . . . .
> Q. Was the purpose of creating these samples to generate sales from Jest Textiles.
> A. Yes.

---

[1] 35 U.S.C. § 271(a) provides in relevant part: "[W]hoever without authority makes, uses, offers to sell, or sells any patented invention within the United States or imports into the United States any patented invention during the term of the patent therefore, infringes the patent."

(See Exhibit C at 20-21) (emphasis added). In light of this testimony there is no question that Intermark has directly infringed the '021 Patent.

### 2. Intermark Is Liable for Inducing Infringement.

The patent laws also impose liability on those who actively induce another's infringement of a patent (by offering advice, components, etc.). See 35 U.S.C. §§ 271(b)[2]; 271(f)(1)[3].

Here, Intermark sells a fabric that contains the primary components of a product that would infringe the '021 Patent. Intermark calls the fabric "Frosty." It consists of a flocked fabric made with a textile substrate and dark-pigmented adhesive. Frosty is missing only one element -- transfer printing -- to make a product that infringes the '021 Patent.

Intermark actively encourages transfer printing. It touts the characteristics of Frosty that make it suitable for transfer printing and even offers instructions on how to transfer print:

> Q. Does or has Intermark advised customers and potential customers that Frosty is suitable for transfer printing?
> A. Yes.
> Q. And what assistance has Intermark offered to transfer printers related to their transfer printing the Frosty product?
> A. Just to explain to them which direction the fabric should be running, what temperature the fabric should be running, different pressures that can be used, brushing, brushing post and after.
>
> . . . .

---

[2] 35 U.SC. § 271(b) states, "Whoever actively induces infringement of a patent shall be liable as an infringer."
[3] 35 U.S.C. § 271(f)(1) states, "Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer."

> Q. And in connection with that, those statements, does Intermark identify any particular characteristics of Frosty which make it suitable for transfer printing?
> A. Frosty – the Frosty product lends itself to darker colors and it lends itself to less grim through.

(Exh. C at 103-04).

> Q. So in connection with your sales efforts related to Frosty, you sometimes hand out written instructions concerning the transfer print process; is that correct?
> A. Yes. We've done that in the past.

(Exh. C at 105).

Intermark sells Frosty to customers like Spandauer Velours knowing they intend to transfer print on it:

> Q. Has Intermark sold Frosty to Spandauer Velour?
> A. Yes.
> Q. Does Spandauer Velour have transfer printing capability?
> A. Yes.
> Q. At the time Intermark sold Frosty to Spandauer Velour, was it aware that Spandauer planned to transfer print?
> A. Yes.

(Exh. C at 76). There is no question that Intermark induces infringement.

### 3. Microfibres Will Recover More Than $2 Million at Trial.

Microfibres will likely obtain a judgment in excess of $2 million at trial and the Court should issue an attachment in that amount.

In patent cases the plaintiff is entitled to recover, at a minimum, a reasonable royalty for the infringer's use of the patented invention. See 35 U.S.C. § 284 ("Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer . . . ."). A reasonable royalty is the amount of money a hypothetical licensee would be willing to pay for the right to manufacture, use,

8

or sell the patented product. See <u>Trans-World Mfg Corp. v. Al Nyman & Sons</u>, 750 F.2d 1552 (Fed. Cir. 1984).



. This base amount will almost certainly be higher when full damages discovery has been completed and Intermark's recent sales have been calculated. It also may be higher if Microfibres seeks to recover its "lost profits" -- another measure of recovery the patent laws permit.

Moreover, when a defendant infringes a patent willfully the law provides that "enhanced damages" damages should be awarded. See 35 U.S.C. § 284. Courts enjoy wide discretion in choosing the level of enhancement but they typically award some multiple of the base amount -- often treble damages. See, e.g., <u>Signtech USA, Ltd. v. Vutek, Inc.</u>, 174 F.3d 1352 (Fed. Cir. 1999). Here, an award of "enhanced damages" is likely given that Intermark has infringed Microfibres' '021 Patent with knowledge of its existence. It has also refused to take any remedial steps to stop infringing. See <u>Read Corp. v. Portec, Inc.</u>, 970 F.2d 816, 826 (Fed. Cir. 1992) (identifying various factors courts employ to determine willfulness).

Finally, Microfibres will also be entitled to collect attorneys' fees, <u>see</u> 35 U.S.C. § 285, and prejudgment interest. See, e.g., <u>Gen. Motors Corp. v. Devex Corp.</u>, 461 U.S. 648 (1983).

B.  **Intermark Will Not Prevail on Its Claims of Invalidity or Unenforceability.**

If this case proceeds to trial, Intermark's claims of invalidity and unenforceability will be rejected and hence a prejudgment attachment should issue.

First, the standard for rendering a patent invalid or unenforceable is extremely high. The Court and the jury must begin with the presumption that Microfibres' '021 Patent is valid. See 35 U.S.C. § 282. The jury will only be permitted to declare the '021 Patent invalid or unenforceable if Intermark presents *clear and convincing* evidence to substantiate those claims. See Transclear Corp. v. Bridgewood Svcs., Inc., 290 F.3d 1364, 1370 (Fed. Cir. 2002). Intermark has no such evidence and its invalidity and unenforceability claims probably will not survive a Rule 50 motion. Intermark's invalidity arguments have been reviewed by Microfibres' patent expert and each has been rejected. (See Expert Report of David Brookstein, Sc.D., attached as Exhibit E and Expert Report of Michael Pomianek, Ph.D. attached as Exhibit F.)

1.  **The '021 Patent is Not Anticipated.**

Intermark first claims that the '021 Patent is invalid under 35 U.S.C. § 102 because it was not a novel invention. This claim is known as "anticipation." See Brown v. 3M, 265 F.3d 1349, 1351 (Fed. Cir. 2001). To invalidate a patent on anticipation grounds Intermark must come forward with clear and convincing evidence that some pre-existing invention (also known as "prior art") is identical to and therefore "anticipates" the invention that McCulloch patented. See Robert L. Harmon Patents and the Federal Circuit § 3.2 at 91 (7th ed. 2005); Woodland Trust v. Flowertree Nursery, Inc., 148 F.3d 1368, 1370 (Fed. Cir. 1998); Juicy Whip, Inc. v. Orange Bang, Inc., 292 F.3d 728, 737 (Fed. Cir. 2002). *Every* element and limitation of McCulloch's claimed invention must

10

be found in the alleged anticipating prior art just as it is arranged in the claim. See In re Paulsen, 30 F. 3d 1475, 1478-79 (Fed. Cir. 1994). Moreover, anticipation must be found with a single prior art reference and not, as Intermark has consistently attempted to do during this litigation, by cobbling together pieces from various prior art references. See Studiengelellschaft Kohle v. Dart Indus., 726 F.2d 724 (Fed. Cir. 1984).

Intermark has pointed to a number of prior art references that -- it claims -- anticipate the '021 Patent and render it invalid under 35 U.S.C. § 102. These prior art references either do not precede McCulloch's invention date or may not be considered as a matter of law. Each of the alleged prior art references is discussed below. They are also discussed in the attached expert reports of Drs. Brookstein and Pomianek.

### a. Intermark's Frosty Fabric

Intermark claims that Frosty -- the fabric it sells to Spandauer and others for transfer printing -- anticipates the '021 Patent. It claims that it manufactured Frosty in the late 1980s, long before McCulloch conceived his invention in early 1991, and that it sold Frosty to transfer printers. There are at least two problems with this anticipation argument.

First, Frosty does not anticipate the '021 Patent for the simple reason that Frosty does not include every element of the invention described by the '021 Patent. Frosty is not a transfer-printed fabric. It is an un-dyed fabric that it sold to others for processing.

Second, there is no evidence (aside from Intermark's bald assertion) that anyone ever transfer printed on Frosty before McCulloch conceived his invention. Although Intermark has produced correspondence and billing records dating from the late 1980s and early 1990s -- which suggest that Intermark shipped fabrics to various dyers, none of

this written material proves that anyone ever transfer printed on a flocked fabric made with a textile substrate and dark pigmented adhesive prior to McCulloch. Neither the jury nor the Court may conclude that someone actually transfer printed on Frosty prior to McCulloch since there is no physical evidence to support that claim.

### b. Testimony from Competitors

Intermark has also come forward with testimony from competitors of Microfibres, including Charles Bunch, Moustafa Nour, Peter Hadley, Hemendrah Shah, and Luther Boyd Madren. Like Intermark, they all claim to have known about or practiced the invention described in the '021 Patent long before McCulloch. This testimonial evidence will not be permitted to go to the jury.

Testimony that is uncorroborated by physical specimens cannot invalidate a patent as a matter of law. Courts treat this type of evidence as self-serving and reject it. See Juicy Whip, Inc. v. Orange Bang, Inc., 292 F.3d 728 (Fed. Cir. 2002); Wooodland Trust v. Flowertree Nursery, Inc., 148 F.3d 1368 (Fed. Cir. 1998) ("In this case, despite the asserted many years of commercial and public use, we take note of the absence of any physical record to support the oral evidence. . . . The district court did not rely on the two undated photographs, and indeed their lack of detail and clarity can not have provided documentary support.").

### c. Culp and Leathertex Fabric Samples and Vertiple Document

Intermark has produced two fabric samples that it also claims anticipate the '021 Patent: (a) a fabric sample manufactured by Spectro Coating and allegedly transfer printed by Culp between December 1991 and January 1992, and (b) a flocked fabric sample that is now attached to an August 11, 1991 letter from Leathertex to Spectro. It

12

has also produced a document dated 1985 from a company called Vertipile, Inc. It is titled "Experimental Production Run."

The Culp fabric sample does not anticipate the '021 Patent because it was created between December 1991 and January 1992 -- long after McCulloch conceived his invention (by March 21, 1991).

The Leathertex sample does not anticipate either. Although a fabric sample is now attached to an August 11, 1991 letter it is entirely unclear when the sample was actually made. The accompanying letter is nearly indecipherable and hardly constitutes clear and convincing proof of the manufacture of a transfer printed flocked fabric on a textile substrate with dark pigmented adhesive. In addition, the letter suggests that whatever product was made, it was made in Italy, not the United States, and thus would not anticipate under § 102.

The Vertipile document is similarly unpersuasive. It does not even indicate if the fabric in question is going to be transfer printed. And even if we generously assume that was the intent there is no evidence that the experimental test run was performed.

### d. Squires Patent

Intermark has pointed to U.S. Patent 4,895,748 to Squires (the '748 Patent) as anticipating prior art but it is not because the '748 Patent does not teach each and every element and limitation of the invention claimed by the '021 Patent.

First, the '748 Patent teaches the creation of a flocked *foam* fabric that is transfer printed, rather than a flocked *textile* fabric. According to the American Flock Association, foam is not a textile substrate.

13

Second, the '748 Patent also teaches the creation of a fabric in which the nylon fibers are "set into a flattened and entangled state" rather than the "raised thermoplastic fibers" claimed by the '021 Patent. In other words, the '748 Patent teaches crushing the fibers rather than keeping them upright. The whole purpose of the '021 Patent was to create a fabric in which the flock stands upright and gives the fabric a nice, soft feel. The '748 Patent teaches an invention that is the exact opposite.

### e. *Design With Flock In Mind* and *The Flocking Process*

*Design With Flock In Mind* and *The Flocking Process* are two articles that were written before McCulloch conceived his invention. They generally discuss the manufacture of flocked fabric. Both articles mention pigmented adhesives and also separately mention transfer printing. Neither article, however, suggests that these two ideas should be combined -- as McCulloch thought to do in early 1991.

In order to anticipate, a prior art reference must not only include every element, it must also arrange them as in the claim, see Brown, 265 F.3d at 1351, and describe the invention so a person of ordinary skill could practice it. See Paulsen, 20 F.3d at 1479. Neither *Design With Flock In Mind* nor *The Flocking Process* do so.

### 2. The '021 Patent Is Not Obvious.

Intermark also wrongly claims that the U.S. Patent and Trademark Office should never have awarded McCulloch the '021 Patent because his invention was obvious at the time he conceived it. See 35 U.S.C. § 103; Beckson Marine, Inc. v. NFM, Inc., 292 F.3d 718, 725 (Fed. Cir. 2002). As with anticipation, an obviousness claim will prevail only when the facts are *clear and convincing*. See id. Intermark's textile expert has reviewed this argument and rejected it. (Exh. E).

Here, none of the prior art references cited by Intermark render the '021 Patent obvious because none of them suggest or teach the particular combination of dark pigmented adhesive, a textile substrate, upright thermoplastic fibers, and transfer printing found in the '021 Patent.

The Court of Appeals for the Federal Circuit has cautioned against taking separate elements found in prior art references and combining them without some clear teaching in the prior art that such a combination should be made. See Karsten Manufacturing Corp. v. Cleveland Golf Co., 242 F.3d 1376, 1385 (Fed. Cir. 2001); N. Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 934 (Fed. Cir. 1990) ("It is insufficient that the prior art disclosed the components of the patented device, either separately or used on other combinations; there must be some teaching, suggestion, or incentive to make the combination made by the inventor."); Heidelberger Druckmaschinen v. Hantscho Commercial, 21 F.3d 1068, 1072 (Fed. Cir. 1994) ("When the patented invention is made by combining known components to achieve a new system, the prior art must provide a suggestion or motivation to make such a combination.")

Here, *Design With Flock in Mind* and *The Flocking Process* both teach the use of pigmented adhesives in flocked fabrics and also separately teach transfer printing. However, neither publication suggests that these things should be combined in order to solve the long-felt need for a deep and dark colored transfer printed flocked fabric that was soft, grin-free, and crock-fast.

### 3.   The '021 Patent Is Not Unenforceable.

Finally, Intermark wrongly claims that the '021 Patent is unenforceable because Microfibres defrauded the Patent Office during the prosecution of the '021 Patent. The

allegation is nothing more than an elaborate story concocted by Intermark's attorneys in the hopes of avoiding the consequences of Intermark's admitted infringing activities. These allegations have also been rejected by Microfibres' patent expert. (Exh. F).

To establish inequitable conduct Intermark must show by clear and convincing evidence that McCulloch failed to disclose material information with the intent to mislead the Patent Office. See Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 326 F.3d 1226, 1233 (Fed. Cir. 2003). Intermark has not (and could not) show that McCulloch intentionally withheld any material information from the Patent Office, much less with the intent to deceive.

Intermark first suggests that McCulloch intentionally deceived the Patent Office by failing to disclose the prior existence of dark pigmented adhesives. The argument is factually wrong and based upon a misreading of the patent prosecution file. As Microfibres has explained repeatedly, McCulloch disclosed the prior existence of pigmented adhesives, both in the specification itself and by referring to the Katz and Bernard patents. Indeed the '021 Patent specifically states that pigmented adhesives were already known in the industry: The '021 Patent itself acknowledges the existence of colored adhesives: "**It is known to add pigment to an adhesive** used in some flocked fabric manufacturing," . . . "**Tinted adhesives** are also known for use with pre-dyed flock to obtain an overall intensity of shade." (Exh. A, Column 1, Lines 37-45) (emphasis added).

Intermark next argues that McCulloch fraudulently claimed that the invention allowed a reduction in printing pressures. McCulloch's statement to the Patent Office concerning reduced pressure levels permitted by the invention was truthful. Microfibres

16

generally printed at the upper limits of a range that extended from 10 pounds to 60 pounds, depending on the fabric. The claimed invention allowed Microfibres to reduce its printing pressures.

Aside from being truthful, the issue is immaterial. The '021 Patent does not make a claim for reduced printing pressures. Although Microfibres' patent application initially included pressure claims, those claims were withdrawn. During the prosecution McCulloch explained that the exact pressures were not material to his invention and the Patent Office accepted that response.

Finally, Intermark claims that Microfibres was obligated to and failed to disclose to the Patent Office that it uses infrared heaters to "heat-set" some of its flocked fabric. The heat setting process helps the flock fibers bounce back after being transfer printed. Like the other alleged non-disclosures, this argument is a fiction created by Intermark's lawyers and it has been rejected by Microfibres' experts. (Exhs. E and F).

First, Microfibres did not have an obligation to disclose the use of infrared heaters because they are not part of the claimed invention. The law provides that so long as a product or process is not claimed it does not need to be disclosed unless it is novel and essential to practicing the invention. See Eli Lilly and Co. v. Barr Labs., 251 F.3d 955, 963 (Fed. Cir. 2001) ('[A]n inventor need not disclose a mode for obtaining unclaimed subject matter unless the subject matter is novel and essential for carrying out the best mode of the invention.").

Second, Microfibres had no obligation to disclose the use of infrared heaters because they were well known in the industry when McCulloch applied for his patent. Infrared electric heaters and temperature sensors like those used by Microfibres were

17

actively marketed by companies like Glenro, Inc. and Casso-Solar during the early 1990s. Indeed, Microfibres' competitor Culp, Inc. admitted that it was using these heaters no later than March 1990.

Third, Microfibres had no obligation to disclose the use of infrared heaters because they did not relate to the quality of the invention. Instead, they were used to achieve manufacturing efficiencies in the production of heat set flocked fabric by eliminating oven fires, reducing scorched and yellowed fabric, increasing line speeds, and improving the ability to perform an even heat set.

Finally, the best mode also does not apply here because there is no evidence, and certainly not clear and convincing evidence, that James McCulloch preferred Microfibres' heat setting process at the time he filed the application for the '021 Patent. See Spectra-Physics, Inc. v. Coherent, Inc., 827 F.2nd 1525, 1535 ("The specificity of disclosure required to comply with the best mode requirement must be determined by knowledge of the facts within the possession of the inventor at the time of filing the application.").

C.  **The Court Should Order Intermark To Disclose Its Assets.**

Pursuant to Conn. Gen. Stat. § 52-278n this Court has the authority to order a defendant to disclose all property in which it has an interest. See, e.g., Walpole, 218 F. Supp.2d at 255. This will permit Microfibres to locate assets for attachment.

IV.  **CONCLUSION**

For the foregoing reasons the Court should issue an attachment and direct Intermark to disclose its assets.

MICROFIBRES, INC.
By its Attorneys,

Brent R. Canning, Esq. (CT 23991)
William R. Grimm, Esq.
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (Fax)

RESIDENT COUNSEL:
Jeffrey W. Kennedy, Esq. (CT 16419)
Milano & Wanat
471 East Main Street
Branford, Connecticut 06405
203.315.7000 (TEL)
203.315.7007 (FAX)

## CERTIFICATION

Charles F. O'Brien, Esq.
William Cass, Esq.
Cantor Colburn LLP
55 Griffin Road South
Bloomfield, CT 06002

I certify that I mailed a copy of the foregoing Memorandum in Support of Microfibres' Motion for Attachment and Disclosure to counsel, as above, on November 29th, 2005.

#677955