UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

INTERMARK FABRIC CORPORATION    :
                                :
    v.                          :        Case Number: 3:02 CV 1267 (AVC)
                                :
MICROFIBRES, INC.               :


**MICROFIBRES, INC.'S REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR PREJUDGMENT ATTACHMENT
AND DISCLOSURE OF ASSETS**

**I.    INTRODUCTION**

This month the Court issued an Order to Intermark and directed it to "show cause" why a prejudgment attachment should not issue. Intermark's Objection to Microfibres' Motion for a Prejudgment Attachment utterly fails to carry that burden.

**II.    ARGUMENT**

First, Intermark claims that Microfibres' Motion should be denied because it did not submit an affidavit and certain forms (such as a summons) that Intermark says are required by Section 52-278c. The problem with this argument is that Section 52-278c deals with attachment motions that are filed *before* a lawsuit is initiated -- hence the summons requirement. It does not apply to attachment motions that are filed *during* a lawsuit and courts have not required compliance when a lawsuit is pending. See, e.g., Walpole Woodworkers, Inc. v. Atlas Fencing, Inc., 218 F. Supp.2d 247 (D. Conn. 2002) (granting a prejudgment attachment motion that was filed during a lawsuit without requiring a summons and the other forms set forth in Section 52-278c.).

The same is true of the affidavit requirement set forth in Section 52-278c. In addition, Microfibres has provided the Court with *better* evidence than an affidavit. It

has provided the Court with sworn deposition testimony from Intermark's Executive Vice President, Wayne Turcotte. His deposition testimony confirms that Intermark has directly and indirectly infringed the '021 Patent. It easily satisfies the "probable cause" standard.

Second, Intermark claims that Microfibres has failed to demonstrate "probable cause" as to liability and damages. With respect to liability, Intermark claims that its defenses to infringement will prevail. To support that argument Intermark relies on a regurgitated version of the summary judgment arguments it presented to this Court two years ago. Those arguments were considered and the underlying motions were denied last year.

These stale arguments are no more persuasive in this context -- especially when the parties' respective burdens of proof are considered. To obtain an attachment Microfibres need only show "probable cause" of infringement. It has done so with the deposition testimony of Mr. Turcotte and the other evidence it submitted.

Intermark's invalidity and unenforceability defenses, on the other hand, must be proven with *clear and convincing evidence*. See Transclear Corp. v. Bridgewood Svcs., Inc., 290 F.3d 1364, 1370 (Fed. Cir. 2002). Intermark's evidence was not sufficient to obtain summary judgment and it is not sufficient to overcome Microfibres' evidence of probable cause. The majority of Intermark's evidence consists of self-serving testimony from Microfibres' competitors. It cannot be considered by the jury or this Court as a matter of law. Juicy Whip, Inc. v. Orange Bang, Inc., 292 F.3d 728, 743 (Fed. Cir. 2002).

With respect to damages, Intermark claims that Microfibres' royalty evidence is insufficient. Microfibres is submitting herewith the affidavit of Don H. Phillips, Esq., a licensing consultant. (Exhibit A.). Mr. Phillips' opinion is that a 5% royalty is appropriate on the greige goods that Intermark has induced others to use for transfer printing and 8.5% on finished, transfer printed fabrics.

Mr. Phillips affidavit also responds to Intermark's false claim that Microfibres entered into royalty-free licenses with three parties for the '021 Patent and hence the appropriate royalty is 0%. The licenses are not royalty-free. They required the licensees (who were Microfibres' customers) to purchase greige fabric from Microfibres -- thereby guaranteeing income to Microfibres. Microfibres had the right to terminate the licenses if the customers stopped purchasing from Microfibres. (The Court should also note that the license to Squires/CINC does not even mention the '021 Patent.)

Third, Intermark claims that the damages in this case are so uncertain that a bond is constitutionally required. They are not. The damages here are not like the personal injury case that Intermark relies on. Instead, the damages are capable of being calculated quite easily. The law provides that Microfibres is entitled, at a minimum, to a royalty -- a percentage of Intermark's net sales to transfer printers. Microfibres has submitted evidence of Intermark's sales and it is undisputed that the vast majority of those sales were to transfer printers like Spandauer. The Court should reject Intermark's suggestion that the damages in this case are uncertain merely because Intermark claims -- without evidence -- that some small percentage of those sales were to non-transfer printers. Intermark has been directed to show cause why the attachment should not issue and it

3

failed to offer any evidence to support the claim that certain sales were to non-transfer printers.

Microfibres has provided "probable cause" that it will recover $2 million given the sales records, the prejudgment interest requirement, and the potential for enhanced damages and attorneys' fees. A $2 million attachment is appropriate.

## III.    CONCLUSION

The Court should issue an attachment and direct Intermark to disclose its assets.


MICROFIBRES, INC.
By its Attorneys

_____
Brent R. Canning, Esq. (CT 23991)
William R. Grimm, Esq.
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, RI  02903
(401) 274-2000 (TEL)
(401) 277-9600 (FAX)

RESIDENT COUNSEL:
Jeffrey W. Kennedy, Esq. (CT 16419)
Milano & Wanat
471 East Main Street
Branford, Connecticut 06405
203.315.7000 (TEL)
203.315.7007 (FAX)

## CERTIFICATION

Charles F. O'Brien, Esq.
William Cass, Esq.
Cantor Colburn LLP
55 Griffin Road South
Bloomfield, CT 06002

I certify that I sent by federal express a copy of the foregoing Reply Memorandum in Support of Microfibres' Motion for Attachment and Disclosure to counsel, as above, on December ___, 2005.

_____

#6787899

# EXHIBIT
# A

**Expert Report of Don H. Phillips**

**Background**

I, Don H. Phillips, upon personal knowledge depose and state as follows:

1.  I received a B. Ch. E. (chemical engineering) degree from Cornell University in 1957 and a J.D. (law) degree from Fordham University School of Law in 1963. I have been registered to practice before the US Patent and Trademark Office since 1960, a member of the New York Bar since 1963 and the North Carolina Bar since 1999. I was employed by an engineering company as a patent agent and patent attorney from 1960 until 1967. From 1967 until my retirement in 1998, I was employed by that company and a large chemical, plastic and textile fiber company, Celanese Corporation and its successors, full time in the licensing of intellectual property, in particular patents and know-how. During my last ten years with Celanese, I was the corporate vice president for licensing. Since retirement, I have continued to work part-time as a licensing consultant. In the course of my career, I have been involved in the negotiation of royalty rates in a great many cases, sometimes representing the licensor and sometimes the licensee. In addition, I have had occasion to review many hundreds of license agreements and the royalty rates arrived at by the parties through their negotiations.

2.  I have been retained by Microfibres, Inc. ("Microfibres") in connection with their dispute with Intermark Fabric Corporation ("Intermark") relating to infringement of Microfibres' US Patent No. 5,981,021 ("the '021 patent"). The patent damages statute 35 USC 284 defines the damages to which the owner of a valid and infringed patent is entitled as "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." I have been asked to give my opinion on reasonable royalty. For that purpose, I am to assume that the '021 patent is valid and infringed by Intermark. I am not offering any opinion on any issues of validity or infringement.

**Conclusion**

3.  The '021 patent claims a transfer printed flocked fabric made with a textile substrate and dark pigmented adhesive. According to Microfibres' counterclaim, Intermark has directly infringed the '021 patent by transfer printing a flocked fabric made with a textile substrate and dark pigmented adhesive ("Finished Fabric"). In addition, Microfibres' counterclaim alleges that Intermark has indirectly infringed the '021 patent by selling flocked fabric made with a textile substrate and dark pigmented adhesive to third parties for transfer printing ("Greige Fabric"). In my opinion Microfibres is entitled to a royalty of 5% of net sales of Finished Fabric and 8.5% of net sales of Greige Fabric.

1

**Discussion**

4. A reasonable royalty is one "that a licensor (the patentee Microfibres in this case) and a licensee (the alleged infringer Intermark here) would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who is willing to grant a license." Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), modified, 446 F. 2d 295 (2d Cir.), cert. denied, 404 U.S. 870 (1971). That case lists fifteen factors applicable to determination of reasonable royalties, the fourteenth of which is the opinion testimony of qualified experts and the fifteenth of which is the hypothetical negotiation quoted above. The hypothetical negotiation is to be held at the time when the infringement began and is to be based on the circumstances of the parties at that time. The date of the negotiation in this case is November 9, 1999, the date when the '021 patent was granted and when Intermark's alleged infringement began.

5. My present information as to the business circumstances of the parties as of the time of the hypothetical negotiation has been provided by Microfibres. Products based on the invention that matured into the '021 patent were first introduced into the market by Microfibres during the time that the patent was pending. Customers who had been buying flocked fabric with conventional adhesives, whether as greige goods or finished transfer-printed fabric, were quick to appreciate and accept the improved aesthetics and performance of the new flocked fabric with dark adhesive. Sometime after Microfibres introduced the product, Intermark, a direct competitor and a company whose main business was the manufacture and sale of flocked fabric in greige form to transfer printers, also began to make and sell fabric using dark adhesive. Over time, the market for transfer-printed flocked fabric shifted to a point where about half of the market was fabric using dark adhesive, the remainder using conventional adhesive. A key factor in the market is the preference of important customers to buy only from manufacturers who can supply both the flocked fabric with dark adhesive and fabric with conventional adhesive.

6. Microfibres estimates that the gross margin on their sales of flocked fabric in 1999 was in the range of 30 to 40% of gross sales. They also report that Intermark's business in 1999 was profitable and depended importantly upon its sales of greige flocked fabric to customers for transfer printing.

7. Royalty rates, unless well established in relevant prior transactions (there are none in this case), are negotiated case-by-case. Experienced negotiators will be familiar with ranges of royalty rates common to particular industries and with the so-called 25% rule which is sometimes invoked in royalty negotiations although it is only a

guideline and not in any sense a rule that must be followed. Based on my experience in the textile industry and on various published surveys that I have seen, royalties in the textile industry are most frequently in the range of 2 to 5% of net sales, with some at lower rates and some at higher rates. Since the '021 patent claims Finished Fabric, the royalty rate to be negotiated in the hypothetical negotiation would be the rate applicable to Finished Fabric. The rate for Greige Fabric can be derived from the rate for Finished Fabric. In such a hypothetical negotiation, the licensee Intermark would seek the lowest possible rate and, as a willing licensee, might be expected to open negotiations with an offer of 1 to 2%. The licensor Microfibres on the other hand would seek the highest possible rate since the license would be to a direct competitor, would be contrary to its policy against licensing competitors and would erode sales that Microfibres had the capacity and desire itself to make. Based on these considerations alone, Microfibres would wish to be paid a royalty to replace the entire gross margin that it was giving up, i.e., 30-40% of gross sales. Since the hypothetical negotiation requires that Intermark be able to make a reasonable profit after paying the royalty, Microfibres might be expected to consider the 25% rule which allocates 25% of pre-tax profitability to the licensor and 75% to the licensee in recognition of the risks undertaken by the licensee and its need to make a profit to justify those risks. On this basis, Microfibres might be expected to open negotiations with an offer of 8 to 10%. Since I must assume that both parties are willing to license and will be able to find a royalty rate within their respective ranges of acceptable results, I believe that they would arrive at agreement at 5% of net sales. This is at the top of the mentioned 2-5% range, but would have been acceptable to Intermark because their entire flocked fabric business was at risk if they were without the ability to supply customers with Greige or Finished Fabric as well as the conventional flocked fabric made without dark adhesive. Further, at 5%, Intermark would continue to have a sufficient profit margin to justify the business. Microfibres, for its part, would have been unlikely to settle for anything less than 5% given the competitive erosion that it could expect to incur.

8.  My understanding is that Intermark made and sold Greige Fabric to its customers and did little or no transfer printing itself. Thus, Intermark's net sales of infringing product were at the lower prices applicable to greige goods. My information is that these forms of goods sold at prices between $1.75 and $2.50 a yard while the transfer printed goods sold at prices between $3.00 and $4.25 a yard, the ranges reflecting the selling prices of various grades of the product. In order to derive an equivalent royalty rate for Greige Fabric, I factored the 5% rate for Finished Fabric by the ratio of the average of the selling price range for finished and greige goods and arrived at a royalty rate of 8.5%. I believe that this is the reasonable royalty rate applicable to Intermark's net sales of Greige Fabric since it corresponds to the 5% rate for Finished Fabric.

9.  I have considered the other Georgia-Pacific factors in the hypothetical negotiation described above. The first of these factors is, "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an

3

established royalty." As mentioned, Microfibres has not granted any licenses that are relevant, so that there is no established royalty. The only licensing Microfibres has done has involved its customers who receive an express or implied license when they purchase Greige or Finished Fabric from Microfibres. No royalties are involved in transactions of this type.

As to the second factor, "The rates paid by the licensee for the use of other patents comparable to the patent in suit," I have no information as to what Intermark may have paid in royalties in other cases nor have I information on comparability.

In the hypothetical negotiation, I have assumed that the license that Microfibres would grant would be non-exclusive and unrestricted insofar as the '021 patent is concerned (foreign counterpart patents are not considered in this type of negotiation). Thus, the third Georgia-Pacific factor, "The nature and scope of the license, as exclusive or non-exclusive in terms of territory or with respect to whom the manufactured product may be sold," tends neither to support a higher nor a lower royalty. A restricted license would presumably justify a lower rate while an exclusive license would justify a higher rate.

The fourth Georgia-Pacific factor does have a bearing on the hypothetical negotiation: "The licensor's established policy and marketing program to maintain the patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly." The policy of Microfibres was not to license competitors, rather it was to supply the entire market needs for the patented product as the patent entitled them to do. This factor which would be understood on both sides of the hypothetical negotiation would tend to push the royalty rate upward.

The fifth factor, "The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter," also tends to support higher rates, as Microfibres and Intermark were direct competitors in the same line of business in the same territory.

The sixth factor, "The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales," is in my opinion a very significant factor in this case, because of the preference of customers for buying the patented product and the conventional non-patented product from the same supplier. That preference made it critical for Intermark to get a license or risk the loss of its conventional non-patented business because of its inability to supply the patented product as well. Since the flocked fabric business was Intermark's main business, it would have been reluctant to allow the negotiation to end without achieving a license. Microfibres, on the other hand, as a supplier of the patented item could expect to benefit in

4

sales of the conventional, non-patented counterpart and would see these derivative or convoyed sales as additional reason to hold out for a high royalty.

The seventh factor, "The duration of the patent and the term of the license," seems not to push the royalty rate up or down. I have assumed that the license resulting from the hypothetical negotiation would be for the remaining life of the patent, i.e., until July 31, 2012. The eighth factor, "The established profitability of the product made under the patent; its commercial success; and its current popularity," was discussed above in connection with assessing the level of Microfibres' initial offer in the hypothetical negotiation. So too was the ninth factor, "The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results." Factor ten is, "The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention." The information in the '021 patent and the commercial acceptance of it demonstrate that the advance made by Microfibres embodied in the claims of the patent were of real value in the marketplace. This tends to support the conclusion I have reached on reasonable royalty.

I have no specific information on the remaining three Georgia-Pacific factors. The eleventh is "The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." The gross profit information mentioned above is for the flocked fabric product line, including both patented and non-patented components of that product line. The twelfth factor is "The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions." The thirteenth factor is "The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer." In my experience in licensing negotiations the parties seldom if ever have economic information of the precision suggested by these factors and I have none in this case.

10.    I have previously served as an expert for Engelhard Corporation in its suit in the New York Supreme Court against Research Corporation involving the interpretation of a license agreement. I am charging Microfibres $200 per hour for my time in preparing this report.

This is signed under the pains and penalties of perjury on December 19, 2005.

Don H. Phillips
Licensing Consultant
4105 Sharon Commons Lane
Charlotte, NC 28210

5