UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| INTERMARK FABRIC CORPORATION | : | |
| | : | |
| v. | : | Case Number: 3:02 CV 1267 (AVC) |
| | : | |
| MICROFIBRES, INC. | : | |

# MEMORANDUM OF LAW IN SUPPORT OF

# MICROFIBRES, INC.'S OBJECTION AND RESPONSE

# TO INTERMARK'S PROPOSED CLAIM CONSTRUCTION

**ORAL ARGUMENT REQUESTED**

## I. INTRODUCTION

Claim construction is the process by which judges interpret and construe disputed terms in a patent. Here, Microfibres is the owner of a patent for an improved flocked fabric. The improved fabric is made by combining (a) flocked fabric made with "dark" pigmented adhesives and (b) transfer printing (a fabric dyeing technique). The invention creates a fabric with deep colors and a soft feel. It is similar to velvet or micro-suede.

Intermark wants the Court to construe the word "dark" in Microfibres' patent. It argues the word is so ambiguous that it should be defined by referring to a scientific scale known as the Munsell Color System. This approach should be rejected.

First, claim construction here is unnecessary because the parties have already agreed on the meaning of the term "dark." Intermark's President and Executive Vice President both testified at their depositions that Intermark's Frosty fabric is made with "dark" adhesive. Intermark's lawyers cannot create a claim construction dispute where none exists.

Second, as the Court of Appeals for the Federal Circuit recently explained when it construed the phrase "golden-brown," it is legal error to define and limit a color term by using scientific measurements that the inventor did not intend. Instead, trial judges must use the disputed word's plain and ordinary meaning, which can be found in a dictionary.

Third, Intermark's proposal violates this Court's Scheduling Order because it seeks to introduce new expert testimony that was never previously disclosed. Microfibres had no opportunity to depose Intermark's textile expert regarding his color opinions and it would be prejudiced by their belated introduction.

Finally, Intermark's proposed construction is wrong on its face. If, as Intermark proposes, the word "dark" is limited to colors that have a value of 1 on the Munsell scale, that definition would exclude virtually all colors that we commonly think of as dark -- including Your Honor's black robe and navy blue suits. Intermark's definition would lead to an absurd result and limit the patent in a way that the inventor never intended.

In short, the term "dark," like the term "golden-brown," has an ordinary meaning that must be used here. To define it with scientific precision, as Intermark argues, merely "invite[s] a violation of our precedent." See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 375 F.3d 1341 (Fed. Cir. 2004), rev'd on other grounds, 126 S.Ct. 980 (2006).

## II.    FACTS

The '021 Patent claims a transfer printed flocked fabric made with dark pigmented adhesive and a textile substrate. (Exhibit 1). The novelty of the invention resides in the combination of two known ideas in the flocked fabric industry: transfer printing, on the one hand, and the use of flocked fabric made with dark pigmented adhesives, on the other hand.

The inventor, James McCulloch, recognized when he transfer printed a flocked fabric made with a textile substrate and a dark pigmented adhesive, that he could obtain a deep colored flocked fabric that was grin-free (the textile substrate did not show through the nylon fibers), crock-fast (the dye did not rub off), and had a soft, plush feel.

Pigmented adhesives were known in the flocked fabric industry when McCulloch conceived his invention by March 1991 and he disclosed this fact during the prosecution of the '021 Patent. He first disclosed the prior use of pigmented adhesives in the specification: "It is known to add pigment to an adhesive used in some flocked fabric

3

manufacturing. In one case, the pigmented adhesive is used to bind flock on fabric which is subsequently printed using wet processing techniques to achieve deep rich colors. Tinted adhesives are also known for use with pre-dyed flock, to obtain an overall intensity of shade." (Exh.1 at Column 1, Line 37-38).

McCulloch explained that the novelty of his invention was not fabric with dark colored adhesive (which as the Examiner noted was not novel), but the *combination* of (1) flocked fabric made with dark colored adhesive and (2) transfer printing:

> Applicant's invention resides in the discovery that prints on flocked fabrics with deep, dark shades can be achieved with transfer printing and the use of colored adhesives. Katz, et al only mentions that colored adhesives …can be used to create further effects thereby varying the ornamental appearance of the product…. The Katz, et al patent, and the prior art generally, fails to recognize or to suggest that the transfer printing of disperse dyes onto flocked fabrics in which the fibers were adhered with dark pigmented adhesive would produce a product with deep, dark shades and less grin through and crocking.

(Exhibit 2 at p. 4-5).

On November 9, 1999, after Microfibres satisfied the Patent Examiner's concerns regarding the novelty of the invention and its utility, the United States Patent Office issued McCulloch the '021 Patent. McCulloch assigned the '021 Patent to Microfibres.

Microfibres has confirmed during this litigation that Intermark's European affiliate, Spandauer, is manufacturing a transfer printed flocked fabric made with dark pigmented adhesive. The underlying fabric is supplied by Intermark. Intermark knows that Spandauer performs transfer printing and encourages it. (Deposition of Wayne Turcotte, attached as Exhibit 3 at p. 76). Intermark also sells flocked fabric with dark pigmented adhesive to transfer printers in the United States, like Culp, and actively encourages and induces the completion of Microfibres' invention. (Exh. 3 at p. 103,

4

105). Intermark has even transfer printed its own flocked fabric with a dark adhesive after the '021 Patent issued. (Exh. 3 at p. 20-21).

As a result of Intermark's admitted infringing activities, Microfibres wrote to Intermark and demanded that it cease all infringing activities. Intermark chose to sue instead.

During this litigation Intermark has been on a desperate hunt to substantiate its bogus claim that others invented the patented fabric before James McCulloch. Intermark claims it was making the patented invention in the 1980s. It even makes the outlandish claim that it came up with the idea. The Court will note, however, that Intermark has yet to put so much as a swatch of this 1980s fabric or a production or sales record in front of the Court to prove its claim. The reason is simple. Intermark's entire defense is a sham. Intermark is simply a patent infringer that has been secretly trying to profit from Microfibres' invention.

**III.    ARGUMENT**

    **A.    Claim Construction is Unnecessary Because the Parties Agree.**

Patents are like contracts or statutes in that guidelines have developed to assist judges in construing the meaning of disputed terms. See Markman v. Westview Instr., Inc., 52 F.3d 967, 984-87 (Fed. Cir. 1995) (en banc) aff'd, 517 U.S. 370 (1996) ("The more appropriate analogy for interpreting patent claims is the statutory interpretation analogy.").

One of the first guidelines for claim construction is that no construction is necessary when there is no genuine disagreement as to what a term means. See, e.g., Bell Communications Research, Inc. v. FORE Systems, Inc., 113 F.Supp.2d 635, 640 (D. Del.

5

2000) ("[C]laim interpretation should involve only genuinely disputed terms that impact infringement or validity issues.").

Here, Intermark's lawyers are trying to manufacture an alleged dispute even though the parties already agree that Intermark's Frosty product (which it encourages others to use for transfer printing) uses "dark" adhesive. Mr. Lucchesi and Mr. Turcotte both know what "dark" adhesive is and both acknowledge that they use "dark" adhesive to manufacture Intemark's Frosty fabric:

> Q. Are all of Intermark's flocked fabrics which use dark pigmented adhesives called Frosty currently?
>
> A. Yes.

(Deposition of William Lucchesi, Jr. at p. 126, attached as <u>Exhibit 4</u>).

> Q: When we say "the product," which product are we talking about?
>
> A. The Frosty product.
>
> Q. And what were the components of Frosty again?
>
> A. Substrate, *black adhesive*, natural flock.

(Exh. 3 at 169) (emphasis added).

> Q. Am I correct that all *dark adhesive* flocked fabric made at Intermark is called Frosty?
>
> A. Yes.

(Exh. 3 at 69) (emphasis added).

Intermark knows what the term "dark" means and has acknowledged that its Frosty fabric is made with "dark" adhesive. Because there is no genuine dispute, there is no reason for the Court to define the term.

### B. The Court Must Use the Plain and Ordinary Meaning of the Term "Dark."

Even though there is no disagreement, Intermark wants this Court to employ a scientific measurement to define the term dark. That approach has been rejected by the Federal Circuit Court of Appeals and must be rejected here too.

The relevant case is Unitherm Food, 375 F.3d at 1341. There, a ConAgra engineer obtained a patent on a method for browning precooked meat. The patent claim included the phrase "golden-brown color" and the parties disputed the meaning of the term "golden-brown." See id. at 1346-47.

ConAgra argued that the phrase ought to be defined by using the "Hunter-Lab Color Meter." The District Court disagreed. Instead, it applied the definition found in Webster's Third New International Dictionary: "A variable color averaging a strong brown that is yellower and slightly darker than gold brown, yellower and paler than average russet, and yellower and less strong than rust." Id. On appeal, the Federal Circuit Court approved the District Court's claim construction.

The Court of Appeals acknowledged the difficulty of construing color terms: "[C]olors can indeed pose challenging construction tasks. At one level, they are commonly used terms with well-accepted plain definitions . . . [a]t another, they are precise scientific terms . . . ." Id. at 1350. It explained, however, that the trial court should always start with the presumption that the inventor intended the disputed term to be understood by its common, everyday meaning. The Court of Appeals held that a trial court should only deviate from that meaning if the intrinsic record (the patent specification and prosecution history) demonstrates that the inventor disavowed the plain meaning or specially defined the disputed term. See id. at 1350 ("'[But] the intrinsic

7

record also must be examined in every case to determine whether the presumption of ordinary and customary meaning is rebutted . . . .").

The Court of Appeals explained that the District Court followed this process correctly. It first looked to see whether the inventor disavowed the ordinary meaning of the phrase "golden-brown" or specially defined it. Because it concluded that the inventor had not specially defined it, it presumed that the ordinary meaning should apply and looked to the dictionary to affix a definition that was "somewhat more precise than an intuitive understanding of a color." Id. at 1351.

The trial court and the Court of Appeals both rejected the idea of using the "Hunter-Lab Color Meter." The Court of Appeals held, "ConAgra does little other than 'invite[] a violation of our precedent counseling against importing limitations into the claims." Id. at 1351.

> In short, the district court properly considered all intrinsic evidence before determining that none of it could overcome the presumption favoring a plain meaning, and only then turned to a dictionary to affix the plain meaning that one of ordinary skill in the art would assign to the color "golden brown." The district court therefore correctly construed the only disputed term according to its plain meaning as one of ordinary skill in the art would understand it, and we affirm its claim construction.

Id. at 1352; see also Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193 (Fed. Cir. 2002)

Here, the same process should be followed. This Court must start with the presumption that the inventor, James McCulloch, intended the plain and ordinary meaning of the term "dark" unless the intrinsic record says otherwise. As Intermark correctly notes, the McCulloch did not disavow the ordinary definition of "dark" or offer

8

a definition of his own. Accordingly, the plain and ordinary meaning of that word controls.

If the Court thinks some additional precision is necessary, it may use a dictionary to define the term "dark." When dealing with colors, Webster's defines the adjective "dark," as "Of colors, of low or very low lightness." Webster's Ninth New Collegiate Dictionary 324 (1991). It defines the noun "dark" as "a dark or deep color." Id.

The fact-finder will understand perfectly well what a dark color is and does not need a scientific scale to help it apply that term to the facts in this case.

### C. Intermark's Proposed Definition is Unreasonable And Violates the Court's Scheduling Order.

Even if the Court could ignore the Unitherm decision and employ the Munsell color system to define the term "dark," it could not use Intermark's proposed definition. First, the definition is based upon expert testimony that was never previously disclosed. Second, the definition itself is unreasonable and does not comport with any average intuitive sense of what a "dark" color is.

To begin with, the deadline for disclosing expert opinions in this litigation expired about a year ago. Nevertheless, two months before trial, Intermark is offering new expert testimony from a textile engineer about the Munsell color system. Not only is Dr. Perry unqualified to offer an opinion about issues of color science but his opinion is being disclosed too late.[1] Microfibres was never notified that Dr. Perry would offer expert testimony about color science and it never had the opportunity to depose him on this

---

[1] No doubt, Dr. Perry's extreme opinion is the product of Intermark's counsel, Cantor Colburn. Like his initial expert report, this opinion was probably typed on Cantor Colburn's computers with help from Attorneys Cass and O'Brien. (Deposition of Ronald Perry at pp. 15-17, attached as Exhibit 5).

9

subject. It would be extremely prejudicial if this Court relied on an expert opinion that was not previously disclosed.

Moreover, as the attached affidavit of William N. Hale (a color expert with two decades of experience working at the Munsell Color Lab) explains, Dr. Perry's proposed definition is unreasonable on its face. (Exhibit 6).

The Munsell system uses a "value" scale to describe the "darkness" or "lightness" of a color. (Exh. 6). At the bottom of the scale is the value "0," which represents absolute black. (Exh. 6). At the top of the scale is the value "10," which represents absolute white. (Exh. 6). Both 0 and 10 are theoretical concepts and there are no man-made colors that achieve a 0 or 10 value. (Exh. 6)

Colors with a value of 1 (the value Intermark proposes) are virtually non-existent. (Exh. 6). Although there are a couple high-gloss paints that can achieve a value of 1, most other colors that we would define as "dark" are higher up the value scale. (Exh. 6). As Mr. Hale's affidavit reveals, standard black fabric (like Your Honor's robe, for instance) is generally closer to a value of 2 -- even though it is black and even though ordinary individuals would agree that it is "dark." (Exh. 6). The same is true of a navy blue suit. (Exh. 6). Average individuals would describe colors like "navy blue," "blood red" and "hunter green" but they do not have a value of 1. Given that Intermark's definition would lead to such absurd results, it must be rejected. It would be more reasonable to say that colors with a Munsell value less than 4 are "dark." (Exh. 6).

### IV.  CONCLUSION

Intermark and Microfibres already agree that Intermark's Frosty fabric is "dark" and there is no reason, therefore, to construe the term. Nevertheless, if the Court is going

to affix a more precise definition, it must use the plain and ordinary meaning, as set forth in the dictionary. The use of a scientific scale is wrong and violates well-established precedent.

                    MICROFIBRES, INC.
                    By its Attorneys,

                    /s/ Brent R. Canning
                    Brent R. Canning, Esq. (ct23991)
                    William R. Grimm, Esq.
                    HINCKLEY, ALLEN & SNYDER LLP
                    50 Kennedy Plaza, Suite 1500
                    Providence, RI 02903
                    (401) 274-2000 (TEL)
                    (401) 277-9600 (FAX)

                    RESIDENT COUNSEL:
                    Jeffrey W. Kennedy, Esq. (ct16419)
                    Milano & Wanat
                    471 East Main Street
                    Branford, CT 06405

## CERTIFICATION

Charles F. O'Brien, Esq.
William Cass, Esq.
Cantor Colburn LLP
55 Griffin Road South
Bloomfield, CT 06002

    I certify that I filed a copy of the foregoing Memorandum of Law in support of Microfibres' Objection to Intermark's Proposed Claim Construction electronically and sent a copy by regular mail to counsel, as above, on August 21, 2006.

                                  /s/Brent R. Canning

#743433