IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| INTERMARK FABRIC CORPORATION, ) ) Plaintiff, ) ) v. ) ) MICROFIBRES, INC., ) ) Defendant. ) | Civil Action No. 3:02-CV-1267 (AVC) |

**PLAINTIFF INTERMARK CORPORATION'S MOTION IN LIMINE
TO EXCLUDE:**

**TESTIMONY BETWEEN DEFENDANT AND DEFENDANT'S COUNSEL
FOR PRIOR ASSERTION OF THE ATTORNEY/CLIENT PRIVILEGE**

1.  <u>Introduction</u>

Intermark Fabric Corporation ("Intermark") commenced this declaratory judgment action seeking a declaration of non-infringement and invalidity (with additional claims for patent misuse, tortuous interference, and CUTPA) concerning its *Frosty* product. Intermark conceived and sold the *Frosty* product before the Defendant Microfibres, Inc. ("Microfibres") applied for its patent.

In 1989, the Plaintiff, Intermark Fabric Corporation ("Intermark") created a flocked fabric with a <u>dark</u> pigmented adhesive called "Frosty." A flocked fabric is created by taking a substrate, such as a woven textile, coating an adhesive onto the textile substrate, and placing the coated substrate in a flocking chamber. In the flocking chamber, small pieces of flock, typically short pieces of nylon strands, are electrostatically charged, causing them to adhere into the adhesive in an upward

1

orientation. The result is a material which has the appearance of velvet. Flocked fabrics have a wide range of applications such as clothing and upholstery. Flocked fabrics may be printed by a variety of printing methods – such as transfer printing and wet printing. Flocked fabrics are frequently referred to as Greige goods prior to finishing operations such as transfer printing. Frosty was designed to be used for transfer printing.

Microfibres and its President, James R. McCulloch ("McCulloch"), certainly knew of Intermark's Frosty product prior to filing his application for a patent on July 31, 1992. Prior to applying for a patent, Microfibres supplied the nylon flock used to make the Frosty product, and was informed by Intermark of a quality issue with its flock. Moreover, Intermark informed Microfibres of the need for consistent flock for various printing applications, including transfer printing.

In July of 1992, McCulloch applied for a patent for transfer printing on a textile substrate in which the flock was adhered to the substrate with a dark pigmented adhesive. Microfibres never informed the Patent Office of Intermark's Frosty product. For approximately seven years, the Patent Office rejected McCulloch's application. Microfibre's distinguished the prior art cited by the Patent Office by representing that the use of dark pigments was unknown. Indeed, in distinguishing a patent to Smith, Microfibres represented that even though the use of a pigment in Smith was disclosed, the pigment used would not impart significant color to the adhesive. The examiner relied on this statement as indicated in the Reasons for Allowance.

Thus, on November 9, 1999, United States Patent No. 5,981,021 entitled Transfer Printing Flocked Fabric (the "'021 patent") issued to McCulloch and was later assigned

to Microfibres. Incredibly, Microfibres has now accused Intermark, and its customers, of infringing the '021 patent, by selling Frosty. See Cass Declaration, Exhibit A.

Included in this case is the assertion by Intermark that McCulloch and representatives of Microfibres committed inequitable conduct in the proceedings at the patent office. During prosecution, the patent examiner studies the available prior art patents to determine whether the patent is novel and/or obvious. The patent office does not have industry publications and/or knowledge of industry activities as a resource to examine patents. Therefore, the patent rules require inventors and anyone acting on their behalf to inform the patent office of prior art which they are aware. (see 37 C.F.R. 1.56(a)). McCulloch represented that pigments for flocked fabrics were conventionally clear in color. The patent examiner repeatedly rejected the claims on the basis that the use of dark pigmented adhesives was obvious.

During discovery it was also revealed that Microfibres began using dark pigmented adhesives for flocked fabrics in the early 1980's, and again never disclosed this information to the Patent Office. Thus, Microfibres never disclosed *Frosty* and/or its own activities with dark pigmented adhesives to the patent office.

During the depositions of James McCulloch, the inventor, and corporate representatives, James Fulks and William Laird (who handed the interactions with the patent office of behalf of Microfibres), the deponents asserted the attorney/client privilege with respect to communications with patent counsel. Microfibres has now given notice that intends to call the patent attorney that prosecuted the patent as a witness in this case.

Under existing precedent, the attorney/client privilege may not be used as a sword and a shield. Therefore, Intermark moves in limine to exclude any testimony from the defendant representatives and their counsel concerning their communications.

2.  The Law

It is well established that a party cannot use the privilege as "a shield and a sword" to waive certain privileged information that is helpful to its case while simultaneously relying on the privilege to block discovery of harmful information. *See In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2nd Cir. 2000):

> We have stated ⋯ that fairness considerations arise when the party attempts to use the privilege both as "a shield and a sword." In other words, a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party.

The Second Circuit recently reaffirmed this principle in *In re Grand Jury Proceedings John Doe Co., v. U.S.*, 350 F.3d 299, 303 (2nd Cir. 2003):

> The unfairness courts have found which justified imposing involuntary forfeiture [of the privilege] generally resulted from a party's advancing a claim to a court or jury (or perhaps another type of decision maker) while relying on its privilege to withhold from a litigation adversary materials that the adversary might need to effectively contest or impeach the claim.

3.  Background

   a.  The Prosecution of the '021 Patent

On September 14, 1992, McCulloch executed a Declaration which was filed at the Patent Office, stating, in part:

> I hereby state that I have reviewed and understand the contents of the above-Identified specification, including the claims, as added by any amendment referred to above. I acknowledge a duty to disclose

4

> information which is material to the examination of this application in accordance with 37 C.F.R. 1.56(a).

See Cass Declaration, Exhibit B, Prosecution History, Book 1, Tab 3 **(emphasis added).**

In the "Background of the Invention" of the initial patent application, McCulloch represents that previous efforts to achieve "deep, dark shades" in transfer printed flocked fabrics had been unsuccessful and describes the problems in the prior art as follows:

> [I]t has not been possible previously in printing the flocked fabrics with transfer printing to achieve deep, dark shades using conventional print papers. When this is attempted, there are problems of grin-through, crocking and inferior lightfastness. The fabric substrate can be seen between the fibers, interfering with the desired visual effect of the printed pattern. Efforts to add dyestuff to print paper in order to achieve deeper shades have been unsuccessful because dyestuff in such heavy concentrations is not fully absorbed into the fibers. As a result the dyestuff can rub off, an undesirable and commercially unacceptable result. The rubbing off of colors in this fashion is known as "crocking." Accordingly there is a need in the art for an improved method for transfer printing onto flocked fabrics to achieve deep, dark shades, and also a need for deep, darkly transfer printed flocked fabrics.

See Cass Declaration, Exhibit B, Prosecution History, Book 1 - Tab 1, p. 1 and Exhibit A, col. 1, lns 46 - 63.

McCulloch represented to the Patent Office that the conventional way that flocked fabric was made was with a clear adhesive. For example, in the initial patent application and in the '021 patent itself, McCulloch represented that "[f]locked fabrics are known to be made by adhering short fibers, typically nylon or polyester to <u>a substrate using, conventionally, a clear adhesive.</u>" See Cass Declaration, Exhibit A, col. 1, lns 20 – 22.

Also, in the Detailed Description of the Preferred Embodiments of the patent application, McCulloch represented that under the invention, a preferably dark pigmented adhesive is used in lieu of the conventional clear adhesives to manufacture flocked fabric:

5

> The present invention is made possible, in part by preparation of the flocked fabric.  <u>In lieu of using the conventional clear adhesives used for adhering the flock to the substrate, a pigmented adhesive is substituted</u> … <u>A pigment is added to the basic adhesive, the precise color of the pigment being dictated by desired results.  Preferably, the pigment is of a dark color to help achieve the deep, dark color in the printed fabric.  The pigment may be black or other dark shades such as navy blue, dark red, dark green, or the like</u>.

See Cass Declaration, Exhibit A, col. 2, ln 61 - col. 3 ln 6; see also Exhibit B, Prosecution History, Book 1 - Tab 1, p. 3 – 4 **(emphasis added).**

Also, early on in prosecution of the '021 patent, Microfibres submitted to the PTO six fabric samples that consisted of two samples of three different print patterns.  Microfibres represented that in each of the three pairs of samples, one sample was made in accordance with the invention, i.e. a "darkly pigmented adhesive" and the other with "a <u>conventional</u>, light colored adhesive."  See Cass Declaration, Exhibit B, Prosecution History, Book 1 - Tab 6, p. 3.

The use of <u>dark</u> pigmented adhesives in the manufacture of flocked fabric was well known in the industry many years before Microfibres filed its patent application in 1992 and McCulloch knew it.  See Cass Declaration, Exhibit G, Hadley Deposition Transcript, p. 114 ln 24 - p. 115 ln 13; Exhibit H, Rosenthal Deposition Transcript, p. 6 ln 23 - p. 9 ln 10; Exhibit E, Fulks Deposition Transcript, p. 28 lns 10 - 17 and p. 32 ln 25 - p. 33 ln 20; Exhibit N, Expert Report of Ronald S. Perry, Ph.D, p. 8;  Exhibit H, Rosenthal Deposition Transcript, p. 6 ln 23 - p. 9 ln 10;  Exhibit G, Hadley Deposition Transcript, p. 110 ln 23 - p. 111 ln 2 and p. 114 ln 8 - p. 116 ln 13.

In addition to its knowledge of Intermark's Frosty product, Mr. William Laird, Director of Engineering for Microfibres, testified that Microfibres had itself been manufacturing and selling flocked fabrics with dark pigmented adhesives, including

black, blue and green, as far back as 1981. Microfibres compounded its own adhesives and had facilities specifically dedicated to pigmenting the adhesives in the early 1980's. See Cass Declaration, Exhibit F, Laird Deposition Transcript, p. 57 ln. 14 - p. 59 ln. 2; , p.64 lns. 2 – 19; p. 73 lns. 2 - 14.

Mr. Fulks admitted at his deposition that he was aware Pervel Industries was using such dark pigmented adhesives in 1978. Pervel purchased the pigmented adhesives from American Finish Company. See Cass Declaration, Exhibit E, Fulks Deposition Transcript, p. 28 lns 10 - 17 and p. 32 ln 25 - p. 33 ln 20.

In an Office Action dated November 3, 1993 and in each of the six office actions that followed during the prosecution of the '021 patent over the course of the next several years, the examiner repeatedly rejected all of the claims in the application as obvious under 35 U.S.C. § 103. In doing so the Examiner cited to the following three patents: (1) United States Patent No. 4, 314,813 to Masaki (hereinafter "Masaki Patent"); (2) United States Patent No. 4,049,374 to Rejito (hereinafter "Rejito Patent"); and United States Patent No. 2,308,429 to Smith, et. al. (hereinafter "Smith Patent"). See Cass Declaration, Exhibit I, Masaki Patent; Exhibit J, Rejto Patent; and Exhibit K, Smith Patent; see also Exhibit B, Prosecution History, Book 1 – Tabs 7, 11, 17, 22, 27, 31 and 34.

In each such office action, the examiner opined that it would have been obvious to one skilled in the art to combine the Masaki Patent and the Rejito Patent, which teach transfer printing flocked fabric, with the Smith Patent, which "teaches flocking a textile substrate by adhering the flock to the substrate with a blue pigmented 'cement' which is the adhesive used to adhere the flock to the substrate", to create the flocked fabric

claimed by Microfibres. See Cass Declaration, Exhibit B, Prosecution History, Book 1 – Tabs 7, 11, 17, 22, 27, 31 and 34.

On December 1, 1993, following the issuance of the November 3, 1993 Office Action, the examiner held an interview with patent counsel for Microfibres. At issue during the interview was the indefiniteness of the term "dark" under 35 U.S.C. §112 and how Microfibres could better define that term in the specification of the patent. During the interview on December 1, 1993, in conjunction with discussing the "112 problems", the examiner referenced the Smith Patent and United States Patent No. 4,963,422 to Katz et. al. See Cass Declaration, Exhibit B, Prosecution History, Book 1 Tab 9 and Exhibit L.

On January 24, 1994, following the interview, Microfibres submitted a response to the November 3, 1993 Office Action. Microfibres amended claim 13 of the initial '021 patent application (which is claim 13 of the '021 patent) which claimed only a "pigmented adhesive", by adding the limitation that the pigmented adhesive be a "<u>dark</u>" pigmented adhesive. See Cass Declaration, Exhibit B, Prosecution History, Book 1 – Tab 10, p. 1.

In that same response, Microfibres represented that while it is known to use "color adhesives" in the manufacture of flocked fabrics but did not disclose that it was known in the prior art to use dark pigmented adhesives in the manufacture of flocked fabrics. See Cass Declaration, Exhibit B, Prosecution History, Book 1 – Tab 10, p. 4. Microfibres then distinguished the Smith Patent by - inconsistent with what McCulloch, Laird, Fulks and Microfibres knew - arguing that it did not teach dark pigmented adhesives as the blue pigment in the cement disclosed in Smith is only one part in 80,000, and therefore the blue pigment "<u>would clearly be insufficient to impart any significant color to the</u>

8

cement." See Cass Declaration, Exhibit B, Prosecution History, Book 1 – Tab 10, p. 1. Microfibres went on to distinguished the Katz Patent by arguing that it "only mentions that colored adhesives ' --- can be used to create further effects thereby varying the ornamental appearance of the product ---'" and that Katz and the prior art generally fail to disclose transfer printed flocked fabric with a dark pigmented adhesive. See Cass Declaration, Exhibit B, Prosecution History, Book 1 – Tab 10, p. 4 - 5.

In the next office action which was dated April 18, 1994, and in the five office actions thereafter, the examiner stated that McCulloch acknowledged prior use of "pigmented adhesives" but that McCulloch argued that the prior art generally fails to disclose transfer printed flocked fabric with a "dark" pigmented adhesives. In each of those office actions, the examiner also questioned the novelty of pigmenting the adhesive under the invention, as the examiner saw no appreciable difference in the samples submitted by McCulloch on August 17, 1993 and thus saw no evidence of a superior product. See Cass Declaration, Exhibit B, Prosecution History, Book 1 – Tabs 11, 17, 22, 27, 31 and 34.

Without responding to the April 18, 1994 Office Action, on August 22, 1994, Microfibres filed a continuation application under 37 C.F.R. 1.62 of the then patent application filed on July 31, 1992, and on September 30, 1994, Microfibres abandoned the patent application filed on July 31, 1992. Over a period of four years following the continuation application filed on August 22, 1994, Microfibres filed five more continuation applications, four of which Microfibres abandoned without any substantive prosecution. See Cass Declaration, Exhibit B, Prosecution History, Book 1 – Tabs 13, 14, 20, 21 24, 25, 29, 30, 32, 33, 36.

Before an office action issued in response to the sixth continuation application filed by Microfibres on November 13, 1998, Microfibres filed a Preliminary Amendment that included a Declaration of William Laird under 37 C.F.R. § 1.132 wherein Laird attributed the reason for filing several continuation applications from 1994 through 1998 with no substantive prosecution to scheduling problems:

> The Examiner is no doubt curious as to why a number of continuations have been filed without substantive prosecution. The reason is that applicant had intentions to run tests to generate the evidence suggested by the Examiner, but was having difficulty in arranging scheduling of the test. [1]

See Cass Declaration, Exhibit C, Prosecution History, Book 2 – Tab 3, p. 3 - 4.

On May 27, 1999, a Notice of Allowability was issued by the PTO and attached thereto was the Examiner's "Reasons for Allowance." Under the Reasons of Allowance, the examiner opined that the Smith Patent suggests only "the addition of a small amount of pigment to the adhesive" The examiner then opined that Microfibres solved the problem of grin-through:

> Thus there are two statements of the prior art reinforcing applicant's position that a dark adhesive is necessary to reduce grin through. Applicant has solved the same problem in a manner not taught in the prior art; that is by adding a pigment to the adhesive. (emphasis added)

See Cass Declaration, Exhibit C, Prosecution History, Book 2 – Tab 8.

---

[1] At the deposition of Microfibre's expert, David Brookstein, admitted such a test was a performed at the university where he was employed and would take no more than "several weeks" to schedule. Rule 56(a)1 Statement, ¶ 182. Brookstein also admitted that none of the references cited by the examiner in the Reasons for Allowance disclosed the use of dark pigmented adhesives in the manufacture of flocked fabrics. See Cass Declaration, Exhibit M, Brookstein Deposition Transcript, p. 156 lns 2 - 16 and p. 165 ln 22 - p. 166 ln 2.

Thus, McCulloch, and the other representatives of Microfibres secured the '021 patent by perpetuating a fraud. The examiner was specifically focused on the use of dark pigmented adhesives in the prior art. McCulloch failed to disclose both the Frosty product and Microfibre's own use of dark pigmented adhesives commencing in the early 1980's. The relevance and materiality of Frosty is easily established by Microfibres' counterclaim, seeking infringement for the sale of Frosty for application in transfer printing.

      b.      Microfibres' Assertion of the Attorney/Client Privilege

During the deposition of James R. McCulloch the attorney/client privilege was asserted:

> MR. CASS: Do you have an understanding that if there is literature in the prior art or literature in industry or activity in industry which predates the date of your invention, that that will impact the ability to enforce the '021 patent?
>
> MR. GRIMM: Objection. I instruct you not to answer any advice that
> you received from your patent counsel or from me on these issues.
>
> MR. CASS: That's improper. I'm asking what his understanding is.
>
> MR. GRIMM: If he obtained that understanding based on conversations with his patent counsel, I'm instructing him not to answer it. If he has some independent understanding, he can answer it.
>
> MR. CASS: Do you have an independent understanding that prior art or literature might impact the validity of the '021 patent?
>
> WITNESS: Yes.

> MR. CASS: And you know that because you signed a declaration when you filed your patent to appraise the patent office of any prior art, correct.
>
> WITNESS: I don't remember if I did, but -- I don't remember.

See Cass Declaration, Exhibit D, McCulloch Deposition Transcript, p. 52 –53.

> MR. CASS: (to Mr. McCulloch) And did you come to have an understanding that the patent office rejected your patent on a number of occasions?
>
> MR. GRIMM: Again, I instruct you not to reveal any attorney/client communications when you answer.
>
> MR. CASS: Well, with respect to communications with a patent counsel, you produced letters between Mr. --
>
> MR. GRIMM: Do you have another question?
>
> MR. CASS: I'm going to explain myself, Mr. Grimm.
>
> MR. GRIMM: I'm not interested in your explanation.
>
> MR. CASS: I don't know if you can claim an attorney/client privilege when you produced communication.
>
> MR. GRIMM: Ask a question.
>
> MR. CASS: I did ask a question. I'm waiting for his answer.
>
> MR. GRIMM: I've gave him my instruction.

See Cass Declaration, Exhibit D, McCulloch Deposition Transcript, p. 60-61.

>MR. CASS: Well, and I understand we are going back roughly 10 years, but did you come to have an understanding that the pressure range of your invention was going to be important with respect to securing a patent?

>MR. GRIMM: Objection and instruct you in answering that question not to reveal any confidential communications you had with your patent counsel.

>WITNESS: Repeat the question.

>MR. CASS: Did you have an understanding in March of 1993 with respect to whether or not the pressure range of the transfer printing was going to be important with respect to securing the patent?

>WITNESS: No, I don't believe so, no.

See Cass Declaration, Exhibit D, McCulloch Deposition Transcript, p. 97-98.

>MR. CASS: And you understood that you had an ongoing duty to review the statements made to the patent office during the prosecution of your patent application, didn't you, sir?

>WITNESS: I know I discussed with Jim Fulks and Bill Laird as well as I think there was again a discussion with the attorneys.

>MR. GRIMM: Don't disclose your conversations with your attorneys.

>THE WITNESS: Okay.

>MR. CASS: Well, did you ever --

>WITNESS: So they would discuss with me some of the objectives and if it was relevant for me to add information, I would.

13

>MR. CASS: You would agree with me that dark adhesives, dark pigmented adhesive for flocked fabric were well known in the industry at least 10 years before the date of your patent application in 1992?

>WITNESS: Yes, not on transfer printing, but use of dark adhesives, yes.

>MR. CASS: I'd like to just direct your attention to tab -- Do you ever recall the examiner indicating to you or your representatives that he had studied the samples that had been submitted and I'm going to quote, "Examiner fails to see any an appreciable difference between the sample studied." Do you ever recall that information being communicated to you during your prosecution of the patent application?

>MR. GRIMM: I object to the form and caution you that to the extent you're getting this statement from your attorney --

>MR. CASS: It's a public statement.

>MR. GRIMM: Want to rephrase your question?

>MR. CASS: Were you aware the examiner stated, "Examiner fails to see any appreciable difference between the sample submitted in or about April of 1994."?

>WITNESS: I believe I read that, but I can't be a hundred percent sure. I either read it or Bill Laird advised me, I'm not sure, or the attorneys.

See Cass Declaration, Exhibit D, McCulloch Deposition Transcript, p. 122-124.

During the deposition of James R. Fulks the attorney/client privilege was asserted:

>MR. O'BRIEN: For the record, I want to make it clear that in my opinion there was a question pending having to do

14

with this July 24, 2002 document as to the factual basis that that document is used to support a claim for direct infringement.  While my question was pending, there was a conference, the brake was called by counsel for Microfibres, and I think the law is pretty clear that I'm entitled to know what that conversation was, the substance of that conversation during the break because there was a pending question and because there is a pending question.

MR. GRIMM:  There was no question pending at the time we took the break and you're not entitled to information that is protected by the attorney/client privilege.

MR. O'BRIEN:  Well, I'm going to ask the question, Mr. Fulks.  I'd like to know what the discussion was that took place between you and counsel for Microfibres, Mr. Grimm during our break.

MR. GRIMM:  I object and instruct the witness not to answer based on the attorney/client privilege.

MR. O'BRIEN:  I'm going to have to actually file a motion then, motion to compel that that information be disclosed verbatim so that we know exactly what was discussed, the entire conversation.  I'd like to mark this July 24 document. (Thereupon, Plaintiff's Exhibit 15 was marked for identification.)

MR. GRIMM:  Let me just say for the record, when I left the room at the brake, I specifically instructed Mr. Fulks that I did not want to discuss the question at all.

MR. O'BRIEN:  Are you saying then that the document, this July 24, 2002 document, the whole line of questioning was not discussed.

MR. GRIMM:  That's correct.

See Cass Declaration, Exhibit E, Fulks Deposition Transcript, p. 73-75.

MR. OBRIEN:  Was there a legal opinion that was generated as a result of the van Heel document?

WITNESS:  I'm not aware that there was anything in writing.  I did have some conversations with attorneys and with Bill about it and with Jim McCulloch about it.

MR. OBRIEN:  When you say Bill, Bill Grimm?

WITNESS:  No, Bill Laird.  I mean I may have also discussed it with Bill, too, but I discussed it with Jim McCulloch, Bill Laird and at least with two intellectual property attorneys, maybe more.

MR. OBRIEN:  What was the substance of your conversation with Mr. Laird having to do with the van Heel document?

MR. GRIMM:  I'm going to caution you, Jim, to the extent you discussed with Mr. Laird advice you got from either me or Mr. MacCord or the other patent attorney, you consulted, that's privileged information and you should not disclose the substance of it.

WITNESS:  I don't understand the question then.  What do you want me to answer.

MR. OBRIEN: I want to know what the conversation was between you and Mr. Laird.

WITNESS:  I've been advised I don't have to answer that.

MR. OBRIEN:  You were advised -- you were not advised that you couldn't answer the question.

WITNESS:  Then I don't understand.

16

>MR. GRIMM: Let me -- In answering his question, do not disclose to him any conversations that you may have had with Mr. MacCord, me or the other attorney.
>
>THE WITNESS: Okay.
>
>MR. GRIMM: If there is a conversation you had with Mr. Laird which was not based on discussions with the attorneys, you can advise Mr. O'Brien of that portion of the conversation.
>
>THE WITNESS: Okay.
>
>WITNESS: Bill reviewed it, and came into my office and basically we sat down for a few minutes. He said he didn't see anything in it at all that would give us a problem with regard to our patent.

See Cass Declaration, Exhibit E, Fulks Deposition Transcript, p. 132-134.

    4.      Conclusion

It is well established that a party cannot use the privilege as "a shield and a sword" to waive certain privileged information that is helpful to its case while simultaneously relying on the privilege to block discovery of harmful information. During the depositions of James McCulloch, the inventor, and corporate representatives, James Fulks and William Laird (who handed the interactions with the patent office of behalf of Microfibres), the deponents asserted the attorney/client privilege with respect to communications with patent counsel. As a matter of law, Microfibres is thus prohibited from offering testimony with respect to those communications.

Therefore, Intermark moves in limine to exclude any testimony from the defendant representatives and their counsel concerning their communications should be granted.

        For the Plaintiff
        Intermark Fabric Corporation


  By: ___/s/ William J. Cass_____
     William J. Cass (ct 12806)
     Charles F. O'Brien (ct 22074)
     CANTOR COLBURN LLP
     55 Griffin Road South
     Bloomfield, Connecticut 06002
     Telephone: (860) 286-2929
     Facsimile: (860) 286-0115


Dated:   August 30, 2006

**CERTIFICATE OF SERVICE**

      I hereby certify that on August 30, 2006, a true and accurate copy of the foregoing document was filed electronically via the Court's ECF system. Notice of this filing will be sent by e-mail to the following parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Brent R. Canning, Esq.
William R. Grimm, Esq.
Hinckley. Allen & Snyder LLP
1500 Fleet Center
Providence, RI 02906

Jeffrey W. Kennedy, Esq.
Stephen G. Murphy, Jr., Esq.
Milano & Wanat
471 East Main Street
Branford, CT 06405

                                          By:    /s/ William J. Cass_____
                                                   William J. Cass, Esq.