# EXHIBIT D

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF CONNECTICUT

3                      ---o0o---

4

5    INTERMARK FABRIC CORPORATION

6       vs.                        C.A. NO. 3:02-CV-1267 (AVC)

7    MICROFIBRES, INC.

8    _____/

9

10

11         Deposition of JAMES R. McCULLOCH, taken on

12   behalf of the Plaintiff, pursuant to the Federal Rules

13   of Civil Procedure, on Thursday, April 17, 2003, at the

14   offices of Hinckley, Allen & Snyder LLP, 1500 Fleet

15   Center, Providence, Rhode Island, taken before Lori R.

16   Colwell, Notary Public, commencing at 10:10 a.m.

17

18

19

20

21

22

23

24

25

spherion
deposition services

475 Sansome Street, Suite 720
San Francisco, CA 94111
Voice: 415-362-6666 or 800-219-5300
Fax: 415-362-0907
Email: sfcourtreporting@spherion.com

1          of the patent, then the patent might not be

2          enforceable?

3                    MR. GRIMM:  Objection.  Could you

4          read that back for me, please.

5                    (Thereupon, the above-referred to

6          question was read back by the reporter.)

7                    MR. GRIMM: Objection to form.

8     Q.   Did you come to have that understanding, sir,

9          with respect to patents?

10    A.   I was not listening; you've got to repeat the

11         question again.

12    Q.   Do you have an understanding that if there is

13         literature in the prior art or literature in

14         industry or activity in industry which

15         predates the date of your invention, that

16         that will impact the ability to enforce the

17         '021 patent?

18                   MR. GRIMM:  Objection.  I

19         instruct you not to answer any advice that

20         you received from your patent counsel or from

21         me on these issues.

22                   MR. CASS:  That's improper.  I'm

23         asking what his understanding is.

24                   MR. GRIMM:  If he obtained that

25         understanding based on conversations with his

                                                    52

```
 1              patent counsel, I'm instructing him not to
 2              answer it.  If he has some independent
 3              understanding, he can answer it.
 4        Q.    Do you have an independent understanding that
 5              prior art or literature might impact the
 6              validity of the '021 patent?
 7        A.    Yes.
 8        Q.    And you know that because you signed a
 9              declaration when you filed your patent to
10              appraise the patent office of any prior art,
11              correct.
12        A.    I don't remember if I did, but -- I don't
13              remember.
14        Q.    So you understand that the date, that dates
15              are involved in determining the validity of
16              patents?
17        A.    Yes.
18        Q.    And you had that understanding at the time
19              you filed this patent application, correct?
20        A.    I can't say for certain.  I know we couldn't
21              show any samples to any customers before we
22              filed, could not show any, I guess commercial
23              samples to customers, I understood that, yes.
24        Q.    And so you understand that in this
25              litigation, one issue that will be litigated
```

53

```
1    A.   I believe I -- I can't say for certain.  I
2         think I did.  I'm not sure.  I believe I did,
3         but I don't -- I can't say for certain.
4    Q.   Do you recall executing a declaration on or
5         about September 14, 1992 that you had -- that
6         you were the named inventor and that you had
7         reviewed and understood the contents of the
8         identified specification?
9    A.   Repeat the question.
10   Q.   Do you recall executing a declaration when
11        you filed your patent application?
12   A.   Do I specifically recall, no.  It was ten
13        years ago, but if it's in the process, then I
14        believe I probably did.
15   Q.   This patent took a long time to get to the
16        patent office, didn't it?
17   A.   Yes.
18   Q.   How about how many years, do you recall?
19   A.   I believe it was issued in '99, '98, or -- I
20        don't know when.  I believe it was issued in
21        '99 or '98, so seven years, six, seven years.
22   Q.   And did you come to have an understanding
23        that the patent office rejected your patent
24        on a number of occasions?
25             MR. GRIMM: Again, I instruct you
```

60

1          not to reveal any attorney/client

2          communications when you answer.

3                    MR. CASS:  Well, with respect to

4          communications with a patent counsel, you

5          produced letters between Mr. --

6                    MR. GRIMM:  Do you have another

7          question?

8                    MR. CASS:  I'm going to explain

9          myself, Mr. Grimm.

10                   MR. GRIMM:  I'm not interested in

11         your explanation.

12                   MR. CASS:  I don't know if you

13         can claim an attorney/client privilege when

14         you produced communication.

15                   MR. GRIMM:  Ask a question.

16                   MR. CASS:  I did ask a question.

17         I'm waiting for his answer.

18                   MR. GRIMM: I've gave him my

19         instruction.

20    A.   Repeat the question.

21    Q.   I'll rephrase it.  Were you aware that your

22         patent application was rejected on a number

23         of occasions over that seven-year period of

24         time from 1992 to 1999?

25    A.   I know it was rejected.  I don't know how

```
 1                statements.

 2       Q.       Let me rephrase that.  At the time you

 3                received this in March of 1993, did you have

 4                an understanding based on your review of the

 5                first two paragraphs that the examiner was

 6                focusing on the pressure range of your

 7                invention for the transfer printing?

 8       A.       I can't say if he was focusing or not.

 9                There's a lot of stuff in here that is in

10                this document.  It is mentioned in

11                this -- It's mentioned on those two

12                paragraphs, yes.

13       Q.       It's mentioned on the first one, isn't it,

14                the very first paragraph on page 2?

15       A.       It's mentioned in this document, yes.

16       Q.       Well, and I understand we are going back

17                roughly 10 years, but did you come to have an

18                understanding that the pressure range of your

19                invention was going to be important with

20                respect to securing a patent?

21                     MR. GRIMM: Objection and instruct

22                you in answering that question not to reveal

23                any confidential communications you had with

24                your patent counsel.

25       A.       Repeat the question.
```

97

1      Q.    Did you have an understanding in March of

2            1993 with respect to whether or not the

3            pressure range of the transfer printing was

4            going to be important with respect to

5            securing the patent?

6      A.    No, I don't believe so, no.

7      Q.    So the statement to you, "In essence,

8            Applicant's method is at a low pressure of 10

9            to 59 pounds per square inch to transfer

10           print a flock nylon fabric," that didn't

11           indicate to you at all that the pressure

12           range was important for the examiner?

13     A.    I did not deal directly with the examiner.  I

14           dealt through our attorney and with Mr.

15           Laird.  I would like to add, though, on this

16           prior question that on the pressure range

17           that Hartford Fibres used, you mentioned Bill

18           Laird in his deposition stated that a

19           conventional range was 10 to 59 pounds, and

20           technically, if you were transfer printing a

21           very light color on a flat fabric where you

22           did not need dark colors, you did not need

23           good light-fastness, you did not need the

24           physical crocking light-fastness, physical

25           properties for upholstery fabric, then on

98

1           of the pigment was discussed between your

2           attorney and the patent office?

3    A.     Based on this, yes, it appears that it was

4           discussed, but I was not present with him

5           when he discussed it with the patent office.

6    Q.     But this was a written document that was

7           submitted to the patent office, correct, sir?

8    A.     I believe so, yes.

9    Q.     This is one of the papers that your attorney

10          filed on your behalf?

11   A.     Yes.

12   Q.     And you understood that you had an ongoing

13          duty to review the statements made to the

14          patent office during the prosecution of your

15          patent application, didn't you, sir?

16   A.     I know I discussed with Jim Fulks and Bill

17          Laird as well as I think there was again a

18          discussion with the attorneys.

19              MR. GRIMM: Don't disclose your

20          conversations with your attorneys.

21              THE WITNESS:  Okay.

22   Q.     Well, did you ever --

23   A.     So they would discuss with me some of the

24          objectives and if it was relevant for me to

25          add information, I would.

                                                    122

1    Q.    You would agree with me that dark adhesives,

2          dark pigmented adhesive for flocked fabric

3          were well known in the industry at least 10

4          years before the date of your patent

5          application in 1992?

6    A.    Yes, not on transfer printing, but use of

7          dark adhesives, yes.

8    Q.    I'd like to just direct your attention to

9          tab -- Do you ever recall the examiner

10         indicating to you or your representatives

11         that he had studied the samples that had been

12         submitted and I'm going to quote, "Examiner

13         fails to see any an appreciable difference

14         between the sample studied."  Do you ever

15         recall that information being communicated to

16         you during your prosecution of the patent

17         application?

18              MR. GRIMM: I object to the form

19         and caution you that to the extent you're

20         getting this statement from your attorney --

21              MR. CASS:  It's a public

22         statement.

23              MR. GRIMM:  Want to rephrase your

24         question?

25    Q.    Were you aware the examiner stated, "Examiner

123

1           fails to see any appreciable difference

2           between the sample submitted in or about

3           April of 1994."?

4    A.     I believe I read that, but I can't be a

5           hundred percent sure.  I either read it or

6           Bill Laird advised me, I'm not sure, or the

7           attorneys.

8    Q.     So at least you knew at some point in 1994

9           that your patent application was being

10          rejected because the samples that were being

11          submitted on your behalf to the patent

12          office, didn't satisfy the examiner, the

13          examiner couldn't see any difference in those

14          samples; is that correct?

15   A.     What page are you referring to.

16   Q.     I'm just asking for your memory, sir, you

17          said you did at some point in time come to

18          learn that the examiner couldn't determine a

19          difference in them, and I'm just asking you

20          if that was in 1994?

21   A.     I don't remember the year.

22   Q.     Did you know your patent application went

23          abandoned?

24   A.     I think so, but again -- I think so.

25   Q.     Did you have an understanding as to why it

124

STATE OF RHODE ISLAND
                    ss. Providence, Rhode Island
COUNTY OF PROVIDENCE


    BE IT KNOWN THAT I, Lori R. Colwell, Shorthand
Reporter and Notary Public, reported stenographically
the foregoing deposition pursuant to notice at the time
and place stated in the caption hereof; that I was then
and there a Notary Public in and for the State of Rhode
Island; that by virtue thereof I was authorized to
administer an oath; that the witness before testifying
was duly sworn to tell the truth, the whole truth and
nothing but the truth; that the testimony of said
witness was reduced to typewriting under my direction;
that the foregoing pages contain a full, true and
correct transcription of the notes of said deposition;
that the deponent has made the request to read and sign
his deposition.

    I, FURTHER CERTIFY that I am not of counsel nor
attorney for either or any of the parties to said
action or otherwise interested in the event thereof,
and that I am not related to either or any of the
parties to said cause.

    IN WITNESS WHEREOF, I have hereunto subscribed my
name and affixed my seal of office this 22nd day of
April 2003.

                    _____
                         LORI R. COLWELL
                          Notary Public



My Commission Expires:
June 20, 2005