# EXHIBIT E

```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF CONNECTICUT
 2
 3
 4    INTERMARK FABRIC CORPORATION
 5    vs.                               C.A. NO. 3:02-CV-1267 (AVC)
 6    MICROFIBRES, INC.
 7
 8
 9            Deposition of JAMES R. FULKS, taken on behalf
      of the Plaintiff, pursuant to the Federal Rules of
10    Civil Procedure, on Thursday, March 27, 2003, at the
      offices of Hinckley, Allen & Snyder LLP, 1500 Fleet
11    Center, Providence, Rhode Island, taken before Lori R.
      Colwell, Notary Public, commencing at 9:10 a.m.
12
13
14
      APPEARANCES:
15
      CANTOR COLBURN LLP
16    By:   Charles F. O'Brien, Esq.
            55 Griffin Road South
17          Bloomfield, CT 06002
      Counsel for Plaintiff
18
      HINCKLEY, ALLEN & SNYDER, LLP
19    By:   William R. Grimm, Esq.
            1500 Fleet Center
20          Providence, RI  02903
      Counsel for Defendant
21
22
23
24
25
```

spherion
deposition services

475 Sansome Street, Suite 720
San Francisco, CA 94111
Voice: 415-362-6666 or 800-219-5300
Fax: 415-362-0907
Email: sfcourtreporting@spherion.com

| | | |
|---|---|---|
| 1 | A. | Well, they used at that time the same type of |
| 2 | | flock equipment that I was familiar with at |
| 3 | | Multifabrics.  It was all made by Microfibres |
| 4 | | or a company called Endef (phonetic), so it |
| 5 | | basically was you purchased or you brought in |
| 6 | | a substrate of some sort, you coated that |
| 7 | | substrate, you sifted flock onto the adhesive |
| 8 | | that you coated on there and you dried and |
| 9 | | cured the product. |
| 10 | Q. | Was Prevel Industries in 1978 purchasing |
| 11 | | colored adhesive? |
| 12 | A. | I believe they were.  My best recollection I |
| 13 | | have, we used colored adhesive. |
| 14 | Q. | Also in 1978 Prevel Industries was |
| 15 | | manufacturing flocked fabric with a colored |
| 16 | | adhesive? |
| 17 | A. | As well as clear adhesive, yes. |
| 18 | Q. | Do you know who Prevel Industries was |
| 19 | | purchasing the pigmented adhesive from? |
| 20 | A. | I believe I do.  The majority of it was from |
| 21 | | American Finish.  I believe some of it could |
| 22 | | have come from C. L. Hathaway. |
| 23 | Q. | And did Prevel Industries keep records of its |
| 24 | | manufacturing process? |
| 25 | A. | I assume they did. |

28

```
 1    Q.   Did they gravure print on flocked fabric?
 2    A.   I believe that they did gravure print
 3         products that were designed for gravure
 4         printing.
 5    Q.   Did they gravure print on flocked fabric?
 6    A.   They gravure printed to the best of my
 7         knowledge on flocked fabric that was prepared
 8         for gravure print.
 9    Q.   How was the flocked fabric prepared for
10         gravure printing?
11    A.   To the best of my knowledge, it would have
12         been with clear adhesive and fiber.
13    Q.   After a flocked fabric with a colored
14         adhesive was manufactured as Prevel
15         Industries, were there any other processes
16         performed on that product internally at
17         Prevel?
18    A.   I have no recollection of that.
19    Q.   Where would that product then go after it was
20         manufactured by Prevel?
21    A.   My recollection would be that that would be a
22         finished product at that point and it would
23         be provided to customers for their end use as
24         it was.
25    Q.   When you were manufacturing the flocked
```

```
 1      I already told you, we've already done that.
 2      I told you I was in the middle of a question
 3      when you stood up and interrupted.
 4              MR. GRIMM:  We are taking a
 5      break.
 6              MR. O'BRIEN:  There's a question
 7      on the table.
 8              MR. GRIMM:  There is not.  The
 9      record will reflect that.
10              MR. O'BRIEN:  I want to know what
11      was discussed about this document.
12              (Thereupon, a brief recess was
13      taken.)
14              MR. O'BRIEN:  For the record, I
15      want to make it clear that in my opinion
16      there was a question pending having to do
17      with this July 24, 2002 document as to the
18      factual basis that that document is used to
19      support a claim for direct infringement.
20      While my question was pending, there was a
21      conference, the brake was called by counsel
22      for Microfibres, and I think the law is
23      pretty clear that I'm entitled to know what
24      that conversation was, the substance of that
25      conversation during the break because there
```

73

1          was a pending question and because there is a
2          pending question.
3                    MR. GRIMM:  There was no question
4          pending at the time we took the break and
5          you're not entitled to information that is
6          protected by the attorney/client privilege.
7    Q.    Well, I'm going to ask the question,
8          Mr. Fulks.  I'd like to know what the
9          discussion was that took place between you
10         and counsel for Microfibres, Mr. Grimm during
11         our break.
12                   MR. GRIMM:  I object and instruct
13         the witness not to answer based on the
14         attorney/client privilege.
15                   MR. O'BRIEN:  I'm going to have
16         to actually file a motion then, motion to
17         compel that that information be disclosed
18         verbatim so that we know exactly what was
19         discussed, the entire conversation.  I'd like
20         to mark this July 24 document.
21                   (Thereupon, Plaintiff's Exhibit
22         15 was marked for identification.)
23                   MR. GRIMM:  Let me just say for
24         the record, when I left the room at the
25         brake, I specifically instructed Mr. Fulks

74

```
 1                 that I did not want to discuss the question
 2                 at all.
 3                         MR. O'BRIEN:  Are you saying then
 4                 that the document, this July 24, 2002
 5                 document, the whole line of questioning was
 6                 not discussed.
 7                         MR. GRIMM:  That's correct.
 8         Q.      Mr. Fulks, we've been talking about this July
 9                 24, 2002 document which has now been marked
10                 an as exhibit which is Exhibit 15.  You've
11                 indicated earlier that this Exhibit 15 was
12                 part of the factual basis for your claim of
13                 direct infringement against Intermark; is
14                 that true?
15         A.      Yes.
16         Q.      Can you point to the language in this Exhibit
17                 15 upon which you factually support your
18                 claim for direct infringement?
19         A.      It's more of the total content of the letter.
20                 I mean, the letter basically acknowledges
21                 that Intermark is producing products that
22                 infringe the patent, so if that's the case,
23                 then they would -- then they are infringing.
24                 It's the substance of the letter.
25         Q.      You've also talked about as an additional
```

75

| | | |
|---|---|---|
| 1 | Q. | When you say you forwarded it to your patent |
| 2 | | attorney, is that Mr. Grimm? |
| 3 | A. | No. |
| 4 | Q. | Is that Mr. MacCord? |
| 5 | A. | Yes, Mr. MacCord.  I may also have sent it to |
| 6 | | another intellectual property attorney who |
| 7 | | used to work at MacCord's firm and now works |
| 8 | | at another firm. |
| 9 | Q. | Was there a legal opinion that was generated |
| 10 | | as a result of the van Heel document? |
| 11 | A. | I'm not aware that there was anything in |
| 12 | | writing.  I did have some conversations with |
| 13 | | attorneys and with Bill about it and with Jim |
| 14 | | McCulloch about it. |
| 15 | Q. | When you say Bill, Bill Grimm? |
| 16 | A. | No, Bill Laird.  I mean I may have also |
| 17 | | discussed it with Bill, too, but I discussed |
| 18 | | it with Jim McCulloch, Bill Laird and at |
| 19 | | least with two intellectual property |
| 20 | | attorneys, maybe more. |
| 21 | Q. | What was the substance of your conversation |
| 22 | | with Mr. Laird having to do with the van Heel |
| 23 | | document? |
| 24 | | MR. GRIMM:  I'm going to caution |
| 25 | | you, Jim, to the extent you discussed with |

132

| | | |
|---|---|---|
| 1 | | Mr. Laird advice you got from either me or |
| 2 | | Mr. MacCord or the other patent attorney, you |
| 3 | | consulted, that's privileged information and |
| 4 | | you should not disclose the substance of it. |
| 5 | A. | I don't understand the question then.  What |
| 6 | | do you want me to answer. |
| 7 | Q. | I want to know what the conversation was |
| 8 | | between you and Mr. Laird. |
| 9 | A. | I've been advised I don't have to answer |
| 10 | | that. |
| 11 | Q. | You were advised -- you were not advised that |
| 12 | | you couldn't answer the question. |
| 13 | A. | Then I don't understand. |
| 14 | | MR. GRIMM:  Let me -- In |
| 15 | | answering his question, do not disclose to |
| 16 | | him any conversations that you may have had |
| 17 | | with Mr. MacCord, me or the other attorney. |
| 18 | | THE WITNESS:  Okay. |
| 19 | | MR. GRIMM:   If there is a |
| 20 | | conversation you had with Mr. Laird which was |
| 21 | | not based on discussions with the attorneys, |
| 22 | | you can advise Mr. O'Brien of that portion of |
| 23 | | the conversation. |
| 24 | | THE WITNESS:  Okay. |
| 25 | A. | Bill reviewed it, and came into my office and |

133

| | | |
|---|---|---|
| 1 | | basically we sat down for a few minutes. He |
| 2 | | said he didn't see anything in it at all that |
| 3 | | would give us a problem with regard to our |
| 4 | | patent. |
| 5 | Q. | Did you and Mr. Laird actually review the |
| 6 | | document together? |
| 7 | A. | We went over those sections that we thought |
| 8 | | were pertinent to the patent. |
| 9 | | MR. O'BRIEN: Could we just mark |
| 10 | | this document. |
| 11 | | (Thereupon, Plaintiff's Exhibit |
| 12 | | 17 was marked for identification.) |
| 13 | Q. | The van Heel document that we've been |
| 14 | | referring to has been marked as Exhibit 17. |
| 15 | | You say that you and Mr. Laird reviewed what |
| 16 | | you considered to be the pertinent portions |
| 17 | | of Exhibit 17. Can you direct me to those |
| 18 | | portions that you reviewed? |
| 19 | A. | I'm having some trouble finding it. For |
| 20 | | some reason I cannot find the specific |
| 21 | | sections, no. |
| 22 | Q. | Do you remember what sections were discussed? |
| 23 | A. | When I find them. I think under 2.6, |
| 24 | | Finishing of Flocked Fabrics, we discussed. |
| 25 | | It's on page -- I think it's 18. |

134

STATE OF RHODE ISLAND
                    ss. Providence, Rhode Island
COUNTY OF PROVIDENCE


    BE IT KNOWN THAT I, Lori R. Colwell, Shorthand Reporter and Notary Public, reported stenographically the foregoing deposition pursuant to notice at the time and place stated in the caption hereof; that I was then and there a Notary Public in and for the State of Rhode Island; that by virtue thereof I was authorized to administer an oath; that the witness before testifying was duly sworn to tell the truth, the whole truth and nothing but the truth; that the testimony of said witness was reduced to typewriting under my direction; that the foregoing pages contain a full, true and correct transcription of the notes of said deposition; that the deponent has not made the request to read and sign his deposition.

    I, FURTHER CERTIFY that I am not of counsel nor attorney for either or any of the parties to said action or otherwise interested in the event thereof, and that I am not related to either or any of the parties to said cause.

    IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal of office this 1st day of April, 2003.

                            _____
                            LORI R. COLWELL
                            Notary Public


My Commission Expires:
June 20, 2005