# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| INTERMARK FABRIC CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:02-CV-1267 (AVC) |
| | ) | |
| v. | ) | |
| | ) | |
| MICROFIBRES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF, INTERMARK FABRIC CORPORATION'S SECOND AMENDED ANSWERS TO DEFENDANT, MICROFIBRES, INC.'S FIRST SET OF INTERROGATORIES

Plaintiff, Intermark Fabric Corporation ("Intermark"), pursuant to Rule 33 of the Federal Rules of Civil Procedure, hereby submits its Second Amended Answers to Defendant, Microfibres, Inc.'s ("Microfibres") First Set of Interrogatories.

## GENERAL OBJECTIONS

1. Intermark objects to the Definitions portion of the Microfibres' Interrogatories to the extent it imposes a duty or seeks information beyond that which is provided for by the Federal Rules of Civil Procedure and the Local Rules for the United States District Court for the District of Connecticut.

2. The responses provided herein are based upon the best relevant information presently available to Intermark and are made without prejudice to the right of Intermark to make additional or modified responses should better or further information or documentation subsequently become available to it. These responses also are made without prejudice to any right of Intermark to offer evidence on its behalf or to object to the relevance, competence, or

admissibility on any ground of any evidence or witness offered by Microfibres; and these responses do not constitute an admission of competence or admissibility of evidence or a waiver of objection on any ground. Intermark's discovery is continuing and Intermark reserves the right to supplement these Responses.

3.    Intermark objects to each of Interrogatories 1-29 to the extent that any seek information or documents that are subject to the attorney-client privilege, constitute attorney work product, or are otherwise immune from discovery under the Federal Rules of Civil Procedure.

4.    Intermark objects to each of Interrogatories 1-29 to the extent that Microfibres seeks documents or information that is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less expensive, or less burdensome, or where the burden or expense to Intermark of the proposed discovery outweighs its likely benefit to Microfibres, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, the importance of the proposed discovery in resolving the issues, and the availability of the information to Microfibres from other sources.

5.    Intermark objects to each of Interrogatories 1- 29 to the extent that any of them seeks the production of any information that is irrelevant and not likely to lead to the discovery of admissible evidence.

6.    Intermark specifically incorporates each of these General Objections and Objections to Definitions into each of its specific responses to Interrogatories 1-29, whether or not express reference is made therein.

2

**INTERROGATORY NO. 1:** State every fact upon which you base the contention that Intermark's heat-set flocked fabric manufactured with a textile substrate and dark-pigmented adhesive, including heat-set Frosty, is a staple article of commerce.

**ANSWER: OBJECTION.** Intermark objects to this contention interrogatory as it is premature because discovery has not been completed. Intermark further objects to this interrogatory to the extent that it calls for a legal conclusion. Intermark further objects to this interrogatory on the grounds that it is overbroad and unduly burdensome. Intermark further objects to this interrogatory as it seeks to discover information prepared in preparation for trial and seeks information protected by the attorney/client privilege and work-product privilege. Subject to and without waiver of the above objections and the General Objections, and reserving Intermark's right to amend its answer, Intermark responds as follows. Both before and after the issuance of the '021 patent, Intermark sold heat set flocked fabrics with dark pigmented adhesives with Type 66 flock not only to transfer printers but also to third parties as finished goods and for wet printing and piece dying.

**INTERROGATORY NO. 2:** State every fact upon which you base the contention that Microfibres' infringement claims are barred or limited by laches.

**ANSWER: OBJECTION.** Intermark objects to this contention interrogatory as it is premature because discovery has not been completed. Intermark further objects to this interrogatory on the grounds that it is overbroad and unduly burdensome. Intermark further objects to this interrogatory to the extent that it calls for a legal conclusion. Intermark further objects to this interrogatory as it seeks to discover information prepared in preparation for trial and seeks information protected by the attorney/client privilege and work-product privilege. Subject to and

without waiver of the above objections and the General Objections, and reserving Intermark's right to amend its answer, Intermark responds as follows. The '021 patent issued in November of 1999. Although Microfibres knew as far back as 1991 that Intermark was manufacturing the Frosty product and also knew that Intermark was selling its Frosty product to third parties not only for wet printing but also for transfer printing, Microfibres waited for almost three years (until July of 2002) to take any action against Intermark.

**INTERROGATORY NO. 3:** State every fact upon which you base the contention that Microfibres' infringement claims are barred or limited by equitable estoppel.

**ANSWER: OBJECTION.** Intermark objects to this contention interrogatory as it is premature because discovery has not been completed. Intermark further objects to this interrogatory on the grounds that it is overbroad and unduly burdensome. Intermark further objects to this interrogatory to the extent that it calls for a legal conclusion. Intermark further objects to this interrogatory as it seeks to discover information prepared in preparation for trial and seeks information protected by the attorney/client privilege and work-product privilege. Subject to and without waiver of the above objections and the General Objections, and reserving Intermark's right to amend its answer, Intermark responds as follows. See Intermark's answer to Interrogatory Number 2. Additionally, the '021 patent was prosecuted at the Patent Office over a period of seven years. For several years during the prosecution of the '021 patent there was no substantive prosecution. Microfibres delayed any substantive prosecution of the '021 patent during those several years by abandoning each application in response to an office action that rejected the claims and filing continuation applications.

**INTERROGATORY NO. 4:** State every fact upon which you base the contention that the

4

invention claimed by the '021 Patent fails to meet one or more of the conditions for patentability specified in Title 35 of the United States Code.

**ANSWER:** **OBJECTION.** Intermark objects to this contention interrogatory as it is premature because discovery has not been completed. Intermark further objects to this interrogatory to the extent that it calls for a legal conclusion. Intermark further objects to this interrogatory on the grounds that it is overbroad and unduly burdensome. Intermark further objects to this interrogatory as it seeks to discover information prepared in preparation for trial and seeks information protected by the attorney/client privilege and work-product privilege. Subject to and without waiver of the above objections and the General Objections, and reserving Intermark's right to amend its answer, Intermark responds as follows. The '021 patent fails to meet the conditions of patentability for at least the following reasons.

Prior to the filing of the initial '021 patent application on July 31, 1992, a specialized heat setting process was developed at Microfibres and the inventor, James McCulloch, contemplated that the specialized heat setting process was the best mode of carrying out the invention but did not disclose that heat setting process in the '021 patent. McCulloch admitted that the specialized heat setting process improves the quality of a product made under the invention because it allows one to make transfer printed flocked fabrics with dark pigmented adhesives with deep, dark colored prints, it minimizes the risk of fires in the ovens, it provides the ability to obtain uniform heat dispersion over the flocked fabric and it reduces the amount of dwell time of the flock in the ovens which minimizes any yellowing of the fabric and allows the line to run at higher speeds which produces a more cost effective product. Prior to the filing of the initial '021 patent application on July 31, 1992, McCulloch and Microfibres considered the specialized heat setting

5

process to be a trade secret and McCulloch and Microfibres still consider the specialized heat setting process to be a trade secret.  The samples that were being produced by Microfibres in Canada for research and development in April of 1992 were heat set.  The transfer printed flocked fabrics with dark pigmented adhesives that Microfibres was interested in selling as of December of 1992 were heat set.  The term "dark pigmented adhesive " and "overall dark pigmented adhesive" are indefinite to a person in the textile industry.

McCulloch never informed the Patent Office that Microfibres had been manufacturing flocked fabric with dark pigmented adhesives, including black pigmented adhesives, since at least the early 1980's.  Instead, McCulloch told the Patent Office during the prosecution of the '021 patent application and in the '021 patent itself that the conventional way to make flocked fabrics before the invention was with clear adhesives.  The Patent Office cited to prior art that disclosed pigmenting a cement in the manufacture of flocked fabric to show that pigmenting an adhesive was conventional practice.  McCulloch told the Patent Office that the amount of blue cement in the prior art patent would not be enough to impart significant color to the cement. McCulloch distinguished another prior art reference cited by the Patent Office by arguing that it only showed colored adhesives for purposes of ornamental affects.

McCulloch failed to inform the Patent Office about the relationship between Intermark and Microfibres in 1991.  In 1989, Intermark began manufacturing and selling its Frosty products which are flocked fabrics with natural flock and a dark pigmented adhesives.   Intermark has produced many fabric samples and corresponding production records that show that Intermark was manufacturing the Frosty product as far back as 1989.  Starting at least in the late 1980's, Microfibres periodically supplied Intermark with flock.  In 1991, Microfibres began again to

supply flock to Intermark.  During that time in 1991, Intermark made it clear to Microfibres that

it was interested in purchasing "Type 66" nylon flock.  In 1991, Microfibres was aware that

Intermark intended to sell its flocked fabric with a textile substrate, natural flock and a dark

pigmented adhesive to transfer printers.  In a letter dated October 2, 1991 from William

Lucchesi, president of Intermark, to Arnold Kaija of Microfibres, Lucchesi told Microfibres that

Intermark's products are used by many different customers, some wet printing and some transfer

printing.  McCulloch knew of the supply relationship between Intermark and Microfibres in 1991

because he was copied on many of the letters between Intermark and Microfibres.  A quality

issue arose in 1991 having to do with the flock that Microfibres was supplying to Intermark

because it contained too much of a special electrical finish so that when Intermark flocked its

fabric using Microfibres' flock the resulting flocked fabric had a uneven appearance.   The

uneven appearance was most obvious in the Frosty product due to the dark pigmented adhesive

used to manufacture the Frosty product because it had a definite contrast against the natural

flock.  In the fall of 1991, Mr. Turcotte and Mr. Kaija had more than one discussion concerning

this quality issue and Mr. Kaija visited Intermark's facility in the fall of 1991 on more than one

occasion on this issue.   During Kaija's visits to Intermark's facility in 1991, he observed a

production run of Intermark's Frosty product (flocked fabric with a textile substrate, natural flock

and a dark pigmented adhesive) both with Microfibres' flock and a production run with a

competitor's flock.   As a result of observing the production run, Kaija was able to observe

specific machine settings used by Intermark in its production of flocked fabric with dark

pigmented adhesives.   In the fall of 1991, Mr. Kaija was also given samples of Intermark's

Frosty product to bring back to Microfibres.  In response to this quality complaint, Microfibres

made adjustments to the manufacture of its flock to accommodate Intermark's manufacture of Frosty. Wayne Turcotte had discussions with Arnold Kaija in 1991 regarding transfer printing on Intermark's Frosty product. In October of 1991, Intermark informed Microfibres that "dye index is very critical for once transfer printer matches paper on your fiber, it must not change." In the fall of 1991, Microfibres was periodically testing the flock being supplied to Intermark to ensure that the flock met Intermark's dye index requirements so that its Frosty product could be correctly transfer printed.

In the early to mid-1980's, Vertipile, Inc. was manufacturing flocked fabric with natural flock and dark pigmented adhesives and selling these fabrics to Bunch Fabrics. Bunch Fabrics would transfer print on the flocked fabric with natural flock and dark pigmented adhesives. Also during that same time frame in the early to mid-1980's, representatives from Vertipile and Bunch Fabrics visited each others facility on more than one occasion and, under no obligations of confidentiality, discussed products and observed samples including the flocked fabric with natural flock and dark pigmented adhesives from Vertipile that Bunch Fabrics was transfer printing on.

In 1985, Vertipile was transfer printing on flocked fabric with natural flock, textile substrate and a dark blue and black pigmented adhesives and selling those fabrics to furniture manufacturers.

In the mid-1980's at a large promotional furniture show in High Point, North Carolina, a company called Gaines Furniture had on public display fabrics that were transfer printed flocked fabrics with a natural flock and dark pigmented adhesives.

In 1989, Spectro Coating Corporation was manufacturing flocked fabric with natural

8

flock and dark pigmented adhesives. Spectro was also heat setting its flocked fabric with dark

pigmented adhesives in 1989. In 1990 or 1991, Spectro began manufacturing and selling a

product called Cadillac which consisted of a flocked fabric with a textile substrate, natural flock

and a black adhesive. Spectro was selling the Cadillac product with a black adhesive to a

company called Anabel in Belgium in 1990 or 1991 which would then transfer print on the

Cadillac product. In 1991, Spectro was also selling the Cadillac product with a black adhesive to

Culp who was transfer printing on the Cadillac product. From at least 1990 through 1992,

representatives from Culp and Spectro visited each others facility on more than one occasion and,

under no obligations of confidentiality, discussed products and observed samples including the

flocked fabric with natural flock and dark pigmented adhesives from Spectro that Culp was

transfer printing on.

 In July of 1991, Spectro shipped 3,500 yards of flocked fabric with natural flock and

beige and black adhesive to Leathertex knowing that Leathertex was going to transfer print onto

the flocked fabric. On August 11, 1991, Leathertex sent a facsimile to Spectro indicating that

Leathertex desired to purchase from Spectro flocked fabric with a natural flock and a dark

adhesive and indicated that a sample would be sent via Federal Express. The sample sent by

Leathertex as referred to in the August 11, 1991 facsimile was a transfer printed flocked fabric

with natural flock and a black pigmented adhesive and was received by Spectro in or around

August 1991.

 United States Patent No. 4,894,748 to William Squires issued in 1990. Claim 10 of the

Squires patent discloses a flocked fabric with a substrate (which includes a foamed polyester

element and a polyester raschel knit fabric). Claim 15 of the Squires patent shows transfer

9

printing the flocked fabric disclosed in Claim 10. Claim 17 shows using a pigmented adhesive, which could be black, blue or any color, in the transfer printed flocked fabric disclosed in Claims 10 and 15.

The publication entitled "The Flocking Process" was authored by G.P. Van Heel and was published by Rohm & Haas. Van Heel discloses a flocked fabric with a substrate (including a textile substrate), raised thermoplastic flock fibers (including nylon fibers) and adhesive adhering the fibers to the substrate. Van Heel also discloses pigmenting the adhesive and transfer printing.

The publication entitled "Flocking" was published by the American Flocking Association in 1990. "Flocking" discloses a flocked fabric with a substrate (including a textile substrate), raised thermoplastic flock fibers (including nylon fibers) and adhesive adhering the fibers to the substrate. "Flocking" also discloses pigmenting the adhesive and transfer printing.

William Laird developed in Canada the specialized heat setting process that McCulloch contemplated as the best mode of the invention. McCulloch claims heat setting as part of the invention but did not disclose Mr. Laird as an inventor. Mr. Laird allegedly made samples in Canada of transfer printed flocked fabrics with pigmented adhesives before McCulloch says that he conceived of the idea but Mr. Laird was not listed as an inventor.

As of at least 1986, Malden Mills was manufacturing and selling transfer printed flocked fabrics with dark pigmented adhesives. Also in 1986 Malden Mills was discussing with representatives of Vertipile, under no obligation of confidentiality, quality complaints of customers that were purchasing transfer printed flocked fabrics with dark pigmented adhesives from Malden Mills.