7.     **Defendant's Contentions**

1.     James McCulloch ("McCulloch") filed a patent application with the Patent and Trademark Office related to a transfer printed flocked fabric on July 31, 1992.

2.     The Patent and Trademark Office investigated and examined the application and various continuations of the application for a period of over seven (7) years.

3.     The United States government issued United States Patent No. 5,981,021 (the "'021 Patent"), on November 9, 1999, to McCulloch, the inventor and president of Microfibres.

4.     McCulloch assigned the patent to Microfibres.

5.     The '021 Patent describes an invention that was a significant step forward in creating richly and deeply colored flocked fabrics that have a soft feel -- something that the industry previously had been unable to achieve.

6.     As the background section of the '021 Patent explains, flocked fabric is manufactured by adhering tiny nylon or polyester fibers (called flock) to a textile backing (called a substrate).

7.     One of the methods of dyeing flocked fabric is to transfer print it -- a process in which paper that has been covered in dyestuffs is pressed into contact with flocked fabric. The pressure and heat from the printing process force the dye off the paper and into the flock fibers, coloring them.

8.      Before McCulloch's invention, manufacturers were unable to transfer print on flocked fabric and create deeply and richly colored flocked fabric with a soft feel.

9.      To get deep color penetration the transfer printing process was performed at high pressure with a substantial amount of dye.  Unfortunately, the intense pressure flattened and melted the flock fibers and created a flat, papery fabric that was unacceptable for most upholstery applications.

10.     The excess dyestuffs used during the printing would rub off in a process known as "crocking."

11.     When manufacturers tried to reduce the amount of pressure and dyestuffs (to prevent flattening and crocking), the color would not penetrate the flock deeply.  The lower portion of the flock fibers would remain un-dyed and the textile substrate would show through the flock -- a problem called "grin-through."

12.     James McCulloch solved these problems.

13.     Microfibres' company records show that on or before March 21, 1991 McCulloch conceived the idea of combining (a) transfer printing, and (b) flocked fabric in which the flock fibers were adhered to the textile substrate with dark-pigmented glue.

14.     The results were remarkable.  The dark-pigmented glue colored the textile substrate and the bottom portion of the flock fibers; eliminating grin-through.

15.        Because there was no grin-through, the amount of dyestuffs and pressure in the transfer print process could be reduced and the flock did not melt or flatten. McCulloch's invention achieved a deeply and richly colored flocked fabric that had a nice soft feel without any crocking or grin-through.

16.        In 2002, Microfibres learned that Intermark had sold greige goods to its German affiliate, Spandauer Velours which had transfer printed the fabric. Microfibres put both Intermark and Spandauer on notice of the '021 Patent.

17.        Microfibres directed Intermark to stop any infringing activity. Intermark responded by filing this lawsuit, claiming that it did not infringe and that the '021 Patent was invalid.

18.        Microfibres filed a counterclaim based upon Intermark's infringement of the '021 Patent.

19.        Claim 1 of the '021 Patent claims as the invention: "A transfer printed, flocked fabric comprising a textile substrate, raised thermoplastic fibers on the substrate, a dark pigmented adhesive adhering said fibers to said substrate and disperse dye distributed in a pattern in upper portions of said thermoplastic fibers."

20.        At Intermark's 30(b)(6) deposition, Wayne Turcotte, the company's Executive Vice President, admitted that Intermark has manufactured a flocked fabric that includes all of the elements claimed in the '021 Patent -

- a flocked fabric that is made with a textile substrate, dark pigmented

adhesive, and that is transfer printed:

| | |
|---|---|
| Q. | What is Exhibit 4? |
| A. | It's a flocked fabric with a black adhesive on a poly cotton substrate that's been embossed and then transfer printed. |
| Q. | When you say "embossed," do you mean air embossed? |
| A. | Yes. |
| Q. | Did Intermark perform all the operations necessary to create Exhibit 4? |
| A. | Yes. |
| Q. | *So Intermark took a textile substrate, applied black adhesive, coated flock to create a flocked fabric, correct?* |
| A. | *Yes.* |
| Q. | It air texturized the fabric, correct? |
| A. | Yes. |
| Q. | The purpose of which was to create a pattern? |
| A. | Yes. |
| Q. | *And then Intermark transfer printed on that fabric, correct?* |
| A. | *Yes.* |
| . . . . | |
| Q. | So is it fair to say that at the time Intermark created the flocked fabric which is Exhibit 4, it was on notice of the existence of Microfibres' 021 patent? |
| A. | Yes. |
| . . . . | |
| Q. | Was the purpose of creating these samples to generate sales from Jest Textiles. |
| A. | Yes. |

21.    The patent laws impose liability on those who actively induce

another's infringement of a patent (by offering advice,

components, etc.).  See 35 U.S.C. §§ 271(b); 271(f)(1).

22.    After the '021 Patent issued, Intermark sold a greige good fabric

that contains most of the primary components of a product that

would infringe the '021 Patent.  Intermark calls the fabric "Frosty."

It consists of a flocked fabric made with a textile substrate and

dark-pigmented adhesive.  Frosty is missing only one element --

transfer printing -- to make a product that infringes the '021 Patent.

23.        Since the patent issued, Intermark has actively encouraged others

to transfer print on Frosty.  It touts the characteristics of Frosty that

make it suitable for transfer printing and even offers instructions

on how to transfer print:

Q.    Does or has Intermark advised customers and potential customers
      that Frosty is suitable for transfer printing?
A.    Yes.
Q.    And what assistance has Intermark offered to transfer printers
      related to their transfer printing the Frosty product?
A.    Just to explain to them which direction the fabric should be
      running, what temperature the fabric should be running, different
      pressures that can be used, brushing, brushing post and after.
. . . .
Q.    And in connection with that, those statements, does Intermark
      identify any particular characteristics of Frosty which make it
      suitable for transfer printing?
A.    Frosty – the Frosty product lends itself to darker colors and it lends
      itself to less grim through.

Q.    So in connection with your sales efforts related to Frosty, you
      sometimes hand out written instructions concerning the transfer
      print process; is that correct?
A.    Yes.  We've done that in the past.

24.    Since the '021 Patent issued, Intermark has also encouraged some of its customers

to transfer print Frosty by:

a)    displaying transfer printed Frosty at trade shows;

b)    advising potential customers that Frosty was suitable for transfer printing;

c)    issuing a press release claiming that the '021 Patent was invalid;

d)    advising customers that Microfibres' '021 Patent was frivolous and that

      Intermark had a legal opinion concerning its invalidity; and

e)      agreeing to indemnify certain customers, including Culp and Spandauer, from infringement claims made against them by Microfibres arising from their transfer printing on Frosty.

25.     After the '021 Patent issued, customers who purchased the Frosty greige goods product from Intermark did in fact transfer print on such greige goods in the United States.

26.     After the '021 Patent issued, Intermark sold Frosty to customers overseas like Spandauer Velours knowing that such customers intend to transfer print on it and did in fact transfer print on Frosty (i.e., add the final component of the invention):

    Q.    Has Intermark sold Frosty to Spandauer Velour?
    A.    Yes.
    Q.    Does Spandauer Velour have transfer printing capability?
    A.    Yes.
    Q.    At the time Intermark sold Frosty to Spandauer Velour, was it
          aware that Spandauer planned to transfer print?
    A.    Yes.

27.     The sales records that Intermark has produced in discovery indicate that its sales of Frosty to transfer printers from 2000 through June 27, 2004 were substantial.

28.     The standard for rendering a patent invalid or unenforceable is extremely high. The Court and the jury must begin with the presumption that Microfibres' '021 Patent is valid. See 35 U.S.C. § 282. The jury can declare the '021 Patent invalid or unenforceable only if Intermark presents *clear and convincing* evidence to substantiate those claims. See Transclear Corp. v. Bridgewood Svcs., Inc., 290 F.3d 1364, 1370 (Fed. Cir. 2002).

29.     Intermark first claims that the '021 Patent is invalid under 35 U.S.C. § 102 because it was not a novel invention. This claim is known as "anticipation." See

33

Brown v. 3M, 265 F.3d 1349, 1351 (Fed. Cir. 2001). To invalidate a patent on anticipation grounds Intermark must introduce clear and convincing evidence that some pre-existing invention (also known as "prior art") is identical to and therefore "anticipates" the invention that McCulloch patented. See Robert L. Harmon Patents and the Federal Circuit § 3.2 at 91 (7th ed. 2005); Woodland Trust v. Flowertree Nursery, Inc., 148 F.3d 1368, 1370 (Fed. Cir. 1998); Juicy Whip, Inc. v. Orange Bang, Inc., 292 F.3d 728, 737 (Fed. Cir. 2002). *Every* element and limitation of McCulloch's claimed invention must be found in the alleged anticipating prior art just as it is arranged in the claim. See In re Paulsen, 30 F. 3d 1475, 1478-79 (Fed. Cir. 1994).

30.     Moreover, anticipation must be found within a single prior art reference and not by cobbling together pieces from various prior art references. See Studiengelellschaft Kohle v. Dart Indus., 726 F.2d 724 (Fed. Cir. 1984).

31.     Intermark has pointed to a number of prior art references that -- it claims -- anticipate the '021 Patent and render it invalid under 35 U.S.C. § 102. These prior art references either do not precede McCulloch's invention date, may not be considered as a matter of law, or do not anticipate.

32.     Intermark claims that Frosty -- the fabric it sells to Spandauer and others for transfer printing -- anticipates the '021 Patent. It claims that it manufactured Frosty in the late 1980s, long before McCulloch conceived his invention in early 1991, and that it sold Frosty to transfer printers.

33.     Frosty does not anticipate the '021 Patent for the simple reason that Frosty does not include every element of the invention described by the '021 Patent. Frosty is

not a transfer-printed fabric. It is an un-dyed fabric that is sold to others for processing. There is no documentary evidence that anyone ever transfer printed on Frosty before McCulloch conceived his invention. Although Intermark has produced its correspondence and billing records dating from the late 1980s and early 1990s -- which suggest that Intermark shipped fabrics to various piece dyers (not transfer printers), none of this written material establishes that anyone ever transfer printed on Frosty prior to McCulloch's invention.

34.    Testimony that is uncorroborated by physical specimens or actual sales documentation cannot invalidate a patent as a matter of law. Courts treat this type of evidence as self-serving and reject it. See Juicy Whip, Inc. v. Orange Bang, Inc., 292 F.3d 728 (Fed. Cir. 2002); Wooodland Trust v. Flowertree Nursery, Inc., 148 F.3d 1368 (Fed. Cir. 1998) ("In this case, despite the asserted many years of commercial and public use, we take note of the absence of any physical record to support the oral evidence. . . . The district court did not rely on the two undated photographs, and indeed their lack of detail and clarity can not have provided documentary support.").

35.    Intermark has produced two fabric samples that it also claims anticipate the '021 Patent: (a) a fabric sample manufactured by Spectro Coating and allegedly transfer printed by Culp between December 1991 and January 1992, and (b) a flocked fabric sample that is now attached to an August 11, 1991 letter from Leathertex to Spectro. It has also produced a document dated 1985 from a company called Vertipile, Inc. It is titled "Experimental Production Run."

35

36.     The Culp fabric sample does not anticipate the '021 Patent because it was created between December 1991 and January 1992 -- long after McCulloch conceived his invention (by March 21, 1991).

37.     The Leathertex sample does not anticipate either. Although a fabric sample is now attached to an August 11, 1991 letter it is entirely unclear when the sample was actually made. The accompanying letter is nearly indecipherable and hardly constitutes clear and convincing proof of the manufacture of a transfer printed flocked fabric on a textile substrate with dark pigmented adhesive. In addition, the letter suggests that whatever product was made, it was made in Italy, not the United States, and thus would not anticipate under § 102.

38.     The Vertipile document invokes an experiment and does not even indicate if the fabric in question is going to be transfer printed. There is no evidence that the experimental test run was even performed.

39.     U.S. Patent 4,895,748 to Squires (the '748 Patent) is not anticipating prior art because the '748 Patent does not teach each and every element and limitation of the invention claimed by the '021 Patent.

40.     First, the '748 Patent teaches the creation of a flocked *foam* fabric that is transfer printed, rather than a flocked *textile* fabric. According to the American Flock Association, foam is not a textile substrate.

41.     Second, the '748 Patent also teaches the creation of a fabric in which the nylon fibers are "set into a flattened and entangled state" rather than the "raised thermoplastic fibers" claimed by the '021 Patent. In other words, the '748 Patent teaches crushing the fibers rather than keeping them upright. The whole purpose

of the '021 Patent was to create a fabric in which the flock stands upright and gives the fabric a nice, soft feel. The '748 Patent teaches an invention that is the exact opposite.

42.    *Design With Flock In Mind* and *The Flocking Process* are two articles that were written before McCulloch conceived his invention. They generally discuss the manufacture of flocked fabric. Both articles mention pigmented adhesives and also separately mention transfer printing. Neither article, however, suggests that these two ideas should be combined -- as McCulloch thought to do in early 1991.

43.    In order to anticipate, a prior art reference must not only include every element, it must also arrange them as in the claim, see Brown, 265 F.3d at 1351, and describe the invention so a person of ordinary skill could practice it. See Paulsen, 20 F.3d at 1479. Neither *Design With Flock In Mind* nor *The Flocking Process* do so.

44.    Intermark also wrongly claims that the U.S. Patent and Trademark Office should never have awarded McCulloch the '021 Patent because his invention was obvious at the time he conceived it. See 35 U.S.C. § 103; Beckson Marine, Inc. v. NFM, Inc., 292 F.3d 718, 725 (Fed. Cir. 2002). As with anticipation, an obviousness claim will prevail only when the facts are *clear and convincing*. See id. Microfibres' textile expert has reviewed this argument and rejected it.

45.    None of the prior art references cited by Intermark render the '021 Patent obvious because none of them suggest or teach the particular combination of dark pigmented adhesive, a textile substrate, upright thermoplastic fibers, and transfer printing found in the '021 Patent.

46.    The Court of Appeals for the Federal Circuit has cautioned against taking separate elements found in prior art references and combining them without some clear teaching in the prior art that such a combination should be made.  See Karsten Manufacturing Corp. v. Cleveland Golf Co., 242 F.3d 1376, 1385 (Fed. Cir. 2001); N. Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 934 (Fed. Cir. 1990) ("It is insufficient that the prior art disclosed the components of the patented device, either separately or used on other combinations; there must be some teaching, suggestion, or incentive to make the combination made by the inventor."); Heidelberger Druckmaschinen v. Hantscho Commercial, 21 F.3d 1068, 1072 (Fed. Cir. 1994) ("When the patented invention is made by combining known components to achieve a new system, the prior art must provide a suggestion or motivation to make such a combination.")

47.    Here, *Design With Flock in Mind* and *The Flocking Process* both teach the use of pigmented adhesives in flocked fabrics and also separately teach transfer printing. However, neither publication suggests that these things should be combined in order to solve the long-felt need for a deep and dark colored transfer printed flocked fabric that was soft, grin-free, and crock-fast.

48.    To establish inequitable conduct Intermark must show by clear and convincing evidence that McCulloch failed to disclose material information with the specific intent to mislead the Patent Office.  See Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 326 F.3d 1226, 1233 (Fed. Cir. 2003).  Intermark has not (and could not) show that McCulloch intentionally withheld any material information from the Patent Office, much less with the intent to deceive.

49.    McCulloch disclosed the prior existence of pigmented adhesives, both in the specification itself and by referring to the Katz and Bernard patents.  Indeed the '021 Patent specifically states that pigmented adhesives were already known in the industry:  The '021 Patent itself acknowledges the existence of colored adhesives:  "**It is known to add pigment to an adhesive** used in some flocked fabric manufacturing," . . . "**Tinted adhesives** are also known for use with pre-dyed flock to obtain an overall intensity of shade."

50.    McCulloch's statement to the Patent Office concerning reduced pressure levels permitted by the invention was truthful.  Microfibres generally printed at the upper limits of a range that extended from 10 pounds to 60 pounds, depending on the fabric.  The claimed invention allowed Microfibres to reduce its printing pressures.

51.    The '021 Patent does not make a claim for reduced printing pressures.  Although Microfibres' patent application initially included pressure claims, those claims were withdrawn.  During the prosecution McCulloch explained that the exact pressures were not material to his invention and the Patent Office accepted that response.

52.    Microfibres uses infrared heaters to "heat-set" some of its flocked fabric.  The heat setting process helps the flock fibers bounce back after being transfer printed.  Claim 1 asserted against Intermark does not include heat setting.

53.    The use of infrared heaters are not part of the claimed invention.  The law provides that so long as a product or process is not claimed it does not need to be disclosed unless it is novel and essential to practicing the invention.  See <u>Eli Lilly</u>

and Co. v. Barr Labs., 251 F.3d 955, 963 (Fed. Cir. 2001) ('[A]n inventor need not disclose a mode for obtaining unclaimed subject matter unless the subject matter is novel and essential for carrying out the best mode of the invention.").

54.     The use of infrared heaters in the heat setting process were well known in the industry when McCulloch applied for his patent.  Infrared electric heaters and temperature sensors like those used by Microfibres were actively marketed by companies like Glenro, Inc. and Casso-Solar during the early 1990s.   Indeed, Microfibres' competitor Culp, Inc. admitted that it was using these heaters no later than March 1990.

55.     The use of infrared heaters did not relate to the quality of the invention.  Instead, they were used to achieve manufacturing efficiencies in the production of heat set flocked fabric by eliminating oven fires, reducing scorched and yellowed fabric, increasing line speeds, and improving the ability to perform an even heat set.

## 8.     Legal Issues

Subject to the motions-in-limine filed by the parties, and unless stated otherwise below, the parties agree that the present case relates to the patent laws of the United States.  The legal issues to be determined are as follows:

(1)     Whether the '021 patent is invalid as anticipated under 35 U.S.C. §102.

(2)     Whether the '021 patent is further invalid as obvious under 35 U.S.C. §103.

(3)     Whether the '021 patent is further invalid and/or unenforceable due to Microfibres' conduct in obtaining the patent.

(4)     Whether the *Frosty* product is a staple article of commerce. (Defendant contends that this is not a legal issue)

40

*(5)*     Whether the '021 patent is invalid as being derived from Intermark's *Frosty* product and information learned during the association between Intermark and Microfibres. (Defendant contends that this is not a legal issue)

*(6)*     Whether the '021 patent is invalid under 35 U.S.C. §102(f).

(7)     Whether Intermark infringed the '021 patent in violation of 35 U.S.C. §271(a).

(8)     Whether Intermark infringed the '021 patent in violation of 35 U.S.C. §271(b).

(9)     Whether Intermark infringed the '021 patent in violation of 35 U.S.C. §271(f)(1).

(10)    What constitutes a dark pigmented adhesive.

(11)    Whether Microfibres violated the Connecticut Unfair Trade Practices Act.

(12)    Whether Microfibres tortiously interfered with the business relationships of Intermark.

(13)    Whether this is an exceptional case under 35 U.S.C. § 285. (Defendant contends that this is not a legal issue)

(14)    Whether James B. McCulloch is the sole and/or an inventor of the '021 patent. (Defendant contends that this is not a legal issue)

(15)    Whether Microfibres failed to disclose the best mode of making the invention.

**9.     <u>Voir Dire Questions</u>**

a.    Plaintiff's Proposed Jury Voir Dire is attached hereto at Tab 1.

b.    Defendant's Proposed Jury Voir Dire is attached hereto at Tab 2.

**10.    <u>List of Witnesses</u>**

a.    <u>Plaintiff's List of Potential Witnesses (not in order of appearance)</u>

1.    Brookstein, David S.

2.    Bunch, Charles L.

3.     Forsdhal, Kerry

4.     Fulks, James R.

5.     Goffney Jr., Lawrence J.

6.     Hadley, Peter M.

7.     Hauser, Peter J.

8.     Laird, William Frederick

9.     Lucchesi Jr., William

10.    Madren, Luther Boyd

11.    McCulloch, James R.

12.    Nour, Moustafa T.

13.    Ouimet, Laura

14.    Perry, Ronald S.

15.    Rahimi, David

16.    Rosenthal, Steven

17.    Shah, Hemendra K.

18.    Strouse, Susan

19.    Turcotte, Wayne

b.  <u>Defendant's List of Potential Witnesses</u>

1.     Peter J. Hauser, Ph.D

2.     Dr. David Brookstein

3.     Michael Pomianek

4.     James R. Fulks

5.     James P. McCulloch

  6.  William F. Laird

  7.  Howard A. MacCord, Jr.

  8.  Arnold Kajia

  9.  Eric Hummel

  10.  Scot Marsland

**11.**  <u>**Exhibits**</u>

The parties reserve the right to supplement the exhibit lists with additional exhibits and objections.

a. See Plaintiff's Exhibit List attached hereto at Tab 3.

b. See Defendant's Exhibit List attached hereto at Tab 4.

**12.**  <u>**Deposition Testimony**</u>

The parties reserve all objections to form made during each deposition and the right to supplement objections to the other party's designations.

a. See Plaintiff's Deposition Designations at Tab 5.

b. See Defendant's Deposition Designations and Counter Designations at Tab 6.

c. See Plaintiff's Counter-Designations at Tab 7.

**13.**  <u>**Requests for Jury Instructions**</u>

a. See Plaintiff's Proposed Jury Instructions at Tab 8.

b. See Defendant's Proposed Jury Instructions at Tab 9.

**14.**  <u>**Anticipated Evidentiary Problems**</u>

Plaintiff has currently filed the following motions-in-limine (but reserves the right to file additional motions-in-limine):

(1)     Motion in Limine to Exclude Testimony Between Defendant and Defendant's Counsel for Prior Assertion of the Attorney/Client Privilege.

(2)     Motion in Limine to Exclude Defendant from Calling Michael Pominanek and Eric Hummel for Failing to Disclose the Witnesses under the Rule 26 (Initial Disclosures) and in Answers to Interrogatories

Defendant has currently filed the following motions-in-limine (but reserves the right to file additional motions-in-limine):

(1)     Motion in Limine to Sever Inequitable Conduct Claim

(2)     Motion in Limine to Re-Order Trial Presentation

(3)     Motion in Limine to Exclude Expert Testimony of Lawrence J. Goffney Jr.

(4)     Motion in Limine to Exclude Evidence Relating to "Best Mode" Defense

(5)     Motion in Limine to Exclude Arnold Kaija Correspondence and Related Evidence

(6)     Motion in Limine to Exclude AFA Meeting Minutes

(7)     Motion in Limine to Exclude Uncorroborated Oral Testimony of Prior Art

**15.**     <u>**Trial Time**</u>

a.   5 to 7 full trial days

//

//

//

//

//

For the Plaintiff
Intermark Fabric Corporation

_____/s/_____

William J. Cass, Esq. (ct 12806)
Charles F. O'Brien, Esq.  (ct 22074)
CANTOR COLBURN LLP
55 Griffin Road South
Bloomfield, Connecticut 06002
Telephone: (860) 286-2929
Facsimile: (860) 286-0115

For the Defendant
Microfibres, Inc.

_____/s/_____

Brent R. Canning, Esq.  (ct 23991)
William R. Grimm, Esq.
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, RI  02903
Telephone:  (401) 274-2000
Facsimile:  (401) 277-9600

# TAB 1

# Plaintiff's Proposed Jury Voir Dire

# TAB 2

# Defendant's Proposed Jury Voir Dire

# TAB 3

# Plaintiff's Exhibit List

# TAB 4

# Defendant's Exhibit List

# TAB 5

# Plaintiff's Deposition Designations

# TAB 6

# Defendant's Deposition Designations

# TAB 7

# Plaintiff's Counter-Designations

# TAB 8

# Plaintiff's Proposed Jury Instructions