# EXHIBIT 2

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF CONNECTICUT

3                          ---o0o---

4

5   INTERMARK FABRIC CORPORATION

6        vs.                        C.A. NO. 3:02-CV-1267 (AVC)

7   MICROFIBRES, INC.

8   _____/

9

10

11              Deposition of JAMES R. McCULLOCH, taken on

12   behalf of the Plaintiff, pursuant to the Federal Rules

13   of Civil Procedure, on Thursday, April 17, 2003, at the

14   offices of Hinckley, Allen & Snyder LLP, 1500 Fleet

15   Center, Providence, Rhode Island, taken before Lori R.

16   Colwell, Notary Public, commencing at 10:10 a.m.

17

18

19

20

21

22

23

24

25

1                       taken.)

2          Q.    Let me rephrase my question.  In order to

3                achieve the deep dark contrasts with your

4                invention, you also developed a heat setting

5                process; is that correct?  I'm not asking you

6                to describe it.  I'm asking if you also

7                developed a heat setting process.

8          A.    It's not deep dark contrast.  It's deep

9                colors.

10         Q.    In order to achieve these deep colors, you

11               developed a heat setting process?

12         A.    Yes, that was part of the work that preceded

13               the invention, yes.

14         Q.    And that process involved certain pressures

15               and treatment of the heat setting, correct?

16               I'm not asking for specifics of what they

17               are, but it involved certain parameters with

18               the heat setting machine?

19         A.    Yes, different types of equipment, yes.

20         Q.    And different treatments?

21         A.    Well, there are normally different ways to

22               heat set fabrics, yes.

23         Q.    But you developed a special way to heat set

24               the fabric, correct?  .

25         A.    An improved way, yes.

103

1    Q.    And you considered that improved way to be a

2          trade secret, correct?

3    A.    Yes.

4    Q.    And that was done in roughly -- it was done

5          before 1992 or -- Strike that.  It was before

6          you filed your patent application?

7    A.    Yes.

8    Q.    I'd like to go  -- and it would be accurate

9          to state you don't disclose that trade secret

10         in your patent application, correct?

11   A.    No.  It was also not limited to the patent as

12         well, the specific way we did it.  It could

13         be done in a variety of ways.

14   Q.    But the best way was this way that you don't

15         want to disclose because it's a trade secret?

16   A.    We thought the best way was, yes, it was

17         certainly a major improvement of over how we

18         had done it in the past.

19   Q.    And do you continue to do it with respect to

20         this trade secret manner, this proprietary

21         manner?

22   A.    Yes, with modifications.  We've made numerous

23         modifications to the equipment.

24   Q.    And this proprietary method of doing it was

25         the way Mr. Laird did it roughly sometime in

104

1              of our ovens, yes, to do the heat setting.

2              The heat setting in the oven, we had to raise

3              the temperatures, fire hazard, and it

4              yellowed the fabric.

5        Q.   So Mr. Laird developed some specific

6              instrumentation or machinery to heat set in a

7              different way?

8        A.   Yes.

9        Q.   And Mr. Laird --

10       A.   He worked with a supplier.

11       Q.   And it altered the temperatures for the heat

12             setting?

13       A.   I don't think if it altered the temperatures.

14             It gave us more control.  It was more

15             efficient.  Normally, you want to stay within

16             a particular range to heat set each fiber.

17             There's a technical range that you use that

18             you need to stay in.

19       Q.   And what is that range?

20       A.   For nylon, I believe it's -- I don't have the

21             exact number, but I think 400 or 440 is a

22             range.  Polyester, I believe, is a little

23             higher.

24       Q.   And how did this proprietary process improve

25             your ability to stay in that range to produce

107

1          the samples that Mr. Laird made?

2    A.    Well, it was a safety improvement, so it

3          minimized the risk of fires in ovens.  That

4          was a major plus.  It was more cost effective

5          to do it, and for transfer printing, transfer

6          printing traditionally was cost -- it was a

7          lower priced product and that was very

8          important.  So it was a more cost effective

9          way.  It used less energy, and it had better

10         control -- it didn't yellow the fabric as

11         much.

12   Q.    Why didn't it yellow the fabric as much?

13   A.    I think the dwell time, the temperature that

14         the nylon was subjected to was shorter.

15   Q.    So with the new improved equipment you were

16         able to create a flocked fabric for transfer

17         printing with a shorter dwell time?

18   A.    It allowed us to run higher line speeds,

19         product speeds.

20   Q.    And it prevented discoloration of the fabric,

21         correct?

22   A.    It reduced it or minimized it.

23   Q.    So it improved the quality of the product,

24         correct?

25   A.    I would say maybe yes, but the main, you know

108

1       the main issue was, we had improvements of

2       the efficiency, cost reduction, safety

3       improvements, and --

4    Q.    And discoloration?

5              MR. GRIMM: Would you let him

6       finish his answers before you interrupt with

7       your comments.

8    A.    And there was less yellowing on the gray

9       goods.

10    Q.    And that's not disclosed anywhere in your

11       patent application?

12    A.    No, it is not.  However, you can use the

13       conventional method as well as the -- or

14       conventional methods for heat setting, off

15       line heat setting or in the ovens.

16    Q.    Or you can use this improved process?

17    A.    Yes.

18    Q.    And it's accurate to state that your company

19       doesn't use the conventional method, it uses

20       this improved process?

21    A.    After '91 or '92 when it was developed, yes,

22       that's what we went to.

23    Q.    And you saw samples from this in 1992 or so

24       and decided that a patent application should

25       be filed, correct?

109

1                            MR. GRIMM: Samples from what?

2      Q.    You saw Mr. Laird's samples?

3      A.    No, I did not.  They were all on natural

4            adhesive.

5      Q.    Have you ever heard the term best mode of the

6            invention.

7      A.    No, I don't believe so.

8      Q.    Did you have an understanding with respect to

9            whether or not at the time you filed your

10           application, you had a duty to disclose the

11           best way of making your invention?

12     A.    No, I can't remember.

13     Q.    No one ever told you that?

14     A.    Again, I can't remember.

15     Q.    Now, this equipment Mr. Laird designed, what

16           did it consist of?

17     A.    Infrared units.

18     Q.    Infrared units?

19     A.    Yes.

20     Q.    So instead of heating or curing the pigmented

21           adhesives with heat, it was being cured with

22           an infrared light?

23     A.    No no, just a different way to generate heat,

24           more efficient way, less expensive.

25     Q.    Did you have an understanding with respect to

110

1                      why it was more efficient, why the infrared

2                      light was more efficient and produced a

3                      better product than a conventional heat?

4       A.      Yes.

5       Q.      What was your understanding?

6       A.      The wavelengths of infrared energy are

7                      different than conventional energy, so it

8                      allowed you, infrared allowed you to generate

9                      heat less expensively over a shorter time

10                     exposure.

11      Q.      And in addition to using the infrared light,

12                     did Mr. Laird put together anything else in

13                     the machine?

14      A.      Which machine?

15      Q.      The machines to produce the invention?

16                              MR. GRIMM: Objection to the form

17                     of the question.

18      Q.      You still have to answer.

19      A.      I don't think any specific -- I can't

20                     remember any specific improvements on the

21                     invention.  The transfer printing process of

22                     the gray goods with a pigmented adhesive was

23                     the key process, so I don't think on the

24                     transfer print machine -- he obviously made

25                     improvements over time to our transfer

1          printing equipment, but I can't remember any

2          specific ones.

3     Q.   But certainly he had put in an infrared

4          light?

5     A.   It's not on the transfer printer.

6     Q.   It's in the heat setting for the fabric?

7     A.   Yes.

8     Q.   Did he make any other improvements to the

9          equipment for the heat setting aspect of the

10         invention?

11              MR. GRIMM: Objection to the gross

12         mischaracterization.  If could you point out

13         the claim which has heat setting as part of

14         the invention, sir, --

15              MR. CASS:  You might want to read

16         his deposition testimony later, Bill, because

17         earlier on he testified that heat setting was

18         a critical part of the invention.

19    Q.   Did he make any improvements other than the

20         infrared light to the heat setting aspect of

21         the invention?

22              MR. GRIMM: Objection to the form.

23         Gross mischaracterization.

24    A.   I believe he made improvements on the ability

25         to control temperature exposure.

                                                    112

SPHERION DEPOSITION SERVICES
(800) 219-5300

```
 1    Q.    In other words, to get a more uniform
 2          disbursing or uniform heat pattern on the
 3          pattern -- Strike that.  In other words get a
 4          more uniform heat dispersion over the
 5          substrate, the fabric?
 6    A.    Yes.  The initial installation didn't have
 7          that, so they made, that's what the trade
 8          secret was.
 9    Q.    And that's not disclosed anywhere in your
10          patent application, is it, sir?
11    A.    No.
12    Q.    Now, to achieve the more uniform heat pattern
13          over the fabric, did that involve modifying
14          equipment and designing equipment?
15    A.    Yes.
16    Q.    And Mr. Laird designed that equipment?
17    A.    I don't know.  He worked with the
18          manufacturer.
19    Q.    He worked with a manufacturer.  Certainly you
20          didn't design the heat setting aspect?
21    A.    No, I was aware of it.  I was aware of the
22          improvements.
23    Q.    Now, going back to tab 6, sir --
24                  MR. GRIMM:· Are you done with
25          this area now?  I just want to check with him
```

113

STATE OF RHODE ISLAND
                    ss. Providence, Rhode Island
COUNTY OF PROVIDENCE


    BE IT KNOWN THAT I, Lori R. Colwell, Shorthand
Reporter and Notary Public, reported stenographically
the foregoing deposition pursuant to notice at the time
and place stated in the caption hereof; that I was then
and there a Notary Public in and for the State of Rhode
Island; that by virtue thereof I was authorized to
administer an oath; that the witness before testifying
was duly sworn to tell the truth, the whole truth and
nothing but the truth; that the testimony of said
witness was reduced to typewriting under my direction;
that the foregoing pages contain a full, true and
correct transcription of the notes of said deposition;
that the deponent has made the request to read and sign
his deposition.

    I, FURTHER CERTIFY that I am not of counsel nor
attorney for either or any of the parties to said
action or otherwise interested in the event thereof,
and that I am not related to either or any of the
parties to said cause.

    IN WITNESS WHEREOF, I have hereunto subscribed my
name and affixed my seal of office this 22nd day of
April 2003.

                    _____
                    LORI R. COLWELL
                    Notary Public



My Commission Expires:
June 20, 2005