# EXHIBIT C
# PART I

## EXPERT REPORT OF MICHAEL POMIANEK, Ph.D., J.D.
## ON MATTERS RELATED TO U.S. PATENT 5,981,021

### I.  Introduction and Qualifications

1.    I am Michael J. Pomianek, Esq., Ph.D. and work extensively in the field of the patent law of the United States of America and practice before the United States Patent and Trademark Office ("PTO").

2.    I received my B.S. in Chemical Engineering, with high honors, in 1988 from Drexel University.  I received my M.S. in Chemical Engineering in 1990 from The Massachusetts Institute of Technology and my Ph.D. in Chemical Engineering in 1998 from The Massachusetts Institute of Technology.  In 1997 after completing my Ph.D. work, I became a Technology Specialist at the Law Firm of Wolf, Greenfield & Sacks, P.C. in Boston, Massachusetts.  I attended Suffolk University Law School, while working at Wolf, Greenfield & Sacks, P.C. and received my J.D. in 2002, graduating *summa cum laude* ranked first in my graduating class.  I am admitted to the Massachusetts Bar – BBO # 655866 – and I am registered to practice before the United States Patent and Trademark Office – Reg. No. 46,190.  I am a member of the American Bar Association, the Boston Bar Association, and the Boston Patent Law Association.  My practice focuses on patent preparation and prosecution of patents, patent portfolio development and management, intellectual property transactions, and the preparation of infringement, validity, and patentability opinions.  My practice focuses on chemical, pharmaceutical, biotechnology, medical device, textile, energy, food and beverage, and optical technologies.  My practice has included patent preparation and prosecution for firm clients in the textile industry related to such topics as flocked fabric manufacturing techniques, such as surface texturing, embossing, wet and transfer printing, high-performance protective fabric materials and construction, fabric coatings and coating techniques, biocompatible/biodegradable fabric materials and construction for medical prostheses, and others.  I have prepared and prosecuted several patents and patent applications for Microfibres.  I have worked with Microfibres' in this capacity since 1998.  I am a member of the Wolf, Greenfield & Sacks, P.C. training committee, and, in this capacity, I

– 2 –

regularly develop curriculum and teach both basic and advanced topics of patent law and practice to other firm attorneys and technology specialists.

3.     I have been asked to comment on Intermark's allegations that Microfibres is enforcing U.S. Patent 5,981,021 with knowledge that the patent is invalid and unenforceable. Wolf, Greenfield & Sacks, P.C. has been retained by Microfibres in this matter and is charging Microfibres my usual hourly billing rate of $350.00 per hour for my services. Beyond the salary I normally receive from Wolf, Greenfield & Sacks, P.C., I am not being personally compensated for the preparation of this report or any research or testimony associated with this matter. For the reasons discussed below, I do not believe that Microfibres is enforcing U.S. Patent 5,981,021 with knowledge that the patent is invalid and unenforceable.

## II.     Opinions on Allegations that Applicants Failed to Disclose Material Information to the PTO or Otherwise Committed Inequitable Conduct

### a.     Non-Disclosure of Information about Intermark's Frosty Product

4.     In my opinion, information related to Intermark's Frosty product known to the individuals associated with the filing and prosecution of U.S. Patent 5,981,021 ("the '021 patent) was not required to be disclosed to the PTO because such information was cumulative of other information of record during examination and, therefore, was not material. 37 C.F.R. § 1.56(b) indicates that information is material to patentability when it is not cumulative to information already of record or being made of record in the application. Accordingly, since information regarding the Frosty product known to the individuals owing a duty of disclosure to the PTO was cumulative of other information already of record during prosecution of the '021 patent, failure to disclose such non-material information cannot be the basis for a charge of inequitable conduct.

5.     Testimonial and documentary evidence of record - for example, the deposition testimony of Wayne Turcotte (May 21, 2003) as well as several letters exchanged between Mr. William Lucchesi, who was president of Intermark, and Mr. Arnold Kaija, who was an employee of Microfibres (letters dated August 14, 1991, October 2, 1991, November 6, 1991, and December16, 1991) - indicate that there was a business relationship between Microfibres and

Intermark in which Microfibres was to supply flock to Intermark to be used in producing flocked fabrics. Both Mr. James Fulks and inventor Mr. James McCulloch of Microfibres were copied on a number of the above-mentioned letters. Mr. Turcotte indicated in his deposition testimony that Mr. Kaija of Microfibres was aware of Intermark's Frosty product and was aware that a dark pigmented adhesive was a part of the product. Importantly, however, even if this were true, there is no testimony or other evidence of record that Mr. Kaija of Microfibres was in any way associated with the filing or prosecution of the '021 patent, such that he would have had a duty to disclose material information to the PTO under 37 C.F.R. § 1.56, nor is there evidence of record that anyone having such a duty – e.g. Mr. McCulloch, Mr. Laird, or Mr. Fulks – was ever made aware of the existence of Intermark's Frosty product or the fact that it included a dark pigmented adhesive. Notably, in none of the above-mentioned letters and correspondence between Mr. Lucchesi of Intermark and Mr. Kaija of Microfibres was the Frosty product ever mentioned or described. Rather, each of the items give no indication of the particular products for which Intermark was using the Microfibres' flock. Accordingly, I have seen no evidence to establish that Mr. Fulks, Mr. Laird, or Mr. McCulloch or anyone else having a duty to disclose material information to the PTO knew about the existence or characteristics of Intermark's Frosty product. It goes without saying that there is no requirement to disclose information of which one is not aware.

6.     More fundamentally, even assuming for the sake of argument that Mr. McCulloch, Mr. Fulks, Mr. Laird or someone else owing a duty of disclosure to the PTO in connection with the filing and prosecution of the '021 patent was aware of the Intermark Frosty product and the fact that it included a dark pigmented adhesive, failure to disclose such information to the PTO would not have been a breach of the duty of disclosure because such information was cumulative of other information already of record – for example, disclosure in U.S. Patent No. 4,294,577 to Bernard ("the Bernard patent"), which was of record during prosecution, and admissions made by the Applicant in the Background section of the '021 patent and in the file history of the '021 patent. The Bernard patent, which was specifically referred to in the Examiner's Reasons for Allowance of the '021 patent, clearly discloses that the use of dark pigmented adhesive in a flocked fabric was known. Specifically, Example 1 in col. 3 of the Bernard patent describes a flocked fabric utilizing a flock adhesive

- 4 –

> "…in which a 3 percent addition of heat-sublimable dye had been mixed." (col. 3, lines 43-44).

The Bernard patent goes on to disclose that:

> "…after curing…the dye had been developed by sublimation to a uniform relatively <u>dark green</u> at the adhesive coat, being visible over the entire flocked surface…" (col. 3, lines 54-58, emphasis added).

Thus, the Bernard patent clearly indicates that the use of a dark dye in the adhesive of a flocked fabric was a known expedient as of its filing date (March 25, 1980). It is clear that the Bernard patent discloses that a flocked pile fabric having, after curing, an adhesive layer with a dark pigment therein was not novel. In my opinion, the Frosty product teaches nothing more.


7.    Additionally, the Applicant of the '021 patent makes clear in both the specification of his patent and in statements made during prosecution that the use of pigmented adhesive, per se, is not new. For example, in the "Background of the Invention" section of col. 1 of the '021 patent, it is clearly indicated that transfer printed fabrics are known and that

> "It is known to add pigment to an adhesive used in some flocked fabric manufacturing. In one case, the pigmented adhesive is used to bind flock on fabric which is subsequently printed using wet processing techniques to achieve deep, rich colors." (Column 1, lines 37-41)

Similarly, in an Amendment in Application Serial No. 07/922,918 (the '918 application) submitted by the Applicants in response to a rejection of the pending claims as obvious over a combination of references some teaching transfer printing with other references teaching pigmented adhesive, Applicant clearly admits that colored adhesives are known:

> "Transfer printing is well known in the prior art. It is also known to color adhesives used in producing flocked fabrics as noted in [U.S. Patent No. 4,963,422 to Katz, et al.]…" (See page 4 of Applicant's Amendment filed January 21, 1994).

The Applicant makes clear in this Amendment that the basis for his objection to the rejection based on the combination of references lies not in the novelty of the use of a pigmented adhesive per se, but rather in that the combination of the use of pigmented adhesive and transfer printing to achieve the beneficial results of the claimed invention:

> "Applicant takes issue, however, with the Examiner's combination of these prior art teachings in rejecting the claims. Applicants invention resides in the discovery that prints on flocked fabrics with deep, dark shades can be achieved with transfer printing and the

use of colored adhesives.  Katz et al. only mentions that colored adhesives '… can be used to create further effects thereby varying the ornamental appearance of the product.' The Katz et al. patent, and the prior art generally, fails to recognize or suggest that the transfer printing of dispersed dyes onto flocked fabric in which the fibers were adhered with a dark pigmented adhesive would produce a product with deep, dark shades and less grin-through and crocking."  (Amendment dated January 21, 1994, pgs. 4-5).

8.     The Frosty product is also not material to the '021 patent on the basis that Mr. McCulloch derived the invention somehow from his alleged exposure to the Frosty product.  As discussed in the paragraph below, evidence of prior manufacture of flocked fabrics with dark pigmented adhesive by Microfibres, a company of which Mr. McCulloch, the inventor of the '021 patent is an owner, as early as 1981, indicates that Mr. McCulloch would have already been aware of the use of dark, pigmented adhesives prior to any possible exposure to the Frosty product.

    b.     Non-Disclosure of Dark, Pigmented Adhesives Used in the 1980s by Microfibres

9.     Mr. William Laird testified in his deposition that Microfibres was manufacturing flocked fabric with colored adhesives, including dark colors, as early as 1981.  For essentially the same reasons as discussed above with respect to the disclosure of information regarding the Frosty product, this information of earlier manufacture of fabrics using pigmented adhesives was cumulative of prior art references and admissions made by the Applicant that were already of record.  Therefore, this information was not material and need not have been disclosed.

    c.     Non-Disclosure of Alleged Best Mode Heat Setting Process

10.     In my opinion, there was no breach of any duty to disclose material information to the PTO regarding an alleged best mode for practicing heat setting contemplated by inventor Mr. McCulloch as of the filing date (July 31, 1992) of the '918 application.  This is because, as explained in the paragraphs below, the details of the heat setting process employed and under development by Microfibres at that time did not constitute the "best mode" of carrying out invention as claimed in the '021 patent such that it was required to be disclosed.

- 6 –

11.     Because the law surrounding the "best mode" requirement is often misunderstood, some background is appropriate. 35 U.S.C. § 112 requires that a specification "...shall set forth the best mode contemplated by the inventor of carrying out his invention." Determining compliance with the "best mode" requirement involves a two-pronged inquiry. First, it must be determined whether, at the time the application was filed, the inventor subjectively possessed a best mode for practicing the invention. Second, if the inventor did contemplate a best mode, it must be determined whether the application enables a person skilled in the art to practice the best mode. Also, there is no requirement that the application point out any particular disclosure as "the best mode" in the text, so long as the text enables one of ordinary skill in the art to practice the best mode. For example, an application disclosing several alternative modes for a particular element of an invention need not identify which of the disclosed modes is the "best mode" to satisfy the best mode requirement.   Importantly, the best mode disclosure requirement must focus on the invention as claimed in the patent or application. Whether the specification adequately discloses the inventor's preferred mode depends on the knowledge and level of skill of those in the pertinent art.  It is important to note that the best mode requirement does not require that the inventor recite every preferred material, piece of equipment, or detail of manufacture where such information constitutes a production detail, which does not relate to the quality or nature of the invention as claimed, or involves routine details, which may relate to the quality or nature of the invention but need not be explicitly disclosed because they are well known to those of ordinary skill in the art.  In other words, it is not uncommon for an inventor to subjectively possess preferences for a wide variety of details and minutia regarding, for example, the commercial production of an article of manufacture, which need not be disclosed in detail in the application to avoid non-compliance with the "best mode" requirement. As noted by the Federal Circuit:

> "...Any process of manufacture requires the selection of specific steps and materials over others.  The best mode does not necessarily cover each of these selections.  To so hold would turn a patent specification into a detailed production schedule, which is not its function.  Moreover, a requirement for routine details to be disclosed because they were selected as the 'best' for manufacturing or fabrication would lay a trap for patentees...A step or materials or source or technique considered 'best' in a manufacturing circumstance may have been selected for a non-'best' mode' reason..." Wahl Instruments, Inc. v. Acvious Inc. 950 F.2d 1575, 1579-81 (Fed. Cir. 1991).

Moreover, the fact that a patent owner adopts a method for commercial production that was not disclosed in the patent may not constitute a violation of the "best mode" requirement. One must consider why the method employed was considered "best." Where the reasons relate to considerations involving commercial-scale manufacturing efficiencies, economy and cost of operation, volume of production, and the like, to the extent that such requirements are not explicitly claimed and that the claimed subject matter does not specifically require such objectives be met, such details are superfluous to the best mode requirement. Wahl Instruments, Inc. v. Acvious Inc. 950 F.2d 1575 (Fed. Cir. 1991). Eli Lilly & Co. v. Barr Laboratories, Inc. 251 F.3d 955 (Fed. Cir. 2001).

12.    In my opinion, the details related to the infrared heating equipment and techniques and the process of heat setting being tested for utilization in the commercial production of heat-set flocked fabrics as of the filing date of the '918 application which may have been subjectively considered "best" in some sense by Mr. McCulloch, was not the type of information required to be disclosed to comply with the "best mode" requirement for the invention recited in claim 17 the '021 patent (or any other claim), so information relating to such techniques and equipment was not material information that needed to be disclosed to the PTO. Specifically, focusing on the knowledge and subjective beliefs of Mr. McCulloch, the inventor – noting that the knowledge and belief of others, such as Mr. Laird, to the extent they were not also reflected in the knowledge and belief of the inventor are irrelevant to this inquiry – Mr. McCulloch's deposition testimony and affidavit of August 7, 2003 support the conclusion that the reasons why Mr. McCulloch believed the infrared heating equipment development by Mr. Laird was, as of the filing date of the '918 application, "best" related to issues regarding the efficiency and productivity of large-scale flocked fabric manufacture and not to reasons related to the nature and quality of a flocked fabric material produced, e.g. according to a method as recited in claim 17 of the '021 patent. Claim 17, which is the only claim specifically reciting heat setting, is directed to a general method of producing a transfer printed flocked fabric, which fabric possesses a number of characteristics recited in the body of independent claim 13 from which claim 17 depends, which includes a heat setting step as part of the overall method. The utility and purpose of the claim relates to the production of a transfer printed flocked fabric having desired, recited characteristics, and the claim is not directed to, and does not require, that the

method involve large-scale production volumes, specific levels of economy, cost, etc., or even that the method be a continuous process. Such additional production features simply relate to unclaimed subject matter for which no "best mode" requirement exists. Significantly, each of the reasons set forth by Mr. McCulloch for believing that the infrared heaters being tested by Mr. Laird were "best" relate to such issues of production efficiency and economy and not to a belief that other alternative heat setting techniques, such as Microfibbres' own use a gas oven for heat setting, were not able to produce a fabric of similar characteristics and quality. For example, in paragraph 9 of Mr. McCulloch's affidavit, he notes that he considered the infrared heaters better because Microfibres' gas oven

> "...had to be run slower by ten yards a minute if we used them for heat setting. In addition, at elevated temperatures, the gas oven sometimes turned flocked fabric yellowish."

In paragraph 10, Mr. McCulloch states that

> "...the infrared heaters were faster and increased MicroFibers' production capabilities...reduced energy consumption...and produced less waste because the fabric did not get too hot and yellow, nor too cool and unevenly heat set. The Glenro equipment also reduced oven fires and promoted safety."

Each of the above articulated reasons for inventor Mr. McCulloch believing that the Glenro infrared heating system was the "best" way of heating setting fabric clearly relates to the efficiency and ability to produce such fabric in a safe, cost-efficient manner on an industrial production scale. The problems noted by Mr. McCulloch with the alternative gas oven heat set equipment do not relate to inabilities of the equipment or the process of using it to produce a heat set transfer printed fabric of equivalent quality, but rather to the ability of such method and equipment to operate at high levels of consistency, safety and economy for a large-scale production operation. As discussed in the paragraph above, such considerations are not relevant to "best mode" unless such features of production scale or efficiency are part of the claimed subject matter, which, in the '021 patent, they are not.

13.    Moreover, even assuming solely for the sake of argument, that there existed at least some reason for which Mr. McCulloch believed the infrared heat setting system and heat set method to be "best" that did relate in some way the quality or nature of the claimed invention, it would still

be my opinion that the disclosure of the use of infrared heating and the specific details of the
infrared heating system would not be required to satisfy the "best mode" requirement because
they constitute details of production about which those of ordinary skill in the art would already
know and/or which would be well within their skill to implement. In other words, it is my
opinion that the disclosure in the '021 specification of heat setting generally is enabling for the
practice of use of the infrared heaters in the manner believed to be "best" in some sense by
inventor Mr. McCulloch because the use of infrared heaters for the purpose of heat setting
flocked fabrics, and the advantages that resulted, was already a well know and well accepted
practice in the industry at the time of the filing of the '918 application, and because the
modifications made by Mr. Laird to the commercially available infrared heating equipment
constituted matters of routine engineering and optimization, the nature of which would be readily
apparent to those of ordinary skill in the art.

14.     As of the July 31, 1992 filing date of the '918 application, Mr. Laird at Microfibres had
purchased Glenro infrared heaters for the purpose of heat setting flocked fabric (affidavit of
William F. Laird of July 31, 2003). The Glenro heaters purchased by Microfibres were generally
commercially available and marketed by Glenro to the fabric industry. Other companies also
sold infrared heaters at that time. A number of Microfibres' competitors were also using infrared
heaters prior to the filing date of the '918 application for heat setting fabrics (See the Laird
Affidavit, paragraph 12). Product literature and specifications published by Glenro in 1990 and
provided to Mr. Laird in Glenro's proposal submitted September 17, 1991 describe the infrared
heaters as minimizing energy waste, preventing burning or scorching, providing individually
controlled temperature zones to provide uniformity across a work piece, automatic temperature
feedback control monitoring, and precision temperature regulation and control. In describing the
uniform heating features of the product, the product literature states that

> "Our ovens can have separately controlled edge and center zones with the edge zones
> operating at a higher temperature. This compensates for edge losses and provides
> uniform heat across the width of the oven."

Accordingly, as of the filing date of the '918 application, the Glenro infrared heaters and similar
infrared heaters were commercially available and known and used in the industry for the purpose
of heat treating fabrics. Moreover, unlike a situation where a particular technique or material

may be known in the art but may be one of a very wide variety of known alternative materials or techniques, such that selection of a particular one to find what is best would require undue experimentation by those of ordinary skill in the art, in the present instance, infrared heating for the purpose of heat setting appears to be one of a very few methods of heat setting fabric employed in the industry, with the use of a gas-fired oven being an alternative, such that the disclosure of heat setting in general would make the use of infrared heaters in particular readily apparent to one of ordinary skill in the art, particularly in view of the known advantages of using such equipment, as exemplified for example by the description of such in Glenro's product marketing literature. Additionally, in February, 1992, Microfibres supplemented the Glenro equipment by installing two additional, infrared sensors and thermometers commercially available from Glenro, locating them on the outside edges of the Glenro heaters to facilitate the ability to sense and control heat distribution across the width of the fabric (Laird Affidavit, paragraphs 16 and 17). These modifications made by Mr. Laird appear to be matters of routine engineering and optimization of an industrial production process performed to achieve more even heating across the width of the fabric for Microfibre's particular equipment and process set-up. The need for and desirability of such routine optimization and the skills required to perform the same would have been readily apparent to those of ordinary skill in the art. Such matters of routine engineering and optimization constitute routine details of production optimization routinely performed by those of ordinary skill in the art in any manufacturing process. Accordingly, it is my opinion that the disclosure of heat setting generally in the specification of the '021 patent was sufficient to enable one of ordinary skill in the art to practice the mode of heat setting developed by Microfibres as of the filing date of the '918 application, should, for the sake of argument, such mode be considered the "best mode" of an invention claimed in the '021 patent.

15.    Finally, it is irrelevant that Mr. McCulloch did not supplement his disclosure to describe additional developments related to the heat setting process that occurred after the filing date of the '918 application. It is uncontested, black letter law that an applicant need not update description of best mode upon filing of a continuation application, unless the application is a continuation-in-part application. For similar reasons, disclosure of information relating to developments made after the filing date of an application, even should such developments

constitute a subsequently developed "best mode" are irrelevant as to whether best mode was satisfied at the time of filing of the application and, therefore, such information is not material to patentability and cannot support a claim of inequitable conduct.

       d.     Non-Disclosure of Mr. Laird's Contribution to Claim 17 of the '021 Patent

16.     Because the '021 patent does not claim any particular method of heat setting flocked fabric but only, in claim 17, claims heat setting in general in combination with transfer printing of a flocked fabric, Mr. Laird's work related to particular heat setting techniques and equipment, which are unclaimed does not constitute an inventive contribution that could raise an issue as to whether the named inventive entity of the '021 patent (i.e. Mr. McCulloch) derived the invention from a different inventive entity. Heat setting in general was a well known technique utilized for manufacturing flocked fabric, which was known to Mr. McCulloch and appreciated by him as being useful in the context of the invention claimed in the '021 patent well before the purchase and development of the Glenro heaters by Mr. Laird around September, 1991, as is indicated the Memorandum to Mr. Laird from Mr. McCulloch and Mr. Fulks dated March 21, 1991. Accordingly, Mr. Laird's contribution to the development of the infrared heat setting equipment and method was not material to the inventorship of any of the claims of the '021 patent and, therefore, need not have been disclosed.

       e.     Non-Disclosure of Conventional Pressures used by Microfibres for Transfer Printing

17.     It is my opinion that information related to the specific pressures utilized by Microfibres for transfer printing during the 1980's was not material to the patentability of any of the claims that issued in the '021 patent, such that the failure to disclose such information did not constitute a breach of the duty of disclosure as set forth in 37 C.F.R. §1.56. Furthermore, assuming solely for the sake of argument that such information bore some relevancy to the subject matter of the '021 patent, such information was not material to patentability because it was cumulative of information already of record during prosecution of the '021 patent.

18.    The specification of the '021 patent indicates that because adding pigment to the adhesive can reduce the need for the transfer printing process to apply dye deep into the depth of the pile fibers, the pressure utilized for transfer printing of the flocked fabrics can be lower than that used in conventional transfer printing processes to obtain similar color saturation.  The specification also gives an example where, for one particular type of printing machine, pressures may be reduced from a conventional level of about 60 psi to as little as about 10 psi, while achieving good depth of shade (see, col. 2, lines 40-45 and col. 3, lines 39-52).  Originally filed claims 21 and 22, which depended from independent method claim 13 (as issued in the '021 patent) recite limitations relating to pressures lower than conventional transfer printing (claim 21) and a specific pressure range between about 10 psi and about 59 psi (claim 22).  Notably, both claims 21 and 22 were cancelled by the applicant via their Amendment submitted on January 21, 1994.  Thereafter, none of the claims pending in any of the applications leading up to the issuance of the '021 patent included any limitations directed to the pressure applied during transfer printing.  Moreover, had the Examiner been of the opinion that the pressure levels were critical to the invention as claimed after the cancellation of claims 21 and 22, then the Examiner should have rejected the claims as not complying with 35 U.S.C. §112, paragraph 1 (see, M.P.E.P. §2164.08(c) "A feature which is taught as critical in a specification and is not recited in the claims should result in a rejection of such claim under the enablement provision section of 35 U.S.C. §112.").  Such a rejection was never made.  Accordingly, it is my opinion that after the cancellation of claims 21 and 22, information related to conventional pressures for transfer printing was no longer material to the patentability of any claim remaining under consideration in the application, and therefore there was no duty to disclose such information.

19.    Neither 37 C.F.R. §1.56 nor 37 C.F.R. §1.97 which deal with the duty to disclose material information and the timing of disclosure, respectively, create any duty to submit material information at a particular time during pendency of an application, so long as such information is cited to the PTO prior to issuance of a patent on the application.  Indeed, even after allowance of an application, it is still possible and proper to submit material information to the PTO via the filing of a Request for Continuing Examination or a Continuation application along with an Information Disclosure Statement.  Furthermore, 37 C.F.R. §1.56(a) clearly states that information is only material if it is material to a claim that issues in a patent:

"The duty to disclose information exists with respect to each pending claim <u>until the claim is cancelled or withdrawn from consideration</u>, or the application becomes abandoned.  <u>Information material to the patentability of a claim that is cancelled or withdrawn from consideration need not be submitted if the information is not material to the patentability of any claim remaining under consideration in the application.  There is no duty to submit information, which is not material to the patentability of any existing claim.</u>  The <u>duty to disclose all</u> information known to be material to patentability <u>is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the office or submitted to the office</u> in a manner prescribed by §§ 1.97(b)-(d) and 1.98. (Emphasis added)."

The Federal Circuit has held that the cancellation of a claim infected by inequitable conduct because of an failure to disclose a material reference with an intent to deceive the PTO cannot be cured by cancellation of such a claim, <u>Driscoll v. Cebalo</u>, 731 F.2d 878 (Fed. Cir. 1984), <u>Fox Industries v. Structural Preservation Systems</u>, 922 F.2d 801 (Fed. Cir. 1990); however, the key to finding that cancellation of claims in an application did not excuse the patentees failure to disclose information to the PTO resided in the fact that the information in question was also material to the claims that ultimately issued in the patent (<u>Baxter Intern., Inc. v. McGaw, Inc.,</u> 149 F.3d 1321, 1331 (Fed. Cir. 1998) (<u>holding that no inequitable was committed for failure to disclose information to the PTO:</u> "In <u>Fox</u>, and in <u>Driscoll</u>, the omitted references were not only material to the claims that were cancelled, but were also material to the issued claims. …It is clear that the [prior art] device was in no way material to the claims of the [patent in question] at any time during its prosecution."). Unlike the <u>Fox</u> and <u>Driscoll</u> cases in which inequitable conduct was found for failure to disclose information material to a claim later cancelled when such information was also material to claims that ultimately issued in a patent, it is my opinion that the information related to the use of certain transfer printing pressures by Microfibres in the 1980's was at no time during prosecution of the '021 patent material to the claims that ultimately issued in the '021 patent and, therefore, there was no breach of the duty of disclosure.

20.    Moreover, even assuming for the sake of argument that such information concerning transfer printing pressures was still relevant after the cancellation of claims 21 and 22 and could, under certain circumstances be considered material, such information was not material because it was cumulative of information already of record during prosecution of the '021 patent.

Specifically, U.S. Patent No. 4,049,374 to Rejto ("the Rejto patent") was of record and was relied upon by the Examiner in formulating many of the rejections based on obviousness – the Examiner relying on the Rejto reference as teaching transfer printing of flocked fabrics (see, e.g., page 4 of the Office Action issued November 3, 1993). The Rejto patent is directed to a method for simultaneously transfer printing and embossing the surface of a fabric containing thermoplastic fibers. In describing the transfer printing conditions utilized according to his method in col. 4, lines 1-6, Rejto states that:

> "The layers 3, 5 and 7 of the stack are then pressed together and heated by the press, for example, to a temperature of about 400°F for a period of 30 seconds. The pressure may vary widely according to circumstances and may for example, be in the range from 1-50 lbs./sq. in."

Thus, the Rejto patent clearly discloses that transfer printing pressures on the order of about 1 psi to about 50 psi were known and used in the art as of its effective filing date of July 21, 1975. Accordingly, it is my opinion that the information that Microfibres utilized pressures within this range under certain circumstances to transfer print fabrics during the 1980's was cumulative of the information contained in the Rejto reference and, therefore, not material under 37 C.F.R. §1.56(b).

PLEASE SEE EXHIBIT C − PART II FOR CONTINUATION