# EXHIBIT C
# PART II

CONTINUATION OF EXHIBIT C - PART I

### III.  Opinions Regarding Allegations of Invalidity of the '021 patent

    a.  Alleged Anticipation of the '021 patent by the Squires patent

21.  It is my opinion that U.S. Patent No. 4,895,748 to Squires ("the Squires patent), issued January 23, 1990, which was not of record during examination of the '021 patent, does not anticipate any of the claims of the '021 patent. The Squires patent is directed to a flocked foam product with flattened fibers which are color transfer printed and to a process for making the same. While in the specification the Squires patent describes prior art employing a color adhesive, without transfer printing, as being disadvantageous and different from his invention (see, e.g., col. 2, lines 63 – col. 3, line 3 and col. 4, lines 42-49), yet despite giving no indication or suggestion that the use of color adhesives is part of the invention in the written description portion of the patent, claim 17 does disclose a claimed embodiment wherein the adhesive has a

925207.1

solid color. Accordingly, the Squires patent must be taken as disclosing a transfer printed article having an adhesive with a solid color. Nevertheless, the Squires patent fails to teach each and every limitation of any of the independent claims of the '021 patent, and, therefore, cannot anticipate any of the claims of the '021 patent. In fact, as described in the following paragraph, the Squires patent is directed to a product that is completely different, and in many respects the antithesis of the fabrics described and claimed in the '021 patent.

22.     The invention disclosed in the Squires patent is directed to a method for transfer printing a flocked polyurethane foam product in which, during the transfer printing process, the fibers are completely flattened onto the substrate. Squires describes the complete flattening of the flock fibers as being critical to achieving the improvements provided by his invention, such as improved hand, appearance, drapability, abrasion resistance, water repellency and heat insulation qualities. The criticality of the flock being completely flattened and entangled during printing is emphasized throughout the disclosure of the Squires patent (see e.g. Abstract; column 4, lines 6-22; and column 5, lines 1-9 and 11-12). In addition, the Squires patent discloses that not only is the flock completely flattened upon printing, but that it becomes permanently flattened such that it remains flattened and entangled during use even after repeating washings (column 4, lines 6-10).

23.     Comparing the disclosure of the Squires patent with the claims of the '021 patent makes clear that the Squires patent neither discloses nor suggests all of the limitations of any of the independent claims of the '021 patent. For example, regarding independent claim 1 of the '021 patent, the Squires patent does not teach or suggest that the transfer printed flocked product has <u>raised</u> thermoplastic fibers on the substrate, nor does it disclose use of a dark pigmented adhesive. By contrast, as discussed in the previous paragraph, the Squires patent emphasizes the criticality of completely flattened fibers, as opposed to raised, flocked fibers. While the Squires patent obliquely discloses the use of colored adhesives, nowhere does the Squires patent disclose any particular pigment color or pigment density that would suggest that such adhesives are dark pigmented adhesives, as is recited in claim 1 of the '021 patent. Independent claim 11 of the '021 patent also recites raised thermoplastic fibers and dark pigmented adhesive and, in addition, recites that transfer printing forms a pattern only on upper portions of the nap-forming part of the

thermoplastic fibers. By contrast, in the Squires patent, because printing is conducted on completely flattened fibers, there would be no nap-forming part of the fibers nor would the print dyes form a pattern on only the upper portions of the fibers, indeed, there would be no "upper portions". Independent claim 12 of the '021 patent similarly recites raised flocked fibers and a dark, in this case black, pigmented adhesive with upper portions of the fibers being colored only by the dispersed dye of the transfer print substrate. As discussed above, the Squires patent does not disclose or suggest any of these limitations. Moreover, independent claim 12 also recites that a deep, dark, crock-fast colored print is formed. Nowhere does the Squires patent disclose or suggest that his method achieves such a result. Independent method claim 13 of the '021 patent recites that the fabric being printed comprises a dark pigmented adhesive, which is not disclosed or suggested in the Squires patent. Moreover, independent claim 13 recites that transfer printing step (i.e. the process of dye transfer to the flock fibers) is effected upon a flocked fabric described in the adhering step as comprising a surface on which flocked fibers form a nap (i.e. are raised from the substrate). By contrast, in the Squires patent method, transfer printing is effected upon completely flattened flock of the foam product, not the raised nap of a flocked fabric (see column 4, lines 11-13, "Another aspect resides in <u>transferring dry ink onto the flattened flock</u> to provide desired colors or colored patterns." emphasis added). Independent method claim 20 also requires the use of a dark pigmented adhesive and transfer printing onto the nap of the flocked fabric. Independent claim 20 further recites that the pattern-forming dispersed dye transferred during transfer printing does not penetrate to the depth of the nap during the printing process. As discussed above, the Squires patent neither discloses nor suggests such limitations, but rather teaches essentially the opposite.

   b. <u>Alleged Anticipation of the '021 patent by the Publications "Design with Flock in Mind" and "The Flocking Process"</u>

24. In my opinion, neither the brochure "Design with Flock in Mind" published by the American Flock Association nor the publication "The Flocking Process" authored by G. P. Van Heel and published by Rohm & Haas, anticipates any of the claims of the '021 patent. Each of the publications contains only a generalized description of the state of the art of flocking cataloging long lists of various known procedures for performing particular aspects of the flocking process on a wide variety of materials and substrates, including fabrics, three-

dimensional objects, solid objects, etc. Neither of these references describes the inventive combination claimed in the '021 patent with sufficient specificity to anticipate, nor does either reference describe all of the limitations of any of the independent claims of the '021 patent.

25. Both the publications ("Design with Flock in Mind" and "The Flocking Process") are generalized overviews setting forth a generic sequence of process steps common to flocking procedures (e.g. see Figure 1 of "Design with Flock in Mind"). For each of the process steps or categories of operations set forth for the overall flocking process, each publication provides a long list of various techniques that are known and have been employed in the art in the context of performing such a step. For example, as part of the overall process, each publication describes as one step the application of adhesives and as another possible step, the finishing and post-finishing of flocked articles. Among the list of characteristics that might be included as part of adhesive preparation, each reference mentions pigmentation generally (see page 13 of "Design with Flock in Mind" and page 18 of "The Flocking Process"). As part of the flock finishing/post-finishing process, in addition to a variety of other treatments and procedures, transfer printing is mentioned (see page 16 of "Design with Flock in Mind" and page 19 of "The Flocking Process").

26. To anticipate a claim, a reference must teach each and every element of the claim. Moreover, when a claim is directed to a combination of elements, it is not sufficient for the elements or limitations to merely be present somewhere within the prior art document, rather the combination itself must be specifically disclosed and not merely be part of a multitude of possibilities assembleable by piecing together elements mentioned in the disclosure of the prior art reference. Richardson v. Suzuki Motor Company 868 F.2d 1226, 1236 (Fed.Cir. 1989) ("The identical invention must be shown in as complete detail as is contained in the patent claim.") It is not sufficient for an anticipatory reference to merely recite individual elements of a claimed combination as part of long lists of possibilities without any suggestion or guidance leading one of ordinary skill in the art to make the specific combination claimed, as opposed to any other of a myriad of possible combinations. Minnesota Mining and Manufacturing Company v. Johnson & Johnson Orthopedics, Inc. 976 F.2d 1559, 1572 (Fed.Cir. 1992) ("The ranges [of the reference] are 'so broad as to be meaningless to one skilled in the art. The [reference] provides no guidance

as to how to construct [the claimed article] with the beneficial properties achieved...'...although [a patent's] specific claims are subsumed in [a prior art reference's] generalized disclosure..., this is not literal identity."). Were the law otherwise, many novel and non-obvious inventions would be anticipated by many treatises, review articles, or even generalized references such as the Encyclopedia Britannica, which may disclose the individual elements somewhere within the reference, but which do not teach with any specificity the particular inventive combination claimed. The situation with "Design with Flock in Mind" and "The Flocking Process" references and the claims of the '021 patent is similar in many respects to situations involving claims to specific chemical compounds and prior art references describing a generic chemical structure along with lengthy lists of chemical moieties or substituents that may be located at particular positions on the generic molecule, but with no description directing one of ordinary skill in the art to select a particular combination from the many possibilities to arrive at the particular compound claimed. In such a situation, when a claimed compound is not specifically named in the prior art reference, but instead it is necessary to select portions of teachings within the reference and combine them, e.g. to select various substituents from a list of alternatives, anticipation can only be found if the classes of substituents are sufficiently limited or well delineated such that one of ordinary skill in the art is able to at once envisage the specific claimed compound within the generic chemical formula of the prior art. See, e.g., MPEP §2131.02. Analogizing to the present situation, nothing in either the "Design with Flock in Mind" or "The Flocking Process" references discloses or suggests the specific combination of pigmented adhesive and transfer printing from among the long list of alternative possibilities for each of the named processes contained within the overall flocking process described, which would enable one of ordinary skill in the art to readily envisage such a combination from the disclosed subject matter. Accordingly, neither of these references discloses the combination claimed in the '021 patent in sufficient detail or specificity to anticipate.

27. Furthermore, even assuming solely for the sake of argument that the "Design with Flock in Mind" and "The Flocking Process" references could be viewed as anticipating the generic combination of a pigmented adhesive combined with transfer printing, such a combination alone does not anticipate the claims of the '021 patent. Specifically, as discussed in the paragraphs above, independent claims of the '021 patent recite, amongst other limitations not specifically

925207.1

disclosed in either publication, the use of a dark pigmented adhesive and a transfer printed fabric comprising a substrate with raised flocked fibers or a method or making such. Neither of the two publications discloses or suggests such limitations. As the Squires patent makes clear, it is certainly possible to transfer print a flocked fabric, even one with a colored adhesive, to arrive at a product that is dramatically different from the product claimed in the '021 patent. Accordingly, because neither the "Design with Flock in Mind" or "The Flocking Process" references disclose or suggest each and every limitation of the '021 claims, they cannot, as a matter of law, anticipate.

    c.    <u>Alleged Anticipation of the Claims of the '021 Patent by Prior Public Use/Sale/Invention of Transfer Printed Flocked Fabrics by Microfibres' Competitors</u>

28.    Intermark has procured the testimony of a number of employees or former employees of a number of Microfibres' competitors in the industry who have alleged that flocked fabrics having a dark pigmented adhesive were transfer printed and sold in the United States prior to one year before the July 31, 1992 effective filing date of the '021 patent and/or prior to the invention of the subject matter of the '021 claims by Mr. McCulloch. Intermark has also produced a sample of a fabric produced by Culp, Inc. and sold in the United States sometime in late 1991 or early 1992, before the filing date of the '021 patent, allegedly meeting all of the limitations of the '021 claims directed to transfer printed fabrics. In addition, Intermark has produced a document from a company in Italy by the name of Leathertex dated July 11, 1991 indicating that certain flocked fabrics produced by Spectro Coating, U.S.A were to be received on July 12, 1991. Intermark has also produced a document and sample sent to Spectro by Leathertex on August 11, 1991. The '021 patent enjoys a statutory presumption of validity and Intermark's evidence of prior inventions/public use/sale will need to be clear and convincing. The documentary evidence I have reviewed of alleged public use/sale prior to July 31, 1991 – the critical date for activities to invalidate under 35 U.S.C. § 102(b) – is vague and ambiguous as to whether a fabric meeting all the limitations of the '021 claims was ever produced and, if so, whether it was ever sold/used in a way to qualify as anticipatory under 35 U.S.C. § 102. For instance, the Vertipile, Inc. document dated May 16, 1985 titled "Experimental Production Run" does not make clear how the fabric was to be printed, whether indeed the printing test was ever completed, what transpired

925207.1

with the fabric after the tests were completed, or what the characteristics of the fabric that may have been subjected to the tests were (i.e. whether or not such fabric met all of the limitations of the claims of the '021 patent). While it is indicated that the fabric, having a navy-colored adhesive, is needed for a "print trial to see if we can get away from stock dyed," the document is silent as to the type of printing that is to be conducted. Moreover, while the document states that a test should be performed by May 28, 1985, no subsequent documentation has been produced to indicate whether or not the test was actually completed nor what the results of the test, if it was completed, were. Also absent is any corroboration of testimony that the fabric so produced was either publicly used, sold, or in some other way transferred to the public domain, which is required for anticipation under 35 U.S.C. § 102(a) and (b). There is also no indication that the invention, if it was indeed made, was not abandoned, suppressed or concealed, which evidence is required in order for such activity to be anticipatory under 35 U.S.C. § 102(g). Regarding Intermark's samples produced by Culp, Inc. and the evidence of sale of such fabrics in late 1991 or early 1992, because such activity took place less than one year prior to the filing date of the '021 patent, it does not qualify as prior art under 35 U.S.C. § 102(b) and can only invalidate the '021 patent if such activity took place before the invention was completed by Mr. McCulloch. Importantly, a memorandum dated March 21, 1991 from Mr. McCulloch and Mr. Fulks of Microfibres to Mr. Laird of Microfibres sets forth features of the fabric described and claimed in the '021 patent in detail in corroboration of the testimony of Mr. McCulloch regarding his conception of the invention no later than March 21, 1991. Moreover, on page 2 of the memo, Mr. Laird indicates that he had already run some samples with pigmented adhesive, which corroborates testimony of an actual reduction to practice and completion of the invention on a date no later than the date of the memo. A date of completion of the invention described and claimed in the '021 patent of no later than March 21, 1991 renders any evidence Intermark may proffer directed to prior public use/sale/publication occurring on or after July 31, 1991 and any evidence of prior invention/ knowledge or use by others occurring after the completion of the invention by Mr. McCulloch as not prior art to the '021 patent under 35 U.S.C. § 102(b) and § 102(a)/ § 102(g), respectively. Regarding the Leathertex sample and documents, even assuming for the sake of argument only that the sample sent to Spectro on August 11, 1991 could anticipate claims of the '021 patent, and further assuming that receipt in the United States of the sample as of that date could be construed to be public knowledge or public use of the invention

925207.1

of the '021 patent, the sample is not prior art to the '021 patent under 35 U.S.C. § 102(b) and is also not prior art under § 102(a) or any other subsection of § 102 given a date of completion of the invention described and claimed in the '021 patent of no later than March 21, 1991. Any production of an anticipatory fabric by Leathertex in Italy prior to July 31, 1991, assuming solely for the sake of argument that such activity occurred, is also not prior art under § 102(b), § 102(a), or § 102(g), each of which exclude activities occurring outside the United States, with the exception of the invention being patented or described in a printed publication. The facsimile from Leathertex to Spectro of July 11, 1991 itself, cannot be prior art under § 102(b), because it is not a patent or publication or a description of a public use or sale of the invention in the United States. Furthermore, even if, solely for the sake of argument the facsimile could itself qualify as prior art somehow, it does not even mention transfer printing or the particular characteristics of the subject fabrics, let alone describe each and every limitation of the claims of the '021 patent, as would be required for anticipation.

 d. Alleged Invalidity of the Claims of the '021 Patent Under 35 U.S.C. §103 as Being Obvious

29. In my opinion the claims of the '021 patent are not invalid under 35 U.S.C. §103 as being obvious over any of the prior art references I have reviewed or of which, I am aware, either taken alone or in any combination. While it is uncontested that, individually, flock fabrics including pigmented adhesives, including dark pigmented adhesives, were known in the prior art and transfer printing of flocks fabrics, generally, was also known, the prior art does not anywhere suggest combining these two concepts in the manner described and claimed in '021 patent, nor does the prior art recognize or appreciate the beneficial results of such combination. In the prior art that I have reviewed, the use of a pigmented adhesive has typically been for the purpose of avoiding the need to color, by dying, printing, etc., flock fibers of the assembled fabric. For example, the Bernard patent, which teaches a dark pigmented adhesive, notes that transfer printing can have detrimental effects on the nature and characteristics of the flock surface and is inherently incapable of dying the substrate (column 1, lines 30-46) and proposes adding a heat-sublimable dye to the adhesive as a way to provide deep color while avoiding such undesirable problems. This was, in fact, noted by the Examiner as supportive of the patentability of the claims of the '021 patent in his reasons for allowance. Thus, the prior art provides no motivation

925207.1

to combine pigmented adhesives and transfer printing in the way described and claimed in the '021 patent, but rather, for the most part suggests such procedures are exclusive alternatives. One exception is the Squires patent, which is the only reference of which I am aware that discloses the combination of heat transfer printing and a pigmented adhesive. However, as noted in the paragraphs above, the Squires patent performs heat transfer printing in an entirely different way from that described in claimed in the '021 patent to achieve a fabric that is dramatically different from that described and claimed in the '021 patent. As previously discussed, while the fabrics produced and claimed in the '021 patent possess raised fibers providing a nap surface onto the upper portions of which dyes from the transfer paper are deposited, in the Squires patented technique, transfer printing is performed so as to completely flatten and entangle the flock fibers such that the pattern is printed onto completely flattened flocked fibers and not onto a raised fiber nap. The resulting fabrics have fibers that are completely flattened onto the substrate, as opposed to the raised fibers of the fabrics described in the claims of the '021 patent. Moreover, there would be absolutely no motivation to modify the Squires patent's teaching in a way that would result in the invention claimed in '021 patent in view of the fact that the Squires patent repeatedly emphasizes that flattening and entanglement of the flock is a critical feature for achieving the desirable characteristics the Squires patent describes as an important utility of the fabrics produced by his technique. Accordingly, it is my opinion that neither the Squires patent nor any of the other prior art that I have reviewed and of which I am aware either individually or in combination renders any of the claims '021 patent invalid under 35 U.S.C. §103 as being obvious.

I reserve the right to supplement this report or provide a rebuttal report.

This has been signed under the pains and penalties of perjury on August 12, 2005.

_____
Michael J. Pomianek, Ph.D.
WOLF, GREENFIELD & SACKS, P.C.

925207.1

I have reviewed the materials listed below in the preparation of this report:

| Description | Date/Issue Date | Author/Inventor |
|---|---|---|
| U.S. Patent 5,981,021 | November 9, 1999 | James R. McCulloch |
| File History of U.S. Patent 5,981,021 | | |
| U.S. Patent 4,895,748 | January 23, 1990 | William J. Squires |
| U.S. Patent 4,294,577 | October 13, 1981 | Leo N. Bernard |
| U.S. Patent 4,049,374 | September 20, 1977 | Thomas Rejto |
| U.S. Patent 2,308,429 | January 12, 1943 | Russell G. Smith et al. |
| U.S. Patent 4,963,422 | October 16, 1990 | Howard Katz et al. |
| U.S. Patent 4,018,956 | April 19, 1977 | James P. Casey |
| U.S. Patent 3,099,514 | July 30, 1963 | Hyman Haber |
| U.S. Patent 3,568,594 | March 9, 1971 | John H. Johnston et al. |
| U.S. Patent 3,999,940 | December 28, 1976 | Ronald E. Freeman |
| U.S. Patent 4,108,595 | August 22, 1978 | Charles Pappas |
| U.S. Patent 4,309,179 | January 5, 1982 | Arthur R. Heuser et al. |
| U.S. Patent 4,314,813 | February 9, 1982 | Yasuzi Masaki |
| U.S. Patent 4,427,414 | January 24, 1984 | Denis G. Orton |
| Document titled "The Flocking Process" | | G.P. van Heel |
| Document titled "Design With Flock in Mind" | | American Flock Association |
| Purchase order No. 05389 from Intermark to Microfibres | September 18, 1991 | |
| Letter from Mr. William Lucchesi of Intermark to Mr. Arnold Kaija of Microfibres | October 2, 1991 | |
| Facsimile to Mr. William Lucchesi of Intermark from Mr. Arnold Kaija of Microfibres | November 6, 1991 | |
| Letter from Mr. William Lucchesi of Intermark to Mr. Arnold Kaija of Microfibres | December 16, 1991 | |
| Letter from Mr. William Lucchesi of Intermark to Mr. Arnold Kaija of Microfibres | August 14, 1991 | |
| Facsimile to Mr. William Lucchesi of Intermark from Mr. Arnold Kaija of Microfibres | October 31, 1991 | |
| Photocopy of a Culp fabric sample with notation "Lab #1908" and a photocopy of an associated document titled "Upholstery Prints Test Request" | December 17, 1991 | Boyd Madren |

925207.1

| Description | Date/Issue Date | Author/Inventor |
|---|---|---|
| Facsimile from Leathertex to Spectro Coating | July 11, 1991 | |
| Facsimile from Leathertex to Spectro Coating and photocopy of appended fabric sample | August 11, 1991 | |
| Letter from Hemendra Shah of Spectro Coating to Don Whitaker | October 10, 1991 | |
| Document titled "Experimental Production Run" (Vertipile, Inc.) | May 16, 1985 | Hemendra Shah |
| Letter from Mr. Boyd Madren to Hemendra Shah | January 24, 1992 | |
| Invoice (Order 2224) from Intermark to Dicy Fabrics | May 12, 1989 | |
| Culp "Vendor Communication Form" to Spectro Coatings | January 9, 1992 | |
| Hartford Fibres memorandum from Jim McCulloch and Jim Fulks to William F. Laird subject "Minutes of Meeting" | March 21, 1991 | |
| Letter to Mr. Wayne Turcotte of Intermark from Mr. James R. Fulks of Microfibres | January 26, 2001 | |
| Letter to Mr. Gunter Walter of Spandauer Valours from Mr. James R. Fulks of Microfibres | October 16, 2000 | |
| Letter to Mr. Mayer Zeiler of Flocktex Industries from Joanne Meyer of Intermark | July 22, 2002 | |
| Hartford Fibres memorandum from William F. Laird to Jim McCulloch subject "Hartford Heatsetting (sic) Unit" | January 28, 1994 | |
| Memorandum from Jim McCulloch to William F. Laird subject "Hartford Heat Set Patent" | February 15, 1994 | |
| Invoice No. 7441 from Glenro to Hartford Fibers | February 26, 1993 | |
| Invoice No. T12-1 from Winkfield Engineering to Hartford Fibers | April 6, 1992 | |
| Purchase Order No. T3-744 from Winkfield Engineering to Leo Pelkus, Inc. and Microfibres | February 7, 1992 | |
| Letter to Mr. Winkfield and Mr. Laird from Sterlington Pitt of Glenroe subject "Our Proposal No. B9102381 and enclosed Glenroe product literature titled "Product Profile, Radplane® Series 80 Rapid Response Electric Infrared Heater" and | Letter dated September 17, 1991; product literature copyright dated 1990 | |

925207.1

| Description | Date/Issue Date | Author/Inventor |
|---|---|---|
| "Temperature Control Systems For Electric Infrared Ovens And Heaters" | | |
| Deposition testimony of James R. McCulloch | | |
| Deposition testimony of William F. Laird | | |
| Deposition testimony of David S. Brookstein, Sc.D. | | |
| Deposition testimony of Wayne Turcotte | | |
| Deposition testimony of Susan Strouse | | |
| Deposition testimony of Charles L. Bunch | | |
| Deposition testimony of Moustafa T. Nour | | |
| Deposition testimony of Peter M. Hadley | | |
| Deposition testimony of Hemendra K. Shah | | |
| Deposition testimony of James R. Fulks | | |
| Deposition testimony of Ronald S. Perry, PhD. | | |
| Deposition testimony of Luther B. Madren | | |
| Affidavit of James R. McCulloch | August 7, 2003 | |
| Affidavit of William F. Laird | July 31, 2003 | |
| Affidavit of David Brookstein, Sc.D. | August 11, 2003 | |
| Affidavit of David Brookstein, Sc.D. | October 10, 2003 | |
| Affidavit of James R. McCulloch | October 14, 2003 | |
| Affidavit of Arnold Kaija | October 2003 | |
| Expert Report of Lawrence J. Goffney, Jr. | June 2, 2003 | |
| Expert Report of Professor Ronald S. Perry, PhD. | May 28, 2003 | |
| Expert Report of David Brookstein, Sc.D. | May 31, 2003 | |
| Corrected Expert Report of David Brookstein, Sc.D. | May 31, 2003 | |
| Expert Rebuttal Report of David Brookstein, Sc.D. | July 31, 2003 | |
| Expert Report of Peter J. Hauser, Ph.D. | June 2, 2003 | |
| Answers of Defendant, Microfibres, Inc. to Plantiff Intermark Fabric Corporation's First Set of Interrogatories | December 13, 2002 | |
| First Amended and Supplemental Answers of Defendant, Microfibres, Inc. to Plantiff Intermark fabric Corporation's First Set of Interrogatories | June 2, 2003 | |
| Answers of Defendant, Microfibres, Inc. to Plantiff Intermark Fabric Corporation's Second Set of Interrogatories | June 27, 2003 | |
| Memorandum of Law in Support of | July 21, 2003 | |

925207.1

| Description | Date/Issue Date | Author/Inventor |
|---|---|---|
| Plaintiff Intermark Fabric Corporation's Motion for Summary Judgment | | |
| Microfibres Inc.'s Objection to Intermark Fabric Corporation's Motion for Summary Judgment | August 11, 2003 | |
| Microfibres Inc.'s Memorandum of Law in Support of its Objection to Intermark Fabric Corporation's Motion for Summary Judgment | August 11, 2003 | |
| Plantiff, Intermark Fabric Corporation's Answers to Defendant, Microfibres, Inc.'s, First Set of Interrogatories | August 12, 2003 | |
| Plantiff, Intermark Fabric Corporation's First Amended Answers to Defendant, Microfibres, Inc.'s, First Set of Interrogatories | August 21, 2003 | |
| Plaintiff, Intermark Fabric Corporation's Memorandum of Law in Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment | August 25, 2003 | |
| Memorandum of Law in Support of Plaintiff Intermark Fabric Corporation's Motion for Summary Judgment Under 35 U.S.C. §§102 and 103 | September 22, 2003 | |
| Microfibres Inc.'s Objection to Intermark Fabric Corporation's Motion for Summary Judgment | October 14, 2003 | |
| Microfibres Inc.'s Memorandum of Law in Support of its Objection to Intermark Fabric Corporation's Motion for Summary Judgment Under 35 U.S.C. §§102 and 103 | October 14, 2003 | |
| Plaintiff, Intermark Fabric Corporation's Memorandum of Law in Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment Under 35 U.S.C. §§102 and 103 | October 28, 2003 | |
| Plaintiff's Motion for Leave to Correct the Record in Support of Plaintiff's Motion for Summary Judgment Under 35 U.S.C. §§102 and 103 | October 30, 2003 | |
| Plaintiff, Intermark Fabric Corporation's Second Amended Complaint | April 12, 2004 | |

925207.1